## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **HRGM CORPORATION** | * |
| **2020 Shannon Place, S.E.** | |
| **Washington, D.C. 20020,** | * |
| | |
| **and** | *    CASE NO: |
| | |
| **RAMESH BUTANI** | * |
| **1205 South Huntress Court** | |
| **McLean, Virginia 22102,** | * |
| | |
| **and** | * |
| | |
| **HANSA BUTANI** | * |
| **1205 South Huntress Court** | |
| **McLean, Virginia 22102,** | * |
| | |
|     **Plaintiffs,** | * |
| | |
|     **v.** | * |
| | |
| **ATLANTIC MUTUAL INSURANCE** | * |
| **COMPANY,** | |
| **Administrative Center** | * |
| **Three Giralda Farms** | |
| **Madison, New Jersey 07940-1004,** | * |
| | |
|     **Defendant.** | * |

\*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*

### NOTICE OF REMOVAL TO THE UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF COLUMBIA

Defendant, Atlantic Mutual Insurance Company ("Atlantic"), by and through its

undersigned counsel, and pursuant to 28 U.S.C. §§ 1441 and 1446 and Federal Rule of Civil

Procedure 81(c), files this Notice of Removal from the Superior Court of the District of

Columbia to the United States District Court for the District of Columbia, and, in support

thereof, states as follows:

1.    The Plaintiffs, HRGM Corporation and Ramesh and Hansa Butani (hereinafter referred to collectively as "Plaintiffs"), initiated the present action in the Superior Court for the District of Columbia, Civil Action No. 003206-07 against Atlantic on May 8, 2007.  In its Complaint, Plaintiffs seek declaratory judgment and assert claims for breach of contract and fiduciary duty.

2.    Defendant was served with the summons issued by the Superior Court for the District of Columbia on June 12, 2007.

3.    The Complaint alleges that Plaintiffs are residents of the District of Columbia.

4.    As set forth in the Complaint, Defendant's principal place of business is in Madison, New Jersey.  Thus, jurisdiction in this Court is proper by virtue of diversity of citizenship.

5.    The Complaint seeks compensatory and punitive damages against Defendant and alleges an amount in controversy in excess of $75,000.  The Complaint also seeks attorneys' fees and costs.  This cause of action is subject to this Court's jurisdiction pursuant to 28 U.S.C. §1332; and therefore, may be removed to this Court pursuant to 28 U.S.C. §1441(a).

6.    This notice is timely filed under 28 U.S.C. §1446(b).

7.    A true and correct copy of the Notice of Filing Notice of Removal, which has been filed in the Superior Court for the District of Columbia contemporaneously herewith, is attached hereto as Exhibit 1.

8.    Copies of all prior pleadings and papers filed in the Superior Court for the District of Columbia are attached hereto as Exhibit 2.

Respectfully submitted,

Niles, Barton & Wilmer LLP

Craig D. Roswell
Bar Number: 433406
cdroswell@niles-law.com
Brett A. Buckwalter
Bar Number: 478382
babuckwalter@niles-law.com
111 South Calvert Street, Suite 1400
Baltimore, MD 21202
410-783-6300
Facsimile 410-783-6363
*Attorneys for Defendant*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 29th day of June, 2007, a copy of the foregoing Notice

of Removal to the United States District Court for the District of Columbia was mailed, postage

prepaid, to:

Craig A. Holman
Arnold & Porter, LLP
555 12th Street, N.W.
Washington, D.C. 20004
*Attorney for Plaintiffs*

Brett A. Buckwalter

JS-44
(Rev.1/05 DC)

# CIVIL COVER SHEET

| I (a) PLAINTIFFS | DEFENDANTS |
|---|---|
| HRGM Corporation, Ramesh Butani, Hansa Butani | Atlantic Mutual Insurance Company |

| (b) COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF     Washington, D.C. <br> (EXCEPT IN U.S. PLAINTIFF CASES) | COUNTY OF RESIDENCE OF FIRST LISTED DEFENDANT    New Jersey <br> (IN U.S. PLAINTIFF CASES ONLY) <br> NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED |

| (c) ATTORNEYS (FIRM NAME, ADDRESS, AND TELEPHONE NUMBER) | ATTORNEYS (IF KNOWN) |
|---|---|
| Craig A. Holman, Esq. <br> Arnold & Porter, LLP <br> 555 Twelfth Street, N.W. <br> Washington, D.C. 2004   (202) 942-5000 | Craig D. Roswell, Esq. <br> Niles, Barton & Wilmer, LLP <br> 111 S. Calvert St., Suite 1400 <br> Baltimore, MD 21202   (410) 783-6300 |

## II. BASIS OF JURISDICTION
(PLACE AN x IN ONE BOX ONLY)

- ○ 1 U.S. Government Plaintiff
- ● 4 Diversity (Indicate Citizenship of Parties in item III)
- ○ 3 Federal Question (U.S. Government Not a Party)
- ○ 2 U.S. Government Defendant

## III CITIZENSHIP OF PRINCIPAL PARTIES (PLACE AN x IN ONE BOX FOR PLAINTIFF AND ONE BOX FOR DEFENDANT) FOR DIVERSITY CASES ONLY!

|  | PTF | DFT |  | PTF | DFT |
|---|---|---|---|---|---|
| Citizen of this State | ● 1 | ○ 1 | Incorporated or Principal Place of Business in This State | ○ 4 | ○ 4 |
| Citizen of Another State | ○ 2 | ○ 2 | Incorporated and Principal Place of Business in Another State | ○ 5 | ● 5 |
| Citizen or Subject of a Foreign Country | ○ 3 | ○ 3 | Foreign Nation | ○ 6 | ○ 6 |

## IV. CASE ASSIGNMENT AND NATURE OF SUIT
(Place a X in one category, A-N, that best represents your cause of action and one in a corresponding Nature of Suit)

- ○ **A. Antitrust**
  - ☐ 410 Antitrust

- ○ **B. Personal Injury/Malpractice**
  - ☐ 310 Airplane
  - ☐ 315 Airplane Product Liability
  - ☐ 320 Assault, Libel & Slander
  - ☐ 330 Federal Employers Liability
  - ☐ 340 Marine
  - ☐ 345 Marine Product Liability
  - ☐ 350 Motor Vehicle
  - ☐ 355 Motor Vehicle Product Liability
  - ☐ 360 Other Personal Injury
  - ☐ 362 Medical Malpractice
  - ☐ 365 Product Liability
  - ☐ 368 Asbestos Product Liability

- ○ **C. Administrative Agency Review**
  - ☐ 151 Medicare Act

  **Social Security:**
  - ☐ 861 HIA ((1395ff)
  - ☐ 862 Black Lung (923)
  - ☐ 863 DIWC/DIWW (405(g)
  - ☐ 864 SSID Title XVI
  - ☐ 865 RSI (405(g)

  **Other Statutes**
  - ☐ 891 Agricultural Acts
  - ☐ 892 Economic Stabilization Act
  - ☐ 893 Environmental Matters
  - ☐ 894 Energy Allocation Act
  - ☐ 890 Other Statutory Actions (If Administrative Agency is Involved)

- ○ **D. Temporary Restraining Order/Preliminary Injunction**

  Any nature of suit from any category may be selected for this category of case assignment.

  *(If Antitrust, then A governs)*

- ○ **E. General Civil (Other)**    OR    ○ **F. Pro Se General Civil**

**Real Property**
- ☐ 210 Land Condemnation
- ☐ 220 Foreclosure
- ☐ 230 Rent, Lease & Ejectment
- ☐ 240 Torts to Land
- ☐ 245 Tort Product Liability
- ☐ 290 All Other Real Property

**Personal Property**
- ☐ 370 Other Fraud
- ☐ 371 Truth in Lending
- ☐ 380 Other Personal Property Damage
- ☐ 385 Property Damage Product Liability

**Bankruptcy**
- ☐ 422 Appeal 28 USC 158
- ☐ 423 Withdrawal 28 USC 157

**Prisoner Petitions**
- ☐ 535 Death Penalty
- ☐ 540 Mandamus & Other
- ☐ 550 Civil Rights
- ☐ 555 Prison Condition

**Property Rights**
- ☐ 820 Copyrights
- ☐ 830 Patent
- ☐ 840 Trademark

**Federal Tax Suits**
- ☐ 870 Taxes (US plaintiff or defendant
- ☐ 871 IRS-Third Party 26 USC 7609

**Forfeiture/Penalty**
- ☐ 610 Agriculture
- ☐ 620 Other Food & Drug
- ☐ 625 Drug Related Seizure of Property 21 USC 881
- ☐ 630 Liquor Laws
- ☐ 640 RR & Truck
- ☐ 650 Airline Regs
- ☐ 660 Occupational Safety/Health
- ☐ 690 Other

**Other Statutes**
- ☐ 400 State Reapportionment
- ☐ 430 Banks & Banking
- ☐ 450 Commerce/ICC Rates/etc.
- ☐ 460 Deportation

- ☐ 470 Racketeer Influenced & Corrupt Organizations
- ☐ 480 Consumer Credit
- ☐ 490 Cable/Satellite TV
- ☐ 810 Selective Service
- ☐ 850 Securities/Commodities/Exchange
- ☐ 875 Customer Challenge 12 USC 3410
- ☐ 900 Appeal of fee determination under equal access to Justice
- ☐ 950 Constitutionality of State Statutes
- ☐ 890 Other Statutory Actions (if not administrative agency review or Privacy Act

| ○ **G.** *Habeas Corpus/ 2255* | ○ **H.** *Employment Discrimination* | ○ **I.** *FOIA/PRIVACY ACT* | ○ **J.** *Student Loan* |
|---|---|---|---|
| ☐ **530** Habeas Corpus-General<br>☐ **510** Motion/Vacate Sentence | ☐ **442** Civil Rights-Employment (criteria: race, gender/sex, national origin, discrimination, disability age, religion, retaliation)<br><br>*(If pro se, select this deck)* | ☐ **895** Freedom of Information Act<br>☐ **890** Other Statutory Actions (if Privacy Act)<br><br>*(If pro se, select this deck)* | ☐ **152** Recovery of Defaulted Student Loans (excluding veterans) |

| ○ **K.** *Labor/ERISA (non-employment)* | ○ **L.** *Other Civil Rights (non-employment)* | ○ **M.** *Contract* | ○ **N.** *Three-Judge Court* |
|---|---|---|---|
| ☐ **710** Fair Labor Standards Act<br>☐ **720** Labor/Mgmt. Relations<br>☐ **730** Labor/Mgmt. Reporting & Disclosure Act<br>☐ **740** Labor Railway Act<br>☐ **790** Other Labor Litigation<br>☐ **791** Empl. Ret. Inc. Security Act | ☐ **441** Voting (if not Voting Rights Act)<br>☐ **443** Housing/Accommodations<br>☐ **444** Welfare<br>☐ **440** Other Civil Rights<br>☐ **445** American w/Disabilities-Employment<br>☐ **446** Americans w/Disabilities-Other | ☐ **110** Insurance<br>☐ **120** Marine<br>☐ **130** Miller Act<br>☐ **140** Negotiable Instrument<br>☐ **150** Recovery of Overpayment & Enforcement of Judgment<br>☐ **153** Recovery of Overpayment of Veteran's Benefits<br>☐ **160** Stockholder's Suits<br>☒ **190** Other Contracts<br>☐ **195** Contract Product Liability<br>☐ **196** Franchise | ☐ **441** Civil Rights-Voting (if Voting Rights Act) |

---

**V. ORIGIN**

○ 1 Original Proceeding  ◉ 2 Removed from State Court  ○ 3 Remanded from Appellate Court  ○ 4 Reinstated or Reopened  ○ 5 Transferred from another district (specify)  ○ 6 Multi district Litigation  ○ 7 Appeal to District Judge from Mag. Judge

---

**VI. CAUSE OF ACTION** (CITE THE U.S. CIVIL STATUTE UNDER WHICH YOU ARE FILING AND WRITE A BRIEF STATEMENT OF CAUSE.)

Removal pursuant to 28 U.S.C. 1441, 1446; Complaint for Declaratory Judgment, Breach of Contract and Breach of Fiduciary Duty

---

**VII. REQUESTED IN COMPLAINT**     CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23     **DEMAND $** $3 million     Check YES only if demanded in complaint
**JURY DEMAND:**     YES ☒     NO ☐

**VIII. RELATED CASE(S) IF ANY**     (See instruction)     YES ☐     NO ☐     If yes, please complete related case form.

**DATE** 6/29/07     **SIGNATURE OF ATTORNEY OF RECORD** *[signature]*

---

### INSTRUCTIONS FOR COMPLETING CIVIL COVER SHEET JS-44
Authority for Civil Cover Sheet

The JS-44 civil cover sheet and the information contained herein neither replaces nor supplements the filings and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. Consequently a civil cover sheet is submitted to the Clerk of Court for each civil complaint filed. Listed below are tips for completing the civil cover sheet. These tips coincide with the Roman Numerals on the Cover Sheet.

I.  COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF/DEFENDANT (b) County of residence: Use 11001 to indicate plaintiff is resident of Washington, D.C.; 88888 if plaintiff is resident of the United States but not of Washington, D.C., and 99999 if plaintiff is outside the United States.

III.  CITIZENSHIP OF PRINCIPAL PARTIES: This section is completed *only* if diversity of citizenship was selected as the Basis of Jurisdiction under Section II.

IV.  CASE ASSIGNMENT AND NATURE OF SUIT: The assignment of a judge to your case will depend on the category you select that best represents the *primary* cause of action found in your complaint. You may select only *one* category. You *must* also select *one* corresponding nature of suit found under the category of case.

VI.  CAUSE OF ACTION: Cite the US Civil Statute under which you are filing and write a brief statement of the primary cause.

VIII.  RELATED CASES, IF ANY: If you indicated that there is a related case, you must complete a related case form, which may be obtained from the Clerk's Office.

Because of the need for accurate and complete information, you should ensure the accuracy of the information provided prior to signing the form.

## JOINT CONTROL TRUST ACCOUNT AGREEMENT

This Joint Control Trust Account Agreement ("Agreement") is made and entered into this 25th day of October 2004 (the "Effective Date"), by and among, HRGM Corporation (hereinafter referred to as the "Principal" or "HRGM"), and Ramesh Butani and Hansa Butani (hereinafter referred to collectively as the "Indemnitors"), and Atlantic Mutual Insurance Company (hereinafter referred to as the "Surety").

### RECITALS

WHEREAS, on or about September 28, 2001, the Principal and the Indemnitors executed an Agreement of Indemnity with the Surety (the "Agreement of Indemnity"), a copy of which is attached hereto as **Exhibit 1;**

WHEREAS, the Principal has entered into various construction contracts (the "Bonded Contracts") for which the Surety has executed certain Performance Bonds and Labor and Material Payment Bonds (the "Bonds") with various entities (the "Obligees") for the construction of various projects (the "Projects") as more fully set forth in a List of the Bonded Contracts, Projects and Bonds attached hereto as **Exhibit 2;**

WHEREAS, as required by the Bonded Contracts, and induced by and in reliance upon the execution of the Agreement of Indemnity by the Principal and the Indemnitors, the Surety executed certain Performance Bonds and Labor and Material Payment Bonds (the "Bonds") as more fully set forth in **Exhibit 2;**

WHEREAS, the Principal and the Indemnitors hereby acknowledge their execution of the Agreement of Indemnity and reaffirm their joint and several obligations and liabilities to the Surety thereunder;

WHEREAS, the Bonded Contracts are in various stages of completion, and the Principal and the Indemnitors hereby acknowledge and admit that: (a) the Principal is financially unable to perform or complete the performance of certain of the Bonded Contracts without the financial assistance of the Surety; (b) certain subcontractors and suppliers of labor and/or materials with respect to certain of the Bonded Contracts and Projects have filed suit claiming non-payment; (c) the Principal has requested the financial assistance of the Surety as a result of (a) and (b) above; and (d) but for the willingness of the Surety to enter into this Agreement, the Principal may be unable to complete the performance of certain of the Bonded Contracts and may be unable to pay certain of its subcontractors and suppliers of labor and/or materials with respect to the Bonded Contracts and Projects; and

WHEREAS, HRGM and Indemnitors have requested that Surety forbear from enforcing its rights under the Agreement of Indemnity, and Surety has agreed to forbear from enforcing its rights under the Agreement of Indemnity and under this Agreement provided that certain additional collateral is provided by the Indemnitors and subject to the conditions set forth in this Agreement.

EXHIBIT
A

# AGREEMENT

NOW, THEREFORE, for and in consideration of these premises and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, it is hereby mutually understood and agreed by and among the Principal, the Indemnitors and the Surety as follows:

## I.    Agreement to Fund Reasonable Settlements

1.    The Surety agrees that it will fund all reasonable settlements that Principal and Surety are able to negotiate with subcontractors, vendors and suppliers for claims arising in connection with the performance of the Bonded Contracts. In connection with any settlement that the Surety is asked to fund under this Agreement, the Surety shall have the right in its reasonable discretion to determine whether to settle or litigate the particular claims. All monies paid by the Surety in satisfaction of such settlements shall constitute advances under the Agreement of Indemnity and this Agreement.

## II.    Indemnification And Forebearance

1.    The Principal and the Indemnitors hereby acknowledge their execution of the Agreement of Indemnity and reaffirm their joint and several obligations and liabilities to the Surety thereunder.

2.    Nothing contained in this Agreement and done pursuant hereto shall in any way impair, alter or modify any and/or all of the rights and remedies of the Surety against the Principal and/or the Indemnitors under or in connection with the Agreement of Indemnity, except that Surety has agreed, under certain conditions, as further provided below, to forbear for a specified period of time from enforcing its rights and remedies under the Agreement of Indemnity.

3.    In the event that the Surety makes any payments under the Bonds, or in accordance with the terms of this Agreement or the Agreement of Indemnity, for which Surety has not received payment or repayment from the Principal, the Indemnitors, or a third party (e.g., a project owner), interest shall accrue on the outstanding balance of the amounts paid by the Surety at an annual rate of interest equal to the Prime Rate published by the Wall Street Journal on the Effective Date plus 2 percent; provided that the rate of interest shall be adjusted based on the Prime Rate published by the Wall Street Journal on the first anniversary of the Effective Date and on each anniversary thereafter until the amounts are paid in full.

4.    The Principal's obligations to the Surety under the Agreement of Indemnity and under this Agreement shall be secured by (i) all of the collateral pledged by the Principal in the Agreement of Indemnity, including but not limited to Section 12 of the Agreement of Indemnity, to secure Principal's obligations under the Agreement of Indemnity, and by all of the monies of the Trust Account (hereinafter defined), which collateral is collectively hereinafter referred to as the "Original Collateral." To further secure their obligations under the Agreement of Indemnity and this Agreement, the Indemnitors hereby grant to Surety security interests and liens (as indicated in **Exhibit 3**) in the following (collectively the "Additional Collateral"): (i) Lot 1027, Square 5771 -

2021 Shannon Place, S.E., Washington, D.C. 20020; (ii) Lot 1026, Square 5771 - 2021 Shannon Place, S.E., Washington, D.C. 20020; (iii) 700 New Hampshire Ave., N.W., Unit 615, Washington, D.C. 20037; (iv) Condominium, 3819 South George Mason Drive, Falls Church, Virginia; (v) Unit 23 Tyco Park, Fairfax County, Virginia; (vi) 4445 B Brookfield Corporate Drive, Chantilly, Virginia; (vii) Harborside Altantis Vacation Timeshare in Paradise Island, Bahamas; and (viii)          Account of Annuity (Account No.                    ).    (Surety acknowledges that certain of the foregoing properties have previously been pledged to financing institutions or Selective Insurance Company of America ("Selective") and Surety agrees not to take any action inconsistent with the prior interests of the financing institutions or Selective in such properties.)  If Surety subsequently becomes oversecured with respect to the liabilities of Principal and Indemnitors to Surety, Surety (at HRGM's request or requests) will release its security interests and liens in one or more pieces of the Additional Collateral such that Surety at its discretion remains fully secured (but not oversecured).   Surety will release the security interests and liens in the following order:  (i) Unit 23, Tyco Park, Fairfax County, Virginia; (ii) 4445 B Brookfield Corporate Drive, Chantilly, Virginia; (iii) Lot 1027, Square 5771 - 2021 Shannon Place, S.E., Washington, D.C. 20020; (iv) Lot 1026, Square 5771 - 2021 Shannon Place, S.E., Washington, D.C. 20020; (v) 700 New Hampshire Ave., N.W., Unit 615, Washington, D.C. 20037; (vi) Condominium, 3819 South George Mason Drive, Falls Church, Virginia; (vii)         Account of Annuity (Account No.                    ); and (viii) Harborside Atlantis Vacation Timeshare in Paradise Island, Bahamas.  Nothing in the foregoing provision shall require Surety to release a property if such release would leave Surety undersecured with respect to the liabilities of Principal and Indemnitors to Surety under this Agreement and the Agreement of Indemnity.

5.    As part of this Agreement, and with the consent and approval of the Indemnitors, the Principal agrees, at the subsequent request of the Surety should Surety deem such request necessary, to execute voluntary letters of default and termination (the "Letters of Default") addressed to the Obligees for one or more of the Bonded Contracts and Projects shown on the List of the Bonded Contracts, Projects and Bonds attached as **Exhibit 2**, a sample copy of which is attached hereto as **Exhibit 4**.  In accordance with the terms of the Agreement of Indemnity and this Agreement, the Surety may use the Letters of Default on each Bonded Contract and Project, individually as to each separate Bonded Contract or as to all of the Bonded Contracts, in the sole option and discretion of the Surety, whether or not there is a default under any of the Bonded Contracts, the Agreement of Indemnity or this Agreement.  A failure to execute one or more of such letters on Surety's request shall constitute a material breach of this Agreement under paragraph II.11.c.  Such letters shall not constitute an admission or recognition by HRGM that HRGM is in default on any of the Bonded Contracts but instead are provided to allow Atlantic an additional measure of control with respect to the Bonded Contracts.

6.    Principal will take whatever steps Surety may reasonably request to allow Surety to resolve Surety's outstanding obligations under its performance bonds and collect all outstanding receivables on the projects for which Surety has issued performance bonds.

7.    Principal and the Indemnitors agree that all monies received from any owner on any project for which Surety issued performance and payment bonds, including any net proceeds

JOINT CONTROL TRUST ACCOUNT AGREEMENT  - Page 3

REDACTED

received by Principal or Indemnitors for claims Principal currently believes that it has against owners on projects for which Surety issued performance and payment bonds, will be paid to Surety and within ten (10) business days of Principal's or Indemnitors' receipt of such monies or claims payments and applied by Surety to reimburse itself for all losses, costs, advances, or expenses Surety has incurred under the Agreement of Indemnity or this Agreement, until Surety has been fully reimbursed for all such losses, costs, advances, or expenses. Thereafter, all such monies and recoveries shall be retained by Principal. (For purposes of this Agreement, net proceeds from claims shall mean the gross proceeds from claims on a specific Bonded Contract less any amounts deducted or withheld for a counter-claim, cross-claim or other defensive claim on the specific Bonded Contract for which Surety is or could be held liable, any applicable taxes, attorneys' fees and expenses owed to HRGM's counsel in matters related to the specific Bonded Contract or for which Surety has agreed to pay HRGM's counsel, supplier or subcontractor balances associated with the claims on the Bonded Contract, fees and expenses owed to consultants/expert witnesses, and any other claim costs following Surety's review and consent, with such consent not to be unreasonably withheld.)

8.    Principal and the Indemnitors agree that any unpaid contract balances, proceeds of change orders, or any funds which are paid by the Obligees on account of Bonded Contracts will be paid to Surety and Surety shall (in the following agreed to order of application): (i) use such amounts to discharge the obligations of Principal and Surety, if any, under the involved Bonds and Projects; (ii) apply those payments to pay down the amounts of any advances to Principal under this Agreement or the Agreement of Indemnity and to reimburse Surety for any other loss, cost, or expense which Surety incurs and for which Principal and Indemnitors are obligated to pay Surety in accordance with the Agreement of Indemnity and this Agreement. Once all advances, losses, costs and expenses have been repaid, Principal shall thereafter be entitled to retain all such funds and have returned to it any excesses paid to Surety. After the execution of this Agreement, Surety agrees to promptly provide to HRGM copies of all invoices from Surety's counsel and from consultants retained by Surety or its counsel, which Surety contends are advances, losses, costs or other charges that are subject to reimbursement by HRGM or the Indemnitors, subject to the terms and conditions of the Agreement of Indemnity. Thereafter, subject to the elimination of privileged communication, Surety will send all such future invoices within thirty (30) days of Surety's receipt of such invoices.

9.    Attached hereto and incorporated herein as **Exhibit 3, Attachment A** is the Indemnitors' current financial statement. The Indemnitors hereby agree and acknowledge that Surety executed this Agreement and agreed to advance funds to Principal, in part, based upon the representations contained in the attached financial statement.

10.    If, by January 2, 2007 ("Reimbursement Deadline"), the Surety has not been fully reimbursed for all advances it has made under the Agreement of Indemnity or this Agreement and for any other loss, cost, or expense which it has incurred and for which HRGM and Indemnitors are obligated to pay Surety in accordance with the Agreement of Indemnity (collectively the "Surety Advances"), then commencing on the Reimbursement Deadline, and on the first day of each month thereafter until the Surety Advances have been paid in full, HRGM shall commence making monthly payments to Surety in an amount sufficient to repay the outstanding balance of the Surety Advances as of the Reimbursement Deadline in twenty four

(24) equal monthly payments of principal and interest assuming no additional payments are made pursuant to this Agreement after the Reimbursement Deadline. If any other payments are made to Surety pursuant to this Agreement after the Reimbursement Deadline, then on each such occasion ("Adjustment Date") the amount of the monthly payments thereafter required shall be adjusted downward, and shall be the amount of monthly payments necessary to pay off the outstanding balance of the Surety Advances as of the Adjustment Date by the twenty fourth (24th) month after the Reimbursement Deadline.

11.    The Surety agrees to forbear from exercising any of its rights and remedies against HRGM and the Indemnitors (whether collectively or separately) under either the Agreement of Indemnity or this Agreement or otherwise until the day which is twenty four (24) months after the Reimbursement Deadline; subject however, to the following acts of default:

a.    HRGM or the Indemnitors' failure to timely make any payments required under this Agreement, if such default is not cured within ten (10) business days after HRGM and the Indemnitors receive notice from Surety of such default;

b.    Any default under the Agreement of Indemnity which is not cured within ten (10) business days after HRGM and the Indemnitors receive notice from Surety of such default, other than HRGM and the Indemnitors': (i) failure to indemnify Surety; (ii) failure to reimburse Surety for any advances, losses, costs, or expenses which HRGM and the Indemnitors are liable to reimburse Surety under the terms of the Agreement of Indemnity; (iii) failure to cure any defaults under any construction contracts bonded by Surety; (iv) failure to pay subcontractors and suppliers which may be owed funds on any contract bonded by Surety; and (v) failure to comply with any other provision of the Agreement of Indemnity which relates to HRGM's failure to meet its monetary obligations under the Agreement of Indemnity;

c.    Any other material default by Principal under this Agreement that is not cured within ten (10) business days after HRGM and the Indemnitors receive notice from Surety of such default;

d.    Any material default of an agreement with any other lender or entity that has extended credit to either HRGM or the Indemnitors, excluding Selective, except as provided in (e), below, and subcontractors and suppliers of HRGM, which default has not been cured within any applicable cure periods and that is not cured by HRGM within ten (10) business days after HRGM and the Indemnitors receive notice from Surety of such default; and

e.    Any material default under the Agreement between HRGM and Selective dated July 30, 2004 that is not cured within any applicable cure periods and that is not cured by HRGM within ten (10) business days after HRGM and the Indemnitors receive notice from Surety of such default

In the event of any act of default as recited above, not cured within ten (10) business days from notice of Surety, then Surety's obligation to forebear as set forth herein shall terminate.

## III.    Establishment of Joint Control Trust Checking Account

1.    The Principal and the Surety shall open and establish a joint control trust checking account (the "Trust Account") in Commerce Bank the New Jersey Branch (the "Bank") in the name of "HRGM Special Operating Account." The Principal authorizes the Bank to establish the Trust Account. The Principal shall not open any other trust account(s) related to the Bonded Contracts, the Projects, or the Contract Funds without the express knowledge and consent of the Surety, which consent will not be unreasonably withheld. Upon written request of the Surety, Principal shall provide Surety with a listing of its trust accounts then in place.

2.    For the purposes of this Agreement, "Contract Funds" shall mean any and all monies payable to or received by the Principal under or in connection with the Bonded Contracts, including but not limited to monies earned and to be earned, payment of retained percentages and final payments due or to become due to the Principal of every kind or nature under the Bonded Contracts, including payments for all extras, net proceeds of claims, bonuses and/or of any other kind or nature which may be received by the Principal from the Bonded Contracts.

3.    The Principal, with the agreement of the Surety and the Indemnitors, shall execute Letters of Direction addressed to the Obligees, a sample copy of which is attached hereto as **Exhibit 5**, directing that all Contract Funds from the Bonded Contracts be made payable jointly to the Principal and the Surety, and mailed to the Surety at:

> Atlantic Mutual Insurance Company
> Administrative Center
> Three Giralda Farms
> Madison, NJ 07940 1004
> Attention: Michael J. Hurley, Esquire
>     Assistant Vice President – Surety Claims.

4.    The Principal, the Indemnitors and the Surety agree to deposit or cause to be deposited in the Trust Account all Contract Funds from the Bonded Contracts collected by the Principal or the Surety, and all monies which the Surety may, in its sole discretion and/or in accordance with the terms and conditions of this Agreement or the Agreement of Indemnity, advance or loan to the Principal. The Principal and the Indemnitors acknowledge and agree that all funds on deposit in the Trust Account are the sole property of Atlantic for use as set forth in this Agreement; provided, however, that any amounts above the amounts due to Atlantic under this Agreement or the Agreement of Indemnity shall be returned to HRGM. Unless and until all amounts due to Surety under the Agreement of Indemnity and this Agreement and satisfied, the Contract Funds shall not be deposited in any other account of the Principal without the express consent of the Surety.

5.    Pursuant to the Power of Attorney attached hereto and incorporated herein by reference as **Exhibit 6**, the Surety, through its authorized representatives, is authorized and empowered to endorse in the name of the Principal any and all checks received by the Surety or its representatives constituting Contract Funds from the Bonded Contracts, and to deposit said checks solely and only into the Trust Account. The Principal hereby agrees that the Surety may name one or more substitutes for the attorneys named in the Power of Attorney, with notice to the Principal.

JOINT CONTROL TRUST ACCOUNT AGREEMENT   - Page 6

Furthermore, the Principal hereby ratifies and confirms all acts that any attorney or his substitute or substitutes may lawfully do or cause to be done by virtue of the Power of Attorney contained in **Exhibit 6**.

6.      Unless and until such time as all amounts due to the Surety under this Agreement and the Agreement of Indemnity are satisfied, the Contract Funds are hereby irrevocably segregated, earmarked and set aside solely and only for the purposes set forth in this Agreement. The Contract Funds and all other monies deposited in the Trust Account shall be considered and constituted as trust funds for the purposes set forth in this Agreement. The Principal shall hold all Contract Funds in the Trust Account in trust for the Surety separate and apart from all other funds and property of the Principal. The Principal hereby covenants and agrees that it will not knowingly permit any funds in the Trust Account, whether represented by checks, vouchers, orders or otherwise, to be used for any purpose other than as more particularly set forth in this Agreement, unless and until all amounts due to the Surety under this Agreement and the Agreement of Indemnity are satisfied or unless otherwise expressly agreed to by Surety.

7.      Except as provided in Section III, paragraph 13 of this agreement, all checks and charges against the Trust Account shall be required to have two signatures, one signature being that of an authorized representative of the Principal and the other by an authorized representative of the Surety. The Principal and the Surety mutually agree that they will work in conjunction with the Bank to establish such other means and methods of transferring funds from the Trust Account so long as such means or methods require the consent of both the Principal and the Surety for any withdrawal or transfer of funds from the Trust Account. The Principal is restricted from making any wire transfers, use of counter-checks, or other non-check transfers from the Trust Account without the express written approval of the Surety.

8.      The persons now designated to sign checks or approve transfers on the Trust Account on behalf of the Surety are any one of the following: 1) Michael J. Hurley; 2) Nancy Manno, 3) William Welsh, 4) Judy Gimson, and 5) David D. Gilliss. It is understood and agreed that the Surety may, in its sole discretion, substitute or add another representative or representatives for the persons originally named, without the prior consent of, but upon notice to the Principal and the Bank.

9.      The persons now designated to sign checks or approve transfers on the Trust Account on behalf of the Principal are: 1) Ramesh Butani; and 2) Rachna Butani. It is understood and agreed that the Principal may substitute or add another representative or representatives for the persons originally named, but only with the approval in writing of the Surety and the Indemnitors, and upon notice to the Bank.

10.      The Principal hereby agrees that any Contract Funds it may receive contrary to the Letters of Direction sent to the Obligees (see sample attached as **Exhibit 5**) or because of the Principal's failure to promptly issue such Letters of Direction or for any other reason shall be held as trust funds by the Principal and shall be immediately presented to a representative of the Surety for deposit in the Trust Account.

11    The Surety shall maintain possession of the checkbook for the Trust Account. The Surety shall receive directly from the Bank all bank statements and the originals of all deposit slips, canceled checks, debit memos, service charges, etc. from the Trust Account. The Principal hereby authorizes the Bank to furnish to the Surety such information as the Surety may desire concerning deposits to and withdrawals from the Trust Account. The Principal also authorizes the Obligees to furnish to the Surety complete information concerning payments made to the Principal of Contract Funds from the Bonded Contracts and to furnish any other information concerning the Bonded Contracts which the Surety may require. Upon request from the Principal, the Surety shall furnish to the Principal copies of all bank statements and checks which have been returned.

12.    None of the Contract Funds deposited in the Trust Account shall be subject to any right of set-off by the Bank as a result of any transactions involving the Bank, the Principal and/or the Indemnitors, nor be assigned or diverted from the uses or purposes set forth in this Agreement. The Surety may require of the Bank a written acknowledgment of this paragraph as a condition to the establishment or continuance of the Trust Account at the Bank.

13.    Subject to the Surety's obligation to forbear from exercising its rights and remedies under Section II above, the Principal hereby authorizes and empowers any two of the signators of the Surety on the Trust Account to sign one or more checks from the Trust Account, and, at the sole option and discretion of the Surety, to withdraw all or a portion of the trust funds from the Trust Account, which Trust funds shall be applied toward satisfaction of Principal's obligations to Surety under the Agreement of Indemnity, the Bonds, or the Bonded Contracts. It is expressly understood by and between the Principal and the Surety that the Bank shall have no duty to make inquiry as to the purpose of any transfer or check from the Trust Account, whether made or done pursuant to this paragraph or any other provision of this Agreement.

14.    At its sole option and discretion, the Surety may notify the Bank in writing, by wire or orally (wire or oral notice shall be confirmed in writing as soon as practicable) to stop payment on and not to honor any checks drawn against the Trust Account after the receipt of such notice unless said check or checks are made payable to the Surety and signed by any two of the signators of the Surety on the Trust Account as provided in Section III, paragraph 8 above. The Principal hereby acknowledges to the Bank that the Principal may not issue a stop-payment request on any check drawn on the Trust Account without the express written approval of the Surety presented to the Bank.

15.    All fees assessed by the Bank with respect to the Trust Account shall be the joint and several obligation of the Principal and the Surety.

## IV.    Use of the Contract Funds from the Trust Account

1.    The Contract Funds contained in the Trust Account shall be used solely (unless otherwise agreed to by the Surety) for the payment of all labor and material costs, including amounts due to laborers, subcontractors and suppliers and for rental of equipment from others which is actually used in the prosecution of the work under the Bonded Contracts, incurred by the Principal, and the Principal's subcontractors and suppliers, which are necessary to complete the work under the Bonded Contracts and for which the Surety may become liable under the Bonds.

Any excess amounts in the Trust Account shall be used to repay Surety advances, losses, costs, or expenses as set forth in Section II of this Agreement and otherwise returned to the Principal. The Principal agrees that it will not use or rent any of its equipment or machinery in any manner which will interfere with or delay the prompt completion of the Bonded Contracts. It is specifically understood and agreed by the Principal, the Indemnitors and the Surety that the Contract Funds contained in the Trust Account shall not be used to pay the obligations of the Principal on contracts not bonded by the Surety.

2.     The Surety is not obligated to pay or cause to be paid any of the overhead and general and administrative expenses of the Principal. The Surety, at its option and sole discretion, may consent to the use of funds from the Trust Account to pay all or a portion of the Principal's overhead and general and administrative expenses. The Principal acknowledges, agrees and consents that the Surety reserves the right to reject the payment of any bill(s) requested by the Principal pursuant to the procedures described below if the Surety deems, in its sole discretion, that the requested payment or payments are for the overhead and general and administrative expenses of the Principal.

3.     On a monthly basis, the Principal shall provide to the Surety a budget of its anticipated revenues from the Bonded Contracts and estimated expenses for labor, materials, subcontractor payments and any other payments, including the overhead and general and administrative expenses described in Section IV, paragraph 2 above, that the Principal anticipates will be requested from the Trust Account.

4.     Absent other mutually agreeable arrangements which must be reduced to a written document between and among the Principal, the Indemnitors and the Surety, the procedure for the payment of the Principal's bills on the Bonded Contracts, including its direct payroll, shall be as follows:

(a)     On a weekly basis or as otherwise required, the Principal shall provide to the representative of the Surety the following information:

(i)     A summary sheet listing all of the invoices to be paid, broken down by Bonded Contract, showing the person to be paid, the amount to be paid, the date to be paid, and the total payments to all payees. The Principal shall designate on the summary sheet those invoices it believes should receive priority for payment in the event that the Contract Funds in the Trust Account are insufficient to pay all of the invoices submitted for payment. The Principal shall sign off its approval of the summary sheet and the payments described therein;

(ii)     A copy of each invoice to be paid, showing the Bonded Contract for which the invoice was incurred, along with a copy of all necessary supporting documentation for the invoice;

(iii)     A check request to the Surety to be drawn from the Trust Account, said check request clearly indicating the specific invoices to be paid and the Bonded Contracts for which the invoices are being paid;

(iv)    If requested by the Surety, a partial waiver and release in a form acceptable to the Surety in the amount of the check, which must be signed by the payee and returned to the Surety.

(b) The Principal represents and warrants that all invoices shown on the summary sheet and all check requests from the Trust Account presented to the Surety's representative are for the purposes authorized by this Agreement, and that the amount of any such invoice and/or check request is currently due and owing to the payee named therein.

(c) The representative of the Surety shall review all of the invoices and back-up information provided above and sign off his or her approval on the summary sheet for all of the invoices that the Surety agrees are to be paid from the Trust Account. The representative of the Surety shall not be obligated to pay or approve the payment of invoices according to the priorities designated by the Principal on the summary sheet. The representative of the Surety shall receive from the Principal for the Surety's records an originally signed copy of the summary sheet along with a copy of the invoice and the backup information, said records to be kept and maintained by the representative of the Surety.

(d) In the event that there are Contract Funds sufficient in the Trust Account to cover those payments which have been approved, the representative of the Surety shall sign the checks drawn on the Trust Account on behalf of the Surety, and mail the checks, along with copies of the partial waiver and release forms if required, to the Principal.

(e) Once the Principal has received the checks, the checks shall be signed by an authorized signator of checks for the Principal drawn on the Trust Account, and mailed, along with the partial waiver and release forms if required, to the named payees of the check drawn to pay the invoice.

(f) It is expressly understood by the Principal and the Indemnitors that should the Surety or its representative disapprove any payments requested by the Principal or any check requests by the Principal or refuse to sign any check drawn on the Trust Account, such decision is final as to the Principal and the Indemnitors, and the Principal and the Indemnitors shall have no right or cause of action of any kind or nature against the Surety, its agents, employees, attorneys or representatives as a result of such disapproval.

(g) In the event that the Contract Funds in the Trust Account are insufficient to cover those payments which have been requested by the Principal and approved by the representative of the Surety, the Surety reserves the right, in its sole option and discretion, to advance monies, loan monies or otherwise fund the Principal or the Trust Account. Any such advances to, loans to or funding of the Principal or the Trust Account by the Surety shall be at the written request of the Principal, and signed by a representative of the Principal. In the event that the Surety advances to, loans to or otherwise funds the Principal or the Trust Account at the request of the Principal:

(i)    Any such advances to, loans to or funding of the Principal or the Trust Account by the Surety shall be conclusively presumed to be a loss to the Surety, notwithstanding the use or misuse of such advances or loans by the Principal, for which the Principal and the

Indemnitors shall be obligated to indemnify the Surety in accordance with the terms of the Agreement of Indemnity and this Agreement;

(ii)    All monies advanced to, loaned to or otherwise used to fund the Principal or the Trust Account by the Surety shall constitute and be deemed trust funds in accordance with the terms of this Agreement; and

(iii)    Any such advances to, loans to or funding of the Principal or the Trust Account by the Surety shall also be deemed to be a payment by the Surety under its Bonds for which interest shall run in accordance with the provisions of this Agreement.

(iv)    In the event that the Surety refuses to advance monies, loan monies or otherwise fund the Principal or the Trust Account, the Surety may, in its sole discretion, send only such checks drawn on the Trust Account to the payees as the Surety deems necessary and expedient under the circumstances.

(h)    On a bi-weekly basis, the Principal shall provide to the representative of the Surety for approval the payroll for the Bonded Contracts bonded by the Surety for the Principal (the "Payroll"), broken down by Bonded Contract, including the net pay for each employee, taxes to be withheld, and all other deductions. In the event that there are sufficient Contract Funds in the Trust Account, upon the approval by the Surety of the Payroll of the Principal, the Principal and the Surety shall take all steps necessary to fund the presently existing payroll account of the Principal from the Trust Account. It shall be the responsibility of the Principal, through its payroll company, to present the net Payroll checks to its employees directly rather than through the representative of the Surety.

(i)    Payment of all withholding and payroll taxes and other amounts deducted from employee wages under the Bonded Contracts from the date of this Agreement forward shall be made on a priority basis directly from the existing payroll account of the Principal or by the Principal's payroll company to the appropriate payee(s) for all withholding and payroll taxes and other normal payroll burden expenses. It shall be the responsibility of the Principal, within the time limits of all appropriate statutes and regulations, to prepare and pay all such taxes and other deductions from the Payroll, from the existing payroll account of the Principal to the appropriate payee(s) or with an appropriate deposit slip to the correct account to receive the appropriate check(s). Surety agrees to and HRGM hereby consents to Surety's right to obtain from HRGM's payroll company information, documentation or certification that the net pay for each employee, taxes to be withheld, and all other deductions have been paid.

5.    The Surety and the representative(s) of the Surety shall incur no liability to the Principal or to any other person in connection with the due discharge of their duties under this Agreement.

### V.    Miscellaneous Provisions

1.    This Agreement shall be construed and governed by the laws of the State of Maryland and shall bind the heirs, personal representatives, assignees and successors in interests of the parties hereto.

2.    The Principal, the Indemnitors and the Surety hereby represent, covenant and warrant that they have full right, power and authority, uninhibited by contract or otherwise, to execute and perform this Agreement, that the Principal and the Surety have been duly authorized by all proper and necessary corporate action, and that all consents and approvals of stockholders or of any public authority or regulatory body required as a condition to the validity or enforceability of this Agreement against the Principal and the Surety have been obtained. Furthermore, the Principal, the Indemnitors and the Surety hereby represent, covenant and warrant that the execution of this Agreement and the full performance of this Agreement will not result in the breach of or default under any agreement to which they may be a party.

3.    THE PRINCIPAL AND THE INDEMNITORS HEREBY ACKNOWLEDGE AND AGREE THAT, EXCEPT AS PROVIDED HEREIN, THE SURETY HAS NO OBLIGATION TO FUND THE TRUST ACCOUNT, PROVIDE FINANCIAL ASSISTANCE TO THE PRINCIPAL IN ANY MANNER OR METHOD, OR MAKE ANY PAYMENTS OTHER THAN THOSE PAYMENTS FOR WHICH THE SURETY HAS SPECIFICALLY AGREED TO MAKE PURSUANT TO THE TERMS OF THIS AGREEMENT. THE PRINCIPAL AND THE INDEMNITORS SPECIFICALLY ACKNOWLEDGE AND AGREE THAT THEIR EXECUTION OF THIS AGREEMENT HAS NOT BEEN INDUCED BY OR MADE IN RELIANCE UPON ANY ORAL OR WRITTEN REPRESENTATIONS BY THE SURETY OR ITS AGENTS, EMPLOYEES, ATTORNEYS OR CONSULTANTS THAT THE SURETY WILL FUND THE TRUST ACCOUNT OR PROVIDE ANY FINANCIAL ASSISTANCE TO THE PRINCIPAL EXCEPT AS PROVIDED HEREIN. IN THE EVENT THAT THE SURETY AGREES TO FUND THE TRUST ACCOUNT, PROVIDE FINANCIAL ASSISTANCE TO THE PRINCIPAL IN ANY MANNER OR METHOD, OR MAKE ANY PAYMENTS OTHER THAN THOSE PAYMENTS FOR WHICH THE SURETY HAS SPECIFICALLY AGREED TO MAKE PURSUANT TO THE TERMS OF THIS AGREEMENT, SAID ACTION SHALL BE IN THE SOLE JUDGMENT, OPTION AND DISCRETION OF THE SURETY AND IN THE BEST INTERESTS OF THE SURETY AND NOT THE PRINCIPAL OR THE INDEMNITORS. FURTHERMORE, THE SURETY'S AGREEMENT TO TAKE ANY SUCH ACTION DOES NOT BIND AND COMMIT THE SURETY TO ANY OTHER FUNDING OF THE TRUST ACCOUNT, PROVIDING OF FINANCIAL ASSISTANCE, OR MAKING OF ANY PAYMENTS OTHER THAN THOSE PAYMENTS FOR WHICH THE SURETY HAS SPECIFICALLY AGREED TO MAKE PURSUANT TO THE TERMS OF THIS AGREEMENT.

4.    THE EXECUTION OF THIS AGREEMENT BY THE SURETY IN NO MANNER BINDS THE SURETY TO EXECUTE ANY FUTURE BOND OR BONDS ON BEHALF OF THE PRINCIPAL. THE PRINCIPAL AND THE INDEMNITORS SPECIFICALLY ACKNOWLEDGE AND AGREE THAT THEIR EXECUTION OF THIS AGREEMENT HAS NOT BEEN INDUCED BY OR MADE IN RELIANCE UPON ANY ORAL OR WRITTEN REPRESENTATIONS BY THE SURETY OR ITS AGENTS, EMPLOYEES, ATTORNEYS OR CONSULTANTS THAT THE SURETY WILL EXECUTE ANY FUTURE BOND OR BONDS ON BEHALF OF THE PRINCIPAL. IN THE EVENT THAT THE SURETY

EXECUTES ANY FUTURE BOND OR BONDS ON BEHALF OF THE PRINCIPAL, ANY SUCH BOND SHALL BE DEEMED INCLUDED IN THE LIST OF BONDED CONTRACTS, PROJECTS AND BONDS ATTACHED HERETO AS **EXHIBIT 2** AND SHALL BE SUBJECT TO THE TERMS AND PROVISIONS OF THIS AGREEMENT.  THE EXECUTION OF BONDS BY THE SURETY FOR THE PRINCIPAL WHILE THIS AGREEMENT IS IN EFFECT SHALL BE IN THE SOLE JUDGMENT, OPTION AND DISCRETION OF THE SURETY, PURSUANT TO ITS UNDERWRITING POLICIES AND PROCEDURES, AND SHALL BE IN THE BEST INTERESTS OF THE SURETY AND NOT THE PRINCIPAL. THE AGREEMENT BY THE SURETY TO EXECUTE ANY ONE BOND IN ACCORDANCE WITH THIS PARAGRAPH DOES NOT BIND AND COMMIT THE SURETY TO EXECUTE ANY OTHER BOND OR BONDS AT THE REQUEST OF THE PRINCIPAL.

5.    The Principal shall maintain accurate books, records and accounts showing clearly, among other things, the itemized receipts and disbursements allocable to the Bonded Contracts. The books, records and accounts shall be available for examination by the Surety and its representatives at the Principal's principal office at all times during regular business hours. The Surety is entitled to receive copies of all bank account records of any and all accounts of the Principal, including but not limited to the Trust Account, of any kind or nature, including canceled checks, bank statements, deposit slips, debit memos, etc.

6.    The Principal hereby authorizes the Surety and its representative(s), including attorneys, accountants, consultants or employees, to visit at any time the job site of the Bonded Contracts, to obtain at any time access to all job records and personnel of the Principal to determine the status of the progress on the Bonded Contracts, and to obtain at any time any and all other information and documentation with respect to the Bonded Contracts deemed necessary in the sole discretion of the Surety and/or its representative(s).

7.    The Principal agrees to use all reasonable efforts to complete the Bonded Contracts on a timely basis.

8.    It is further agreed that this Agreement is solely for the benefit of the parties hereto and shall not create any rights in any person not a party hereto, or in any way increase the rights of third persons, or increase the obligations of any party hereto to any third person, or increase the liability or obligations of the Surety under its Bonds.

9.    The terms and provisions of the Agreement of Indemnity shall remain in full force and effect, subject to the agreement to forbear set forth in Section II. Nothing contained in this Agreement shall in any way prejudice or waive the legal and equitable rights of subrogation of the Surety. Subject to the agreement to forbear set forth in Section II, the rights of the Surety under this Agreement are in addition to, and not in lieu of, any of the rights which the Surety may have against the Principal or any other parties, including the Indemnitors, at law, in equity or by the terms of any other agreement, including the Agreement of Indemnity. All rights of the Surety pursuant to the Agreement of Indemnity and this Agreement shall inure to the benefit of the Surety, its co-sureties, if any, and its and their reinsurers.

10.    HRGM and the Indemnitors, for themselves, their heirs, successors, executors and

assigns do hereby waive and forever relinquish, and they do hereby release the Surety, its parent, affiliates and subsidiary companies, their officers, directors and employees, their agents and any professionals employed by it in connection with any of the matters set forth herein, or with respect to the Indemnity Agreements or any of the Bonds, from, any and all claims and causes of action which they now have, whether known or unknown, including, but not limited to, claims of fraud, fraud in the inducement, extortion, tortious or contractual interference, domination, lender liability or the like or any breach of any alleged obligation of Surety, its parent, affiliates and subsidiary companies to issue bonds on behalf of or to otherwise act toward or for the benefit of HRGM or Indemnitors.

11.    The Principal agrees to provide its full and complete cooperation to the Surety in any and all future litigation involving the Bonded Contracts and the Bonds.

12.    It is agreed and understood by the Principal, the Indemnitors and the Surety that there have been no oral or other agreements of any kind whatsoever as a condition precedent or to induce the execution and delivery of this Agreement by any party hereto. It is further agreed that no change, addition or amendment shall be made herein or to any of the terms, covenants or conditions hereto except by writing, signed by the parties to this Agreement.

13.    In the event that one or more provisions of this Agreement shall be declared to be invalid, illegal or unenforceable in any respect, unless such invalidity, illegality or unenforceability shall be tantamount to a failure of consideration, the validity, legality and enforceability of the remaining provisions contained in this Agreement shall not in any way be affected or impaired thereby.

14.    Except as otherwise specifically provided herein, or as specifically and subsequently agreed to by the parties in writing, all notices, requests or other communications required or permitted to be given hereunder shall be deemed duly given if mailed by Federal Express overnight delivery service or another nationally recognized same day or overnight delivery service, and addressed as follows:

<u>To the Principal and the Indemnitors:</u>

HRGM Corporation
2020 Shannon Place, SE
Washington, D.C. 20020
Attention: Ramesh Butani

Ramesh Butani
1205 South Huntress Court
McLean, VA 22102

Hansa Butani
1205 South Huntress Court
McLean, VA 22102

With a Copy to:

Holland & Knight LLP
2099 Pennsylvania Avenue, N.W., Suite 100
Washington, D.C. 20006
Attention: Craig Holman, Esquire

To the Surety:

Atlantic Mutual Insurance Company
Administrative Center
Three Giralda Farms
Madison, NJ 07940 1004
Attention: Michael J. Hurley, Esquire

With a copy to:

Niles, Barton & Wilmer, LLP
111 S Calvert Street, Suite 1400
Baltimore, Maryland 21202
Attention: David D. Gilliss, Esquire

Any such notice shall be deemed to have been received by the recipient on the next business day following the day it was mailed.

15.    It is further understood and agreed by the Principal and the Indemnitors that this Agreement shall be construed without any regard to any presumption or other rule requiring construction against the party causing this Agreement, or any Exhibits attached to this Agreement, to be drafted.

16.    This Agreement may be executed in one or more counterparts, each of which shall be deemed to be an original.

IN WITNESS WHEREOF, the parties have executed this Agreement on the date indicated above, and each of the undersigned personally represent and warrant that they have the full right, power and authority to execute this Agreement on behalf of the respective parties.

(Signature page to follow on next page)

JOINT CONTROL TRUST ACCOUNT AGREEMENT - Page 15

ATTEST/WITNESS

_Jennie D Hughlett_ _____

PRINCIPAL

_[signature]_ _____
By:  Ramesh Butani, President

_Jennie D Hughlett_ _____

INDEMNITORS

_[signature]_ _____
Ramesh Butani

_Jennie D Hughlett_ _____

_H Butani_ — 10/25/04 _____
Hansa Butani

SURETY

_Jan Nellie Vogel_ _____

_[signature]_ _____
By: Michael J. Hurley, Esquire
    Assistant Vice President – Surety Claims

# 2344672_v2

JOINT CONTROL TRUST ACCOUNT AGREEMENT  - Page 16

**Exhibit 2**

## LIST OF THE BONDED CONTRACTS, PROJECTS AND BONDS

Attached hereto and incorporated herein by reference as **Exhibit 2, Attachment A** is a list of all or substantially all of the Bonded Contracts, Projects and Bonds entered into by the Principal for which the Surety executed Performance Bonds, Labor and/or Material Payment Bonds, also listed, on behalf of the Principal.

The fact that any bonded contract(s), project(s) and/or bond(s) have been left off of or inadvertently omitted from the list attached as Attachment A does not absolve the signers of the Agreement from any liability for any losses paid by the Surety as described in the Agreement for any such bonded contract(s), project(s) and/or bond(s), and the signers of the Agreement agree to be bound to the Surety for each such bonded contract(s), project(s) and/or bond(s) as if it or they had been included in the list attached as Attachment A. It is the intent of Exhibit 2 and Attachment A to include all of the bonded contract(s), project(s) and/or bond(s) that involve Surety.

Furthermore, in the event that the Principal should, now or in the future, enter into any contract(s) and/or project(s) for which the Surety should execute any bond(s) for any reason whatsoever, it is the intention of the parties to the Agreement that such future contract(s), project(s) and/or bond(s) shall be deemed to be included in Attachment A to Exhibit 2, whether listed or not, as if said contract(s), project(s) and/or bond(s) had, in fact, been listed in Attachment A to Exhibit 2, and said future contract(s), project(s) and/or bond(s) shall be included within the terms of the Agreement between the parties.

**Exhibit 2, Attachment A**

USACE Retaining Walls      (Bond No.:  447-390154)

Berwyn Heights Elementary (Bond No.: 447-390166)

Blue Plains Water      (Bond No.: 447-410462)

DC Housing Authority (Atlantic)*      (Bond No.: 447-410455)

Engine 20 Firehouse (Bond No. 447-410459)

Glen Haven Elementary (Bond No  447-410458)

McKinley Roof ( Bond No. 447-410470)

NEVIS (Bond No.: 447-410465)

Oakland  Terrace Elementary (Bond No  447-410453)

Patuxent Fuel Farm

Reeves Center Restroom  (Bond No.447-410478)

Reeves Center Windows (Bond No.447-410464)

Sully Police Station (Bond No. 447-390165)

Wm. Tyler Page Elementary (Bond No. 447-410452)

Taft Window Replacement


* Atlantic is aware that Selective supplied a bond for a related DC Housing Authority project and nothing herein shall be construed as assigning to Atlantic any Contract Funds which may be due to Selective on the DC Housing Authority Bonded Contract.

**Exhibit 3**

## LIST OF COLLATERAL

As Collateral for this Agreement and the Agreement of Indemnity executed by the Principal and the Indemnitors, the Principal and the Indemnitors grant, convey and assign to the Surety a lien on the real property more fully described below and a security interest in all of the personal property more fully described below.

1.  All of the collateral pledged by the Principal in the Agreement of Indemnity, including but not limited to Section 12 of the Agreement of Indemnity, to secure Principal's obligations under the Agreement of Indemnity, and by all of the monies of the Trust Account set forth in the Agreement;

2.  Lot 1027, Square 5771 - 2021 Shannon Place, S.E., Washington, D.C. 20020;
3.  Lot 1026, Square 5771 - 2021 Shannon Place, S.E., Washington, D.C. 20020;
4.  700 New Hampshire Ave., N.W., Unit 615, Washington, D.C. 20037;
5.  Condominium, 3819 South George Mason Drive, Falls Church, Virginia;
6.  Tyco Park Warehouse, Unit 23 Tyco Park, Fairfax County, Virginia;
7.  4445 B Brookfield Corporate Drive, Chantilly, Virginia;
8.  Account of Annuity (                                             ); and
9.  Harborside Atlantis Vacation Timeshare in Paradise Island, Bahamas.

The Surety shall have all of the rights and remedies of a secured party under the Uniform Commercial Code in effect in the state in which the personal property is located.

The Collateral shall be properly insured by the Principal and the Indemnitors until the Surety's security interest and lien rights are terminated. Such policies shall be payable to the Surety and the Principal and/or the Indemnitors or others as their interests may appear. The Principal and the Indemnitors shall furnish the Surety with certificates or other evidence satisfactory to the Surety in compliance with the foregoing insurance provisions.

The Principal and the Indemnitors shall execute alone or with the Surety any financing statement required by the Uniform Commercial Code and necessary to perfect the security interest in any of the Collateral described herein.

The Surety may, at any reasonable time, enter upon the premises of the Principal and/or the Indemnitors to inspect the Collateral and the books and records of the Principal and the Indemnitors pertaining to the Collateral or its proceeds, and the Principal and the Indemnitors shall assist the Surety in making such an inspection.

The rights of the Surety against the Collateral shall be governed by the terms of the Agreement to which this Exhibit 3 is attached. The Surety may delay or refrain from exercising any past, present or future right or remedy hereunder without waiving any such right or remedy, and no waiver by the Surety of any default shall operate as a waiver of any other default or the same default on a future occasion.

REDACTED

All of the rights of the Surety hereunder shall inure to the benefit of its successors and assigns.

ATTEST/WITNESS

_[signature]_ Jamie B Hughlett

PRINCIPAL _[signature]_

By:  Ramesh Butani, President

ATTEST/WITNESS

_[signature]_ Jamie B Hughlett

INDEMNITORS _[signature]_

Ramesh Butani

_[signature]_ Jamie B Hughlett

_[signature]_ H Butani     10/25/04

Hansa Butani

ATTEST/WITNESS

_[signature]_ Nellie Sogel

SURETY _[signature]_

By: Michael J. Hurley, Esquire,
Assistant Vice President –     Surety Claims

LIST OF COLLATERAL - Page  2

**Exhibit 4**
**[Example]**

## VOLUNTARY LETTER OF DEFAULT AND TERMINATION

[Principal's Letterhead]

[Date]

To:    Obligee

_____

_____

_____

RE:Principal:          HRGM Corporation
Obligee:
Bonded Contract & Project:    _____
Bond No.:                      _____
Surety:                 Atlantic Mutual Insurance Company

To Whom It May Concern:

    This is to advise you that the Principal, HRGM Corporation, the contractor on the above-referenced construction Project, is financially unable to perform or complete the performance of the work or comply with its contractual obligations on the above Project, and is in default under the above Bonded Contract for the Project. Therefore, the Principal hereby irrevocably and voluntarily abandons and terminates the above construction Bonded Contract effective upon your receipt of this letter. The Surety for the Principal, Atlantic Mutual Insurance Company, will be in contact with you within a short period of time to discuss this matter.

Very truly yours,

_____

HRGM Corporation

By: Ramesh Butani, President

c.c. Surety

VOLUNTARY LETTER OF DEFAULT AND TERMINATION

**Exhibit 5**
**[Example]**

**LETTER OF DIRECTION**

[Principal's Letterhead]

[Date]

To:    Obligee

_____

_____

_____

RE:Principal:          HRGM Corporation
Obligee:                _____
Bonded Contract & Project:    _____
Bond No.:               _____
Surety:                 Atlantic Mutual Insurance Company

To Whom It May Concern:

This is to advise you that the Principal, HRGM Corporation, hereby irrevocably requests that any and all payments due or to become due of any kind or nature on account of the above described Bonded Contract and Project be made payable jointly to the Principal and Atlantic Mutual Insurance Company, which is the Surety on the Performance Bond and the Labor and Material Payment Bond for the above Project. All such joint check payments should be forwarded directly to:

Atlantic Mutual Insurance Company
Administrative Center
Three Giralda Farms
          Madison, NJ  07940 1004
Attention: Michael J. Hurley, Esquire

Please be advised that the Surety agrees to this arrangement. Furthermore, there will be no modification or change in these instructions without the written authorization and express consent of the Surety.

Very truly yours,

_____

HRGM Corporation
By: Ramesh Butani, President


c.c. Surety

LETTER OF DIRECTION

**Exhibit 6**

**Power of Attorney**

KNOW ALL MEN BY THESE PRESENTS THAT, HRGM Corporation (hereinafter referred to as the "Principal") does constitute and appoint Atlantic Mutual Insurance Company (the "Surety"), and its representatives, their successors and assigns, its true and lawful attorney-in-fact, for it and in its name to receive, endorse and collect any and all checks and drafts or other forms of remittance payable to the Principal, and issued in payment of money earned or to be earned, or to become due and payable under the Bonded Contracts described in the list attached hereto as **Exhibit 2**, including all retained percentages, estimates, final payments, any other monies now due or which may become due in payment for work performed and materials furnished under the Bonded Contracts described in **Exhibit 2**, and all other Contract Funds as defined in a Joint Control Trust Account Agreement between the Principal, the Surety and others dated October 25, 2004 (the "Agreement"), which may require endorsement for deposit and collection. This Power of Attorney shall give the Surety the right to endorse any such checks or drafts on behalf of the Principal solely and only for the purpose of depositing said checks or drafts in the Trust Account more fully described in the Agreement.

The Principal does hereby authorize and empower its said attorney-in-fact, or any of them, to give full discharge and acquittance for the same and hereby ratifies and confirms all that lawfully may be done by virtue of this Power of Attorney. This Power of Attorney is coupled with an interest and is irrevocable. The Principal hereby revokes any and all previous Powers of Attorney executed in reference to the disposition of the proceeds of the Bonded Contracts described in **Exhibit 2** of the Agreement.

IN WITNESS WHEREOF, the Principal has caused this instrument to be executed and sealed by its duly authorized officers this _____ 25ᵗʰ _____ day of October, 2004.

| ATTEST/WITNESS | PRINCIPAL |
|---|---|
|  | By: Ramesh Butani, President |

## NILES, BARTON & WILMER, LLP

ATTORNEYS AT LAW

SUITE 1400

111 S. CALVERT STREET

BALTIMORE, MARYLAND 21202-6185

TELEPHONE 410-783-6300

FACSIMILE 410-783-6363

WEBSITE www.niles-law.com

WRITER'S DIRECT CONTACT

(410) 783-6396

email: bwstevens@niles-law.com

October 29, 2004

Michael J. Hurley, Esquire
Assistant Vice President – Surety Claims
Atlantic Mutual Insurance Company
Administrative Center
Three Giralda Farms
Madison, NJ 07940 1004

Craig Holman, Esq.
Holland & Knight LLP
2099 Pennsylvania Ave., NW
Suite 100
Washington, D.C. 20006

Re:    Bond Principal:    HRGM Corporation
       Surety:           Atlantic Mutual Insurance Company
       Our File:         45523

Gentlemen:

Enclosed for each of your files please find a fully executed original of the Joint Control Trust Agreement between Atlantic Mutual Insurance Company, HRGM Corporation and the Butanis.

Please do not hesitate to contact me if you have any questions.

Sincerely yours,

Bambi W. Stevens

BWS/bms
Enclosures
Cc:    David D. Gilliss, Esquire (w/o enclosures)
       Ms. Nancy Manno (w/o enclosures)

STATE OF _MARYLAND_____ , COUNTY OF _BALTIMORE_, City to wit:

    I HEREBY CERTIFY that on this _25th_ day of ~~June~~ October, 2004, before me, the subscriber, a Notary Public of the State of _MARYLAND_ , personally appeared _RAMESH BUTANI_ the President of HRGM Corporation, who is personally known to me; who, being duly sworn, did depose and say that he is the President of HRGM Corporation, the corporation described in and which executed this Power of Attorney; and that he has been duly authorized by all proper and necessary corporate actions to execute this Power of Attorney.

    AS WITNESS, my hand and Notarial Seal.


_____
Notary Public

JANICE D. HUGHLETT
NOTARY
—
PUBLIC
BALTIMORE CITY, MD

MY COMMISSION EXPIRES:
April 1, 2005

MAR-02-2006  15:34        HRGM                    2028891741        P.01

**≋AtlanticMutual**
        *When it counts*●

Atlantic Mutual Insurance C
Centennial Insurance Compa
Administrative Center
Seven Giralda Farms
Suite 120
Madison, New Jersey 07940
973.408.5000
www.atlanticmutual.com

DD:  973 408-6087
Telefax:  973 410-2131
nmanno@atlanticmutual.com

February 16, 2006

Ms. Rachna Butani
HRGM Corporation
2021 Shannon PL SE
Washington, DC 20020-5730

RE: Indemnity

Dear Rachna:

    As a follow up to our meeting on Tuesday, February 14, 2006 you requested copies of various documents relating to the current claim situation spanning 13 bonded projects.

    Enclosed for your review are copies of all Niles, Barton & Wilmer and Meridian Consulting Group invoices relating to all HRGM matters. I have also included the financial detail surrounding all the HRGM matters that we used to reconcile our numbers. During that review you indicated several payments that you were unaware of and the document supporting those payments is also included.

    I am pleased that we were able to reconcile these numbers; within $0.70 concerning the special operating account and within $2,500 for the overall loss payments. In checking my records I was able to confirm the agreed credits you listed in your recovery detail.

    My understanding is that upon review of the enclosed documents HRGM intends on making a proposal for repayment.

    I look forward to hearing from you as we work toward a final resolution of these matters.

Very truly yours,

*Nancy Manno*

Nancy Manno
Surety Claims Specialist

S:\Claims\Form Letters\TenderOfDefense.dot

┌─────────────────────┐
│     **EXHIBIT**      │
│ tabbies'    B        │
│          ─────────   │
└─────────────────────┘

Surety Claims Specialist
Atlantic Mutual Insurance Company
Centennial Insurance Company
Seven Giralda Farms
Suite 120
Madison, New Jersey   07940-1027
973-408-6087
fax 973-410-2131

# NILES, BARTON & WILMER, LLP

ATTORNEYS AT LAW

SUITE 1400

111 S. CALVERT STREET

BALTIMORE, MARYLAND 21202-6185

TELEPHONE 410-783-6300
FACSIMILE 410-783-6363

WEBSITE www.niles-law.com
WRITER'S DIRECT CONTACT

Phone: (410) 783-6384
Fax: (410) 783-6363
E-Mail: ddgilliss@niles-law.com

December 21, 2006

## VIA FACSIMILE AND FIRST CLASS MAIL

Craig Holman, Esquire
Holland & Knight LLP
2099 Pennsylvania Ave., NW
Suite 100
Washington, D.C. 20006

Re:    HRGM's Indemnity Obligations

Dear Craig:

I am receipt of your email of Tuesday, December 19, 2006 and feel it necessary to respond in writing to correct certain misstatements in it.

Preliminarily, I note that your frustration with this firm about HRGM's inability to reach an agreement on its indemnity obligation to Atlantic is misplaced. On more than one occasion, I told you that I was not involved in the indemnity discussions between Atlantic and HRGM. Rather, I made it clear that if you wanted to convey to me any of HRGM's concerns about the process, I would forward those comments to Atlantic for their consideration. Despite your insinuations that Atlantic has some ulterior motive, HRGM's inability to schedule a meeting with Atlantic amounts to nothing more than a timing issue. Atlantic has always been and remains willing to meet to discuss HRGM's indemnity obligations.

In recent months, Ms. Manno and Ms. Butani have spoken via telephone in an effort to reach an agreement on the amount of losses and expenses which HRGM and the indemnitors are obligated by contract to repay. Your client may have told you that after being unable to reach an agreement on those amounts, Ms. Manno told Ms. Butani that she would be in Philadelphia in early December to attend a mediation, and suggested that it would be convenient to meet with Ms. Butani in person to discuss HRGM's indemnity obligations. Unfortunately, the mediation has taken longer than expected and Ms. Manno has not yet traveled to Philadelphia to attend that mediation. The inability to schedule the meeting is nothing more than the consequence of Ms. Manno not yet traveling to Philadelphia.

**EXHIBIT**

C

Craig Holman, Esquire
Holland & Knight LLP
December 21, 2006
Page 2

  With regard to your assertion that when we spoke last week I advised that a meeting between us was not possible, you are mistaken. I simply tried to convey to you my belief that the issue of HRGM's indemnity obligations was a matter better left resolved directly between HRGM and Atlantic and that there was limited benefit in having the attorneys involved. At that time, I also told you that despite HRGM's belief that the "reimbursement amount" was approximately $700,000, for the purposes of the repayments that are scheduled to commence (pursuant to the Joint Control Trust Account Agreement) on January 2, 2007, Atlantic had suggested, without prejudice and in the nature of settlement, that it may be appropriate for HRGM to begin its repayments on an amortization schedule based on a $2 million debt.

  However, in light of HRGM's threatened lawsuit, Atlantic now views what had been an amicable discussion about HRGM's repayment obligations as an unprincipled effort on the part of HRGM to apply unfair pressure to Atlantic to convince Atlantic to accept less than it is contractually entitled to receive. Consequently, Atlantic's offer to have HRGM commence repayments based on $2 million in losses and expenses is rescinded. Rather, pursuant to the Joint Control Trust Account Agreement, Atlantic expects HRGM to commence payments on January 2, 2007 based on Atlantic's current accounting of $2,749,654.30 in losses and expenses. In addition, Atlantic is entitled by contract to be paid interest (at a rate of prime plus 2%) on the amounts owed by HRGM to Atlantic. Atlantic expects this interest to be repaid in addition to the reimbursement amount.

  I remind you that Atlantic and HRGM met last spring to discuss repayment of HRGM's indemnity obligations. At that time, the parties were significantly closer to an agreement than they are currently. Since that time, there has been an increase in the amount of losses and expenses simply because additional claims have been settled and additional fees have been incurred. However, that increase has not been significant enough to warrant "confusion" about the difference between Atlantic's current reimbursement amount and the reimbursement amount discussed last spring. In fact, since that meeting, Ms. Butani has repeatedly revised downward the number that she believes HRGM is required to pay to Atlantic. Incredibly, HRGM has even taken the position that it should not have to repay all of Holland & Knight's fees to Atlantic. Simply put, Atlantic is entitled by contract to be repaid the amount of losses and expenses it incurred as a consequence of having issued bonds to HRGM.

  Your e-mail states that Atlantic's own numbers are "inconsistent." That is not true. Atlantic's number has remained consistent for the entire time that HRGM has sought to negotiate the reimbursement amount. While HRGM has asserted that it has not been sent all of the invoices for fees paid by Atlantic, Atlantic has always been willing to and has provided access to that information. (Atlantic's most recent spreadsheet showing losses and expenses and this firm's invoices for October and November are attached to this letter). In fact, with regard to Holland & Knight's bills, Ms. Butani expressly requested that Atlantic *not* send copies of those invoices because HRGM already received them. Please let me know if HRGM now wants copies

Craig Holman, Esquire
Holland & Knight LLP
December 21, 2006
Page 3

of all of the invoices and Atlantic will be pleased to again provide you or your client with that information.

With regard to HRGM's request for a release of additional collateral, on more than one occasion, Ms. Manno has advised HRGM that it would review the collateral issue once all of the claims had been resolved. That has not yet happened. Further, Atlantic does not believe that it is over-collateralized. However, if you believe that Atlantic is over-collateralized, please provide Atlantic with recent, verifiable appraisals of the real property that has been posted as collateral. If those appraisals show that Atlantic is indeed over-collateralized, Atlantic will take any action that is reasonable in light of the Joint Control Trust Account and indemnity agreements and the appraisal amounts.

You have asked that Atlantic extend the "reimbursement deadline" by 60 days to allow for a meeting to occur between Atlantic and HRGM. Atlantic remains willing to meet with HRGM to discuss the reimbursement amount. However, Atlantic is not willing to extend the reimbursement deadline. Frankly, I am perplexed that you seem to suggest that it is unreasonable that Atlantic seeks to have HRGM and the indemnitors live up to their commitment to indemnify Atlantic. I cannot fathom how HRGM believes that it is not responsible for such an obligation. I am also perplexed as to why HRGM believes that a court may intervene and allow HRGM to delay its reimbursement obligation simply because HRGM does not agree with the amount it has been presented to be repaid. I will refrain from further comment on that issue until I see the lawsuit with which you have threatened Atlantic.

Finally, your email states that I agreed to accept service of a suit that is to be filed against Atlantic "in the immediate future." I am distressed and a bit angry about such a mischaracterization of our conversation. There is little chance that you could have misunderstood me when I told you that while I had no problem accepting service, I also had no authorization from my client to do so. I advised that I would inquire with my client as to whether I had authority to accept service and get back to you. I have since spoken with Atlantic and they have not authorized me to accept service. Your representation that I agreed to do so is just wrong.

I have spoken with Atlantic about scheduling a meeting between Atlantic and HRGM to reach an agreement on the reimbursement amount. Atlantic would like Ramesh Butani to be present at any meeting, as he is both an indemnitor and a signatory to the Joint Control Trust Account Agreement. Atlantic will do its best to accommodate Mr. Butani's schedule. Please provide me with some dates in January on which Mr. Butani and Ms. Butani are available. I suggest that for the convenience of the parties that the meeting take place in Baltimore.

Craig Holman, Esquire
Holland & Knight LLP
December 21, 2006
Page 4

I trust that this letter clarifies Atlantic's position on the issues raised in your email. Should you wish to comment further, I suggest that to avoid additional "confusion," we limit our communications to writing. Until final resolution of this matter, Atlantic continues to reserve all rights, remedies and defenses available to it, both at law and in equity.

Very truly yours,

David D. Gilliss

DDG/kf
Cc: Ms. Nancy Manno

Rachna,

Attached is the updated worksheet I have for losses and expenses to date. My numbers show the current net results. If I recall there was some confusion concerning recovery because a large portion was deposited directly into the control account. Keep in mind my loss numbers reflect payment made into the control account as well as direct payment to subs and suppliers. I have identified the claims that have had a change since 8-22-06. (I am not sure if you received an interim revised report or if you only had the 2-06 report. If that is the case the change/unchange has no meaning for you.)

Lets try and get our numbers to match before we begin settlement discussions.

I look forward to hearing from you.

Thanks

(See attached file: HRGM Loss-Expense Report.xls)

Nancy Manno



EXHIBIT

D

## HRGM- Loss/Expenses as of 11/17/06

| Bond No. | Claim No. | Description | Loss Pymt | Meridian | Misc. Exp. | H&K |
|---|---|---|---|---|---|---|
| 447-390154 | 85900501 | Dept. of Army | $23,399.00 | $151.07 | | $7.35 |
| 447-390165 | 85900212 | Sully | $866,511.67 | $5,656.22 | $275.09 | $20 |
| 447-390166 | 85900051 | Berwyn | $548,815.48 | $3,078.76 | $149.73 | $3 |
| 447-410452 | 85900055 | Page | $855,882.01 | $7,711.73 | $5,668.97 | $16 |
| 447-410453 | 85900214 | Oakland | $223,133.63 | $2,168.32 | $5,123.44 | $10 |
| 447-410454 | 85900500 | Bell BCI | $252,212.50 | $2,471.57 | | $3 |
| 447-410455 | 85900498 | Various DC | $23,087.37 | $3.03 | | $1 |
| 447-410459 | 85900227 | Eng. Co. 20 | $18,234.14 | $30,528.03 | $2,456.01 | $1 |
| 447-410462 | 85900139 | Blue Plains Waste | $791,699.58 | $30.26 | $1.47 | $4 |
| 447-410464 | 85900499 | Reeves | $2,522,840.14 | $325,743.66 | $1,916.43 | $27 |
| 447-410465 | 85900228 | NEVIS | $120,575.90 | $2,568.26 | $7,893.12 | $8 |
| 447-410458 | 85900046 | Glen Haven | $1,047.20 | | | |
| 447-410479 | 85900489 | Pentagon | $178,732.35 | | | |
| 447-410496 | 85900685 | Taft | | | | |
| **Totals** | | | $6,426,170.97 | $380,110.91 | $23,491.76 | $1,11 |

### Recoveries

| Claim No. | Source | Description | Amount | Date | Known future liability |
|---|---|---|---|---|---|
| 85900051 | Contract Proc | Berwyn | $115,984.99 | 12/20/04 √ | |
| 85900227 | Contract Proc | Eng. Co. 20 | $21,288.23 | 3/28/05 √ | |
| 85900055 | Contract Proc | Page | $750,000.00 | 9/20/05 √ | |
| 85900214 | Contract Proc | Oakland | $100,000.00 | 9/20/05 √ | |
| 85900227 | Contract Proc | Eng. Co. 20 | $497,000.00 | 11/15/05 √ | |
| 85900228 | Contract Proc | NEVIS | $3,210,000.00 | 12/15/05 √ | |
| 85900085 | Contract Proc | Taft | $95,802.50 | 1/25/06 √ | |
| 85900685 | Contract Proc | Taft | $325,464.00 | 2/6/06 √ | |
| 85900212 | Contract Proc | Sully | $420,000.00 | 2/6/06 √ | |
| 85900228 | Contract Proc | NEVIS | $13,548.32 | 10/12/05 √ | |
| Various | Close-out of acct. | | $56,201.18 | 7/20/06 √ | |
| 85900498 | Contract Proc | DCHA | $20,000.00 | 7/12/06 √ | |
| 85900139 | Contract Proc | Blue Plains Waste | $95,802.49 | 3/15/06 √ | |
| 85900685 | Contract Proc | Taft | | | |
| **Total as of 8/23/06** | | | $5,721,091.71 | | |

| | | |
|---|---|---|
| Total Loss | | $8,757,537.53 |
| less recoveries | | $5,721,091.71 |
| Agreed Credits | MCPS | $100,000.00 |
| Agreed Credits | NEVIS | $200,000.00 |
| current outstanding amt. due | | $2,736,445.82 |

-----Original Message-----
From: rachnabutani@hotmail.com [mailto:rachnabutani@hotmail.com]
Sent: Friday, December 08, 2006 6:48 AM
To: nmanno@atlanticmutual.com; Craig Holman; Dad Cell
Subject: Meeting
Importance: High

Good Morning Nancy,

I still haven't heard back from you concerning our HRGM/Atlantic meeting date/time. I left you a voicemail message on Tuesday night as well as the email this past weekend. It is very critical that we schedule a meeting for next week immediately. I am available every night from 6:30 onwards except Tuesday. Please let me know asap.

Thank you,
Rachna
Rachna Butani
Director
RGM Corporation



1

## Holman, Craig A (WAS - X77155)

| | |
|---|---|
| **From:** | Rachna Butani [rachna@hrgm.com] |
| **Sent:** | Sunday, December 03, 2006 7:29 PM |
| **To:** | Nancy_Manno@AtlanticMutual.com |
| **Cc:** | craig.holman@hklaw.com; Ramesh Butani |
| **Subject:** | RE: HRGM/Atlantic |

Hi Nancy,

I received the loss numbers per your spreadsheet, and as I noted to you in our last discussion, my numbers are different from yours. We will need to sit down and go over the transactions, specficaly those items recently paid.

Please let me know when you can meet in Philadelphia. As I mentioned to you, I am definitely available in the evenings. This week I can meet on Wednesday after 4:30pm, Thursday between 2pm-7:30pm, and next week I am open every evening after 6:30pm except Tuesday night.

Please let me know what date(s)/time(s) work for you!

Thank you,
Rachna

---

**From:** Nancy_Manno@AtlanticMutual.com [mailto:Nancy_Manno@AtlanticMutual.com]
**Sent:** Fri 11/17/2006 4:09 PM
**To:** Rachna Butani
**Subject:** Re: HRGM/Atlantic

Rachna,
Attached is the updated worksheet I have for losses and expenses to date. My numbers show the current net results. If I recall there was some confusion concerning recovery because a large portion was deposited directly into the control account. Keep in mind my loss numbers reflect payment made into the control account as well as direct payment to subs and suppliers. I have identified the claims that have had a change since 8-22-06 (I am not sure if you received an interim revised report or if you only had the 2-06 report. If that is the case the change/unchange has no meaning for you.)
Lets try and get our numbers to match before we begin settlement discussions.
I look forward to hearing from you.
Thanks

(See attached file: HRGM Loss-Expense Report.xls)

Nancy Manno
Surety Claims Specialist
Atlantic Mutual Insurance Company
Centennial Insurance Company
Seven Giralda Farms
Suite 120



12/20/2006

Madison, New Jersey  07940-1027
973-408-6087
fax 973-410-2131

12/20/2006

"Rachna Butani"
<rachna@hrgm.com      To: nmanno@atlanticmutual.com
>                     cc: "Ramesh Butani" <butani@hrgm.com>
                      Subject: HRGM/Atlantic
11/14/2006 10:23
PM

Hi Nancy,

Thanks for talking to me about the HRGM/Atlantic balance on the Joint
Control Agreement this past Friday. As I mentioned to you, the only
items I received in the mail in the last two weeks were Niles Barton's
bills for May/June of 2006.

I have not received an up to date accounting summary of what Atlantic
believes is owed from HRGM per the Joint Control Agreement. You
mentioned that you believe the balance may be as high as $3 Million,
which I vehemently disagree with. As you know, when we met in February



12/20/2006

of this year, you believed that the balance owed from HRGM was approximately $2.2 Million. At that point, we discussed HRGM's disagreement with the figure, including HRGM's dispute concerning Niles Barton's bills.

You also mentioned that Atlantic made a business decision to close-out the Interstate matter and will be paying an additional $20K. As I indicated to you earlier this year, I believe the $33,000 that was paid was well above what Interstate should have received in total for their claim. In addition, HRGM has requested on several occasions that Atlantic release the property tendered under the Joint Control Agreement, given the substantial repayments and the terms of the Joint Control Agreement. To date, Atlantic has not allowed this discussion, despite my attempts to close this arrangement for HRGM since early this year.

Per our discussion on Friday, you will send me Atlantic's summary of the HRGM/Atlantic balance this week – hopefully no later than 11/17/06. At that point, I will have the opportunity to review the numbers and prepare for the settlement meeting. As you mentioned, you will be in Philadelphia for several weeks in December – I believe you mentioned 3 out of 5 days of the week for three consecutive weeks. Although I am concerned about putting our meeting off further, I agree that we should meet in person to resolve this no later than early December. Please let me know what dates work for you. I am scheduled to begin Final Exams on 12/11/06, and will be out of the country from 12/20/06-1/7/07. It is best if we can meet to finalize this matter prior to 12/11/06, given the impending 1/1/07 deadline.

If you are planning to send the account documents by mail, please send them to me at the following address:

Rachna Butani
2020 Walnut Street
Apt. 15B
Philadelphia, PA 19103

Thanks Nancy,
Rachna

12/20/2006

```
>
> "Rachna Butani"
> <rachnabutani@ho  To: nmanno@atlanticmutual.com
> tmail com>    cc: craig.holman@hklaw.com, butani@hrgm com
> Subject: HRGM
> ~9/26/2006 11:47
(      )
>
>
>
> -
>
>
> Hi Nancy,
>
> I wanted to drop you a line because I hadnâ€™t heard back from you since I
> left two voicemail messages on 9/15 and 9/22. I was hoping to speak
> with you concerning the closeout between HRGM and Atlantic  I believe
> we are now at the point where we can come to some agreement, and
> hopefully put this to bed. Since Iâ€™m in school right now it may be best
> if we schedule a specific time. Generally Fridays work best for me, so
> please let me know if that works for you as well. This Friday I am
> available from 11:15 - 1:30pm and again after 5pm.
>
> Thanks,
> Rachna
>
> Rachna Butani | Class of 2008 | MBA Candidate
> The Wharton School | University of Pennsyivania
> (: 703.980.3000 | *: rachnab@wharton.upenn.edu
```



EXHIBIT

H

## SUPERIOR COURT FOR THE DISTRICT OF COLUMBIA
## CIVIL DIVISION

HRGM CORPORATION )
2020 Shannon Place, S.E. )
Washington, D.C. 20020 )
)
and )
)
RAMESH BUTANI )
1205 South Huntress Court )
McLean, Virginia 22102 )
)
and )
)
HANSA BUTANI )
1205 South Huntress Court )
McLean, Virginia 22102 )
)
Plaintiffs, )
)
v. )
)
ATLANTIC MUTUAL INSURANCE )
COMPANY )
Administrative Center )
Three Giralda Farms )
Madison, New Jersey 07940-1004 )
)
SERVE:      D.C. Dept. of Insurance and )
Securities Regulation )
Lawrence Mirel, Insurance )
Commissioner )
Statutory Agent )
810 First Street, N.E., )
Suite 701 )
Washington, D.C. 20022 )
Attn: Ms. Michelle Mathis )
)
Defendant. )

RECEIVED
Civil Clerk's Office
MAY 0 8 2007
Superior Court of the
District of Columbia
Washington, D.C.

0003206-07

Civil Action No. _____

**JURY TRIAL DEMANDED**

**COMPLAINT FOR DECLARATORY JUDGMENT, BREACH OF CONTRACT,
BREACH OF FIDUCIARY DUTY, AND ACCOUNTING**

COMES NOW Plaintiffs HRGM Corporation ("HRGM") and Ramesh Butani and Hansa Butani (collectively, the "Butanis"), by and through their undersigned counsel and for their complaint against defendant Atlantic Mutual Insurance Company state as follows:

## PARTIES AND JURISDICTION

1.      Plaintiff HRGM, formerly HR General Maintenance Corporation, is a small, minority-owned corporation with its principal place of business in the Anacostia section of Washington, D.C., at 2020 Shannon Place, S.E., Washington, D.C. 20020. HRGM is organized under the laws of Virginia and registered to conduct business in the District of Columbia. HRGM provides construction contracting services to public and private entities.

2.      Plaintiff Ramesh Butani is an individual and the President of HRGM. Mr. Butani resides at 1205 South Huntress Court, McLean, Virginia 22102.

3.      Plaintiff Hansa Butani is an individual and the wife of Ramesh Butani. Mrs. Butani resides at 1205 South Huntress Court, McLean, Virginia 22102. (Sometimes Ramesh Butani and Hansa Butani are referred to herein as the "Butanis".)

4.      Defendant Atlantic Mutual Insurance Company ("Atlantic") is an insurance and surety company with its principal place of business located at Three Giralda Farms, Madison, New Jersey 07940. Atlantic has conducted business in the District of Columbia on numerous occasions in connection with the events outlined herein.

3.      This Court has jurisdiction over this action under D.C. Code Ann. 11-921.

## BACKGROUND FACTS APPLICABLE TO ALL COUNTS

### The Atlantic-HRGM Relationship

5.      HRGM has provided construction services since the 1970s.

2

6.    Many of the projects for which HRGM provides construction services (particularly jobs for federal, state, and local governments) require the issuance of bid, performance, and payment bonds by a surety.

7.    In or about 2001, Atlantic and HRGM entered a relationship by which Atlantic began issuing bid, performance, and payment bonds for HRGM on a number of projects. HRGM paid Atlantic a percentage of the contract amount for issuing these bonds.

8.    Although HRGM had an established history of performing construction projects, Atlantic required that HRGM and the Butanis execute a General Agreement of Indemnity in connection with issuance of the bonds. (*See* Exhibit A at Attachment 1, General Agreement of Indemnity.)[1]

9.    Over the course of the next year or so, Atlantic issued bonds for HRGM on approximately fifteen different projects located throughout the District of Columbia, Maryland, and Virginia.

10.    Beginning in or about 2002, HRGM (which had over 20 years of business experience and was an Anacostia success story - even receiving Inc. Magazine recognition as a fastest growing inner city company) suffered difficulties on several of its projects, including improper terminations for default on two District of Columbia projects for which Atlantic had issued bonds. At the same time, HRGM also suffered a major fire (which HRGM did not cause) on a Prince Georges' County project (the Carmody Hills Elementary School).

11.    Although the owners had stopped payments to HRGM on several of the projects, HRGM's subcontractors continued to demand payment (in many instances despite contractual

---

[1] Exhibit A to the Complaint is a Joint Trust Control Agreement between Atlantic, HRGM, and the Butanis that is discussed at length later in this Complaint. The General Agreement of Indemnity between the parties is attached as to the Joint Trust Control Agreement and is included as part of Complaint Exhibit A. The copy of the Joint Control Trust Account Agreement attached hereto, however, does not contain the confidential financial statement of the Butanis that was part of that Agreement and redacts certain financial information.

3

"pay when paid" and "pay if paid" provisions) from both HRGM and Atlantic (under the project payment bonds). A number of subcontractors commenced legal actions against HRGM and Atlantic.

12. Pursuant to the General Agreement of Indemnity, HRGM indemnified and held Atlantic harmless in connection with the legal matters through the fall of 2004.

### The Joint Control Trust Account Agreement

13. In the fall of 2004, HRGM was dealing with simultaneous litigation, asserting claims against project owners and defending against payment demands and lawsuits brought by subcontractors against HRGM and Atlantic (in which HRGM was defending both HRGM and Atlantic). In light of this situation, HRGM met with Atlantic to discuss whether Atlantic would advance funds (secured by property owned by the Butanis) to allow HRGM to resolve a number of the subcontractor matters.

14. As a result of their meeting, on October 25, 2004, Atlantic, HRGM, and the Butanis entered a Joint Control Trust Account Agreement. The Agreement created more than a surety relationship between the parties. In essence, Atlantic assumed control of many of the pending lawsuits against both it and HRGM. In addition, Atlantic assumed complete control over all funds paid to HRGM that were in any way connected with the bonded contracts. In short, HRGM and the Butanis entered into a relationship of trust with Atlantic, pursuant to which Atlantic acted on behalf of all of the parties with regard to certain legal actions and controlled funds to which both parties had potential rights.

15. With respect to the subcontractor legal actions, Atlantic initially demanded the power to decide whether to litigate or settle those cases. HRGM (having provided Atlantic with substantial property to secure the debt) and the Butanis, however, had concern that Atlantic

might simply close cases (by paying more than a subcontractor was due) and required language allowing only the exercise of "reasonable discretion" by Atlantic.

16.     In addition, the Joint Control Trust Account Agreement required that HRGM pay to Atlantic any "unpaid contract balances, proceeds of change orders, or any funds which are paid by the Obligees on account of the Bonded Contracts." (Ex. A at ¶ II.8.)  The Agreement provided that such funds would be held in "trust," and would be used to repay amounts advanced by Atlantic, with any remainder paid to HRGM. (*Id.* at ¶ II.7.)

17.     Any "checks or charges" against the Trust Account that were to be used for HRGM's benefit required "two signatures, one signature being that of an authorized representative of the Principal and the other by an authorized representative of the Surety [*i.e.,* Atlantic]." (*Id.* at ¶ II.6, II.7.)  Atlantic, however, was permitted to write checks to itself out of the Trust Accounts without an HRGM signature. (*Id.* at ¶ II.13.)

18.     With respect to any expenses incurred by Atlantic, its counsel, or its consultants that Atlantic contended were subject to reimbursement by HRGM or the Butanis, the Joint Control Trust Account Agreement required that Atlantic "promptly" provide invoices for already incurred amounts and send all future invoices to HRGM or the Butanis within 30 days of the Surety's receipt of such invoices:

> . . . . After the execution of this Agreement, Surety agrees to promptly provide to HRGM copies of all invoices from Surety's counsel and from consultants retained by Surety or its counsel, which Surety contends are advances, losses, costs or other charges that are subject to reimbursement by HRGM or the Indemnitors, subject to the terms and conditions of the Agreement of Indemnity. Thereafter, subject to the elimination of privileged communication, Surety will send all such future invoices within thirty (30) days of Surety's receipt of such invoices.

(*Id.* at ¶ II.8.)

19.    Under the Joint Control Trust Account Agreement, HRGM and the Butanis agreed to begin reimbursing Atlantic on January 2, 2007 (in payments spread over two years) for any amounts then due under the Agreement:

> If, by January 2, 2007 ("Reimbursement Deadline"), the Surety has not been fully reimbursed for all advances it has made under the Agreement of Indemnity or this Agreement and for another loss, cost, or expense which it has incurred and for which HRGM and Indemnitors are obligated to pay Surety in accordance with the Agreement of Indemnity (collectively the "Surety Advances"), then commencing on the Reimbursement Deadline, and on the first day of each month thereafter until the Surety Advances have been paid in full, HRGM shall commence making monthly payments to Surety in an amount sufficient to repay the outstanding balance of the Surety Advances as of the Reimbursement Deadline in twenty four (24) equal monthly payments of principal and interest assuming no additional payments are made pursuant to this Agreement after the Reimbursement Deadline. If any other payments are made to Surety pursuant to this Agreement after the Reimbursement Deadline, then on each such occasion ("Adjustment Date") the amount of the monthly payments thereafter required shall be adjusted downward, and shall be the amount of monthly payments necessary to pay off the outstanding balance of the Surety Advances as of the Adjustment Date by the twenty fourth (24th) month after the Reimbursement Deadline.

(*Id.* at ¶ II.10.)

16.    Atlantic also agreed to forebear from taking action under the General Agreement of Indemnity provided that HRGM and the Butanis, *inter alia*, provided Atlantic with security interests and liens in a number of HRGM and Butani assets. (*See Id.* at I.1 ("The Surety agrees that it will fund all reasonable settlements that Principal and Surety are able to negotiate with subcontractors, vendors and suppliers for claims arising in connection with the performance of the Bonded Contracts. . .").)

17.    Paragraph II.4 of the Joint Control Trust Account Agreement described the property tendered as collateral in connection with the Joint Control Trust Account Agreement:

> The Principal's obligations to the Surety under the Agreement of Indemnity and under this Agreement shall be secured by (i) all of the collateral pledged by the Principal in the Agreement of Indemnity, including but not limited to Section 12 of the Agreement of Indemnity, to secure Principal's obligations under the Agreement of Indemnity, and by all of the monies of the Trust Account (hereinafter defined), which collateral is collectively hereinafter referred to as the "Original Collateral." To further secure their obligations under the Agreement of Indemnity and this Agreement, the Indemnitors hereby grant to Surety security interests and liens (as indicated in **Exhibit 3**) in the following (collectively the "Additional Collateral"): (i) Lot 1027, Square 5771 – 2021 Shannon Place S.E., Washington, D.C. 20020; (ii) Lot 1026, Square 5771 – 2021 Shannon Place, S.E., Washington, D.C. 20020; (iii) 700 New Hampshire Ave., N.W., Unit 615, Washington, D.C. 20037; (iv) Condominium, 3819 South George Mason Drive, Falls Church, Virginia; (v) Unit 23 Tyco Park, Fairfax County, Virginia; (vi) 4445 B Brookfield Corporate Drive, Chantilly, Virginia; (vii) Harborside Atlantis Vacation Timeshare in Paradise Island, Bahamas; and (viii) [redacted] Account of Annuity [redacted]. . . .

(*Id.* at ¶ II.4.) Several of the properties securing the Joint Control Trust Account Agreement are in the District of Columbia.

20.    Atlantic agreed not to immediately perfect its security interest in the Annuity Account, a retirement account that Mr. Butani assigned as collateral, because such actions would result in immediate losses and tax liabilities that would irreparably harm Mr. Butani. Instead, the parties agreed that Atlantic would not perfect or otherwise file the assignment absent an event of default under the Agreement.

21.    Paragraph II.4 of the Joint Control Trust Account Agreement also required Atlantic to begin releasing the property (on request) as soon as Atlantic became oversecured with respect to the liabilities of HRGM and the Butanis:

> . . . If Surety subsequently becomes oversecured with respect to the liabilities of Principal and Indemnitors to Surety, Surety (at HRGM's request or requests) will release its security interests and liens in one or more pieces of the Additional Collateral such that

Surety at its discretion remains fully secured (but not oversecured). Surety will release the security interests and liens in the following order: (i) Unit 23, Tyco Park, Fairfax County, Virginia; (ii) 4445 B Brookfield Corporate Drive, Chantilly, Virginia; (iii) Lot 1027, Square 5771 – 2021 Shannon Place, S.E., Washington, D.C. 20020; (iv) Lot 1026, Square 5771 – 2021 Shannon Place, S.E., Washington, D.C. 20020; (v) 700 New Hampshire Ave., N.W., Unit 615, Washington, D.C. 20037; (vi) Condominium, 3819 South George Mason Drive, Falls Church, Virginia; (vii) [redacted] Account of Annuity [redacted]; and (viii) Harborside Atlantis Vacation Timeshare in Paradise Island, Bahamas. Nothing in the foregoing provision shall require Surety to release a property if such release would leave Surety undersecured with respect to the liabilities of Principal and Indemnitors to Surety under this Agreement and the Agreement of Indemnity.

(*Id.* at ¶ II.4.)

### The Post-Joint Control Trust Account Agreement Period

22.    After entering into the Joint Control Trust Account Agreement, Atlantic insisted that its lawyers (Niles, Barton & Wilmer, LLP) take over much of the active litigation related to the Atlantic bonds from the lawyers HRGM had been using (Holland & Knight LLP). The primary exceptions involved HRGM's litigation against the owners and certain exceptionally advanced subcontractor litigation. As a result of this transition, many of the tasks performed by Atlantic's counsel were duplicative of tasks already performed by HRGM's counsel and already paid for by HRGM.

23.    Over the coming year, Atlantic lawyers' engaged in a course of settling the subcontractor claims against HRGM and Atlantic. On a number of occasions, the settlements were made over HRGM's express written objection and/or in bad faith disregard of HRGM's interests and assertions.

24.    In certain circumstances, Atlantic faced subcontractor legal allegations that Atlantic had waived defenses by failing to timely respond to subcontractor bond claims.

25.    Also, at or about the time that Atlantic was settling the cases over HRGM objection, Atlantic (on information and belief) was seeking to shut down and close its bonding business.

26.    Simultaneously, HRGM and its counsel litigated the claims against the project owners, ultimately succeeding in getting the two District of Columbia default terminations converted to terminations for convenience and obtaining significant settlement payments. HRGM and its counsel also successfully settled several other owner claims. All Atlantic related owner claim settlements were made with the knowledge and consent of Atlantic. Pursuant to the Joint Control Trust Account Agreement, HRGM provided the litigation settlement amounts and all other proceeds on the Atlantic bonded contracts to Atlantic - an amount in excess of $6.8 million. (In two instances, Atlantic provided additional credit to HRGM to make owner settlement offers more attractive and when these credits are accounted for, HRGM's overall contribution to Atlantic is more than $7.1 million.)

27.    By early 2006, much of the litigation (subcontractor and owner) had been resolved and HRGM and the Butanis requested an opportunity to meet with Atlantic to seek an early resolution of the Joint Control Trust Account Agreement and the immediate release of some or all of the secured properties.

28.    In or about February 2006, the parties met in Baltimore. During the meeting, Atlantic asserted that HRGM and the Butanis owed it approximately $2.2 million under the Joint Control Trust Account Agreement. Because the figure was far above what HRGM's records showed, HRGM and the Butanis requested that Atlantic break down the amounts.

29.    The high level breakdown that Atlantic provided at the February 2006 meeting made it clear that Atlantic sought to charge HRGM and the Butanis for well over $1 million in

attorney fees (Niles, Barton and Wilmer) and consultant fees, despite the fact that Atlantic had not provided HRGM or the Butanis with invoices for these fees as required under the Joint Control Trust Account Agreement. The breakdown also seemed to reveal other material discrepancies in the amount that Atlantic claimed was due from HRGM and the Butanis.

30. HRGM and the Butanis objected to Atlantic's calculations both in the meeting and later in writing. Specifically, HRGM and the Butanis objected to Atlantic's inclusion of amounts for which Atlantic had not provided timely notice, certain settlements that Atlantic made over HRGM's objection, and discrepancies in Atlantic's accounting records. (*See, e.g.,* Exhibit B, Letter from Manno to Butani dated 2/16/06 (forwarding for the first time redacted Niles Barton and Meridian bills).)

31. Atlantic's failure to timely present invoices from its attorneys and consultants deprived HRGM of the ability to account for such costs and expenses in its affirmative claim settlements and to review and question the time and amounts charged. Moreover, significant amounts included in the untimely provided bills have nothing to do with subcontractor lawsuits or owner claims but instead relate to Atlantic seeking to improve its position with respect to HRGM, the Butanis, and their assets. Certain of the bills also are heavily redacted making it difficult to determine whether such amounts would be properly reimbursable even if timely provided (which they were not).

32. When the February 2006 meeting concluded, the parties had not reached agreement regarding the amount properly claimed by Atlantic under the Joint Control Trust Account Agreement.

33. Following the February meeting, Atlantic and HRGM met again to reconcile their accounts with respect to the Joint Control Trust Account Agreement. Although the meeting shed

further light on the efforts the parties needed to undertake to accurately reconcile the accounts, no such reconciliation occurred.

34.    During this period, HRGM and the Butanis continued to request that Atlantic begin releasing property secured by the Joint Control Trust Account Agreement. Even though the time had passed for any further suits on the Atlantic bonds (subcontractor or otherwise), and even though Atlantic had received over $7.1 million from HRGM since the parties entered into the Joint Control Trust Account Agreement, Atlantic did not meaningfully respond to the requests to release the secured property, much less release any of that property. (*See, e.g.,* Exhibit C, Letter from Gillis to Holman dated 12/21/06 ("With regard to HRGM's requests for a release of additional collateral, on more than one occasion, Ms. Manno has advised HRGM that it would review the collateral issue once all of the claims have been resolved."))

35.    On November 17, 2006, Atlantic (by Nancy Manno) sent Rachna Butani (the Butani's daughter and an HRGM director) an "updated worksheet" that recognized "some confusion concerning the recovery" and the inability of the parties to get "the numbers to match." (Exhibit D, E-mail from Manno to Butani dated 11/17/06.) The worksheet reflected numerous unexplained increases and again sought the nearly $1.2 million in fees and costs associated with Atlantic's attorneys and consultants for which Atlantic had not timely provided HRGM invoices. (*Id.*) The worksheet reflected a revised, materially increased purported amount due from HRGM and the Butanis of $2,736,445.82. (*Id.*)

36.    The worksheet Atlantic provided is (as Atlantic seemingly admits) a work in progress. Among other shortcomings, the worksheet is not complete. It is missing substantial payments that HRGM made to Atlantic and its agent Meridian under the Joint Control Trust Account Agreement and it does not provide any detail below the project level as to the claimed

advances. In addition, the worksheet improperly seeks nearly $1.2 million in costs associated with Niles Barton and Meridian for which Atlantic failed to provide timely or proper notice under the Joint Control Trust Account Agreement.

37. Through the end of 2006, HRGM and the Butanis (repeatedly and in writing) sought to meet with Atlantic in order to (i) obtain an accurate accounting, (ii) reconcile the parties' disparate numbers, (iii) obtain the release of the secured property, and (iv) if possible, close the parties' relationship. (See, e.g., Exhibit E, E-mail from Butani to Manno dated 12/8/06 ("I still haven't heard back from you concerning our HRGM/Atlantic meeting date/time. I left you a voicemail message on Tuesday night as well as the email this past weekend. It is very critical that we schedule a meeting next week immediately. . . . "); Exhibit F, E-mail from Butani to Manno dated 12/3/06 ("I received the loss numbers per your spreadsheet as I noted to you in our last discussion, my numbers are different than yours. We will need to sit down and go over the transactions .. . . ."); Exhibit G, E-mail from Rachna Butani to Manno dated 11/14/06 (" . . . I have not received an up to date accounting summary of what Atlantic believes is owed from HRGM per the Joint Control Agreement."); Exhibit H, E-mail from Butani to Manno dated 9/26/06 ("I wanted to drop you a line because I hadn't heard back from you since I left two voicemail messages. . . .I was hoping to speak with you concerning the closeout between HRGM and Atlantic.").) Atlantic, however, refused these requests, stating that it was too busy to meet with HRGM.

38. In late December, while still was refusing the requests for a meeting, Atlantic asserted, for the first time, that HRGM and the Butanis should begin making monthly payments under the Joint Control Trust Account Agreement based upon an Atlantic assumed debt of at least $2 million.

39.    HRGM and the Butanis, through counsel, objected to Atlantic's demanded approach because it required HRGM or the Butanis to begin paying on an amount that was far in excess of what they believed to be due and did so without even providing a detailed accounting of the claimed amount.  HRGM and the Butanis suggested instead that the parties: (i) meet immediately to reconcile the account and address any disagreements; (ii) allow their counsel to meet to do the same (if Atlantic was not available); and (iii) allow HRGM or the Butanis to start paying on a lesser amount (approximately $700,000) until the parties could meet.

40.    Although Atlantic was the holder and trustee of over $6.8 million dollars that HRGM provided and further was secured by substantial property, it responded to the requests of HRGM and the Butanis with an increased demand and threats of default.  Specifically, on December 21, 2006, Atlantic demanded that HRGM "commence payment on Atlantic's current accounting of $2,749,654.30 in losses and expenses."  (*See* Exhibit D, Letter from Gilliss to Holman dated 12/21/06 at 2.)

41.    Despite Atlantic's hostile posture, and in a good faith effort to comply with its obligations under the Joint Control Trust Account Agreement, HRGM timely sent a first payment check to Atlantic in January 2007 for $29,162.44. The amount of the check was based upon HRGM's good faith estimate of the amount that it properly owed under the Agreement with monthly repayments spread over the Agreement's repayment period.

42.    In addition, after much effort, Atlantic finally agreed to meet with HRGM and Ramesh Butani in New Jersey on January 17, 2007.  This meeting, however, once again ended without Atlantic providing an accounting to support its calculations of the amount owed under the Joint Control Trust Account Agreement or an agreement by the parties with regard to that

amount. Indeed, Atlantic continued to assert that HRGM and the Butanis owe $2,749,654.30 and demanded that they immediately begin making payments.

43.     On January 18, 2007, Atlantic sent a notice of default to HRGM and the Butanis and returned the $29,162.44 good faith payment. In violation of the cure provisions in the Joint Control Trust Account Agreement, Atlantic demanded that HRGM or the Butanis make a payment of $127,197.33 by January 28, 2007. Atlantic threatened to initiate action to protect its interests if the payment was not made.

44.     In response to a letter from HRGM's counsel (noting the improper and heavy-handed nature of the January 18, 2006 default notice), Atlantic reissued its default notice on January 23, 2007. This notice demanded that HRGM or the Butanis make a payment of $127,197.33 by February 7, 2007.

45.     In light of the ongoing dispute between the parties, HRGM and the Butanis through counsel, requested that Atlantic withdraw its January 23, 2007 default notice pending further negotiations between the parties and without prejudice to Atlantic's right to reissue the notice should such negotiations fail. HRGM and the Butanis explained that if Atlantic did not withdraw the notice, HRGM and the Butanis would be forced to seek a judicial resolution of the dispute. HRGM and the Butanis again required that Atlantic provide them with "copies of all bank statements and checks for the Trust Account pursuant to provision III.11."

46.     Subsequent to January 2007, the Parties entered a standstill agreement to allow for further discussions. The standstill agreement extended through May 7, 2007. The Parties were unable to reach resolution of the matter.

47.     HRGM and the Butanis have satisfied all conditions precedent to bringing this action.

## CAUSES OF ACTION

### Count I Declaratory Judgment

48.    HRGM and the Butanis restate the allegations of paragraphs 1 through 47 of the Complaint.

49.    HRGM, the Butanis, and Atlantic are parties to a Joint Control Trust Account Agreement.

50.    An actual, existing, justiciable controversy exists between HRGM and the Butanis and Atlantic regarding the Joint Control Trust Account Agreement and the parties' rights and liabilities arising thereunder.

51.    HRGM and the Butanis have performed their obligations under the Joint Control Trust Account Agreement.

52.    Atlantic, however, has refused to perform its obligations under the Joint Control Trust Account Agreement and otherwise breached the Joint Control Trust Account Agreement by:

- Demanding that HRGM and the Butanis pay amounts not due under the Joint Control Trust Account Agreement;

- Settling several subcontractor claims at levels above the amounts authorized by HRGM notwithstanding that Atlantic had security interests sufficient to cover any amounts due under the Joint Control Trust Account Agreement and the amounts at issue in the involved litigation;

- Failing to handle the "Trust" account monies as provided for in the Joint Control Trust Account Agreement;

- Failing to acknowledge and act with reasonable promptness on requests to meet, reconcile, and account for the handling of the Joint Control Trust Account Agreement money;

- Settling subcontractor claims at amounts above those reasonably determined as potentially due apparently with bad faith disregard for the interests of HRGM and the Butanis or as a result of legal issues caused by or business issues relating solely to Atlantic (e.g., Atlantic's intended shut down of its bonding business);

- Refusing to consider release of the property tendered by HRGM and the Butanis under the Joint Control Trust Account Agreement;

- Failing to provide HRGM and the Butanis with "copies of all bank statements and checks" as requested and required under the Joint Control Trust Account Agreement; and

- Failing to provide HRGM and the Butanis with sufficient information to understand the amounts claimed by Atlantic under the Joint Control Trust Account Agreement.

53.     Atlantic demanded (notwithstanding the foregoing conduct) that HRGM and the Butanis commence "repayment" to Atlantic on January 2, 2007 at a rate sufficient to pay Atlantic the sum of $2,749,654.30 plus interest over the next two years even though such amounts are not due under the Joint Control Trust Account Agreement and Atlantic has not provided an adequate explanation of the amount claimed.

WHEREFORE, HRGM and the Butanis request declaratory judgment in their favor: (i) that Atlantic must give HRGM and the Butanis a full and proper accounting of all transactions taking place in connection with the Atlantic controlled Joint Control Trust Account Agreement

before demanding repayment from HRGM and the Butanis and must provide a two year period for repayment of any outstanding amounts; (ii) that Atlantic has breached its obligations of good faith and fair dealing under the Joint Control Trust Account Agreement by failing to provide a proper accounting to HRGM and the Butanis regarding Atlantic's handling of the trust amounts and multi-million dollar demands; (iii) that Atlantic may not demand reimbursement of expenses (including, but not limited to, the expenses associated with Niles Barton and Meridian) that Atlantic did not properly or timely tender as required under paragraph II.8 of the Joint Control Trust Account Agreement; (iv) that Atlantic may not demand reimbursement of expenses not reasonably incurred by reason of having executed the involved bonds (including, but not limited to, amounts paid because Atlantic failed to timely respond to bond claims, amounts related to redacted entries, amounts related to work performed to improve Atlantic's position versus HRGM, amounts representing unreasonable charges, amounts paid to expedite Atlantic's departure from the bonding business, etc.); (v) that Atlantic, which is fully secured under the Joint Control Trust Account Agreement, may not settle subcontractor disputes over HRGM's reasonable objections and then demand repayment of such amounts from HRGM and the Butanis; and (vi) that HRGM and the Butanis are entitled to have some or all of the collateral released under the Joint Control Trust Account Agreement.

## Count II Breach of Contract and Fiduciary Duty

54.    HRGM and the Butanis restate the allegations of paragraphs 1 through 47 of the Complaint.

55.    HRGM, the Butanis, and Atlantic are parties to a Joint Control Trust Account Agreement.

56.    The Joint Control Trust Account Agreement creates a trust relationship between Atlantic and HRGM and the Butanis.

57.    Under the Joint Control Trust Account Agreement, Atlantic is called upon to act on behalf of HRGM and the Butanis.

58.    HRGM and the Butanis have performed their obligations under the Joint Control Trust Account Agreement.

59.    Atlantic, however, has failed to perform its obligations under the Joint Control Trust Account Agreement and otherwise breached the Joint Control Trust Account Agreement by:

- Willfully and maliciously demanding that HRGM and the Butanis pay amounts not due under the Joint Control Trust Account Agreement;

- Willfully and maliciously seeking reimbursement from HRGM and the Butanis of expenses that Atlantic incurred without regard for their reasonableness or propriety.

- Willfully, maliciously, and unreasonably settling several subcontractor claims at levels above the amounts authorized by HRGM notwithstanding that Atlantic had security interests sufficient to cover amounts due under the Joint Control

Trust Account Agreement and any potential litigation losses and otherwise with bad faith disregard for the interests of HRGM and the Butanis;

• Willfully and maliciously settling certain subcontractor claims at amounts above those reasonably determined as potentially due by HRGM (and charging such amounts back to HRGM and the Butanis) with bad faith disregard for the interests of HRGM and the Butanis or as a result of legal issues caused by or business issues relating solely to Atlantic (e.g., Atlantic's intended shut down of its bonding business);

• Willfully and maliciously failing to handle the Trust account monies as provided for in the Joint Control Trust Account Agreement;

• Willfully and maliciously failing to acknowledge and act with reasonable promptness on requests to meet with HRGM and the Butanis to reconcile and account for the handling of the Joint Control Trust Account Agreement money in violation of Atlantic's obligation of good faith and fair dealing;

• Willfully and maliciously failing to release (or even consider release of) HRGM and Butani property as required by the Joint Control Trust Account Agreement notwithstanding multi-million dollar repayments by HRGM;

• Willfully and maliciously failing to and provide HRGM and the Butanis with "copies of all bank statements and checks" as requested and required under the Joint Control Trust Account Agreement; and

• Willfully and maliciously failing to provide HRGM and the Butanis with sufficient information to understand the amounts claimed by Atlantic under the Joint Control Trust Account Agreement.

60. By and through the above listed conduct, Atlantic breached the Joint Control Trust Account Agreement and underlying Indemnity Agreement.

61. In addition, by and through the above listed conduct, Atlantic breached the fiduciary duties it owes to HRGM and the Butanis as a result of the Joint Control Trust Account Agreement.

62. As a direct and proximate result of Atlantic's breaches of the Agreement, HRGM and the Butanis have been injured and continue to suffer further injury and damages.

WHEREFORE, HRGM and the Butanis request compensatory damages in the amount of $3 million dollars or such other amount as HRGM and the Butanis prove at trial and punitive damages, together with interest, costs, and attorneys' fees, and such other relief as is just and equitable.

### Count III Accounting

63. HRGM and the Butanis restate the allegations of paragraphs 1 through 47 of the Complaint.

64. HRGM, the Butanis, and Atlantic are parties to a Joint Control Trust Account Agreement.

65. HRGM and the Butanis have performed their obligations under the Joint Control Trust Account Agreement, including HRGM tendering over $6.8 million (excluding credits) to Atlantic for use and handling only as set forth under the Agreement.

66. Pursuant to the Joint Control Trust Account Agreement, Atlantic has taken the $6.8 million dollars for use in trust and demanded that HRGM and the Butanis owe Atlantic an additional $2,749,654.30 under the Agreement.

67.    HRGM and the Butanis are entitled to a full, complete, and accurate statement of the handling of the amounts tendered by HRGM under the Joint Control Trust Account Agreement and the amounts claimed by Atlantic under the Agreement.

68.    HRGM and the Butanis have sought such an accounting over a period of numerous months.

69.    Atlantic, however, has not provided a full or complete account of the handling of the amounts tendered by HRGM through the Joint Control Trust Account Agreement or claimed by Atlantic under the Agreement.

WHEREFORE, HRGM and the Butanis request that Atlantic be ordered by this Court to fully and completely account for the handling and use of all sums provided by HRGM under the Joint Control Trust Account Agreement or charged by Atlantic (and back to HRGM and the Butanis) under the Joint Control Trust Account Agreement and that HRGM and the Butanis have judgment against Atlantic in any sum found due them together with interest, costs, and attorneys' fees, and such other relief as is just and equitable.

## PRAYER FOR RELIEF

WHEREFORE, HRGM and the Butanis respectfully request that the Court:

a.    grant HRGM and the Butanis the relief requested in the Complaint; and

b.    grant HRGM and the Butanis such other and further relief as the Court deems just and proper.

## JURY TRIAL DEMAND

HRGM and the Butanis hereby demand a trial by jury on all counts so triable.

**VERIFICATION**

I, Ramesh Butani, President of HRGM Corporation, state that the facts contained in this Complaint are true and correct to the best of my information and belief.

Dated:  May 8, 2007

_____
Ramesh Butani

Dated:  May 8, 2007

Respectfully Submitted,

_____
Craig A. Holman (D.C. Bar No. 447852)
Cameron W. Fogle (D.C. Bar No. 473380)
ARNOLD & PORTER LLP
555 Twelfth Street, N.W.
Washington, D.C. 20004
Tel:  (202) 942-5000
Fax:  (202) 942-5722

CA Form 1

$\mathfrak{Mamo}$

**RECEIVED**

JUN 1 4 2007

Corporate Legal

## Superior Court of the District of Columbia
### CIVIL DIVISION
500 Indiana Avenue, N.W., Room JM-170
Washington, D.C. 20001 Telephone: 879-1133

| HRGM Corporation, et al. |
|---|

*Plaintiff*

vs.

| Atlantic Mutual Insurance Company |
|---|

*Defendant*

Civil Action No. | 0003206-07 |

## SUMMONS

To the above named Defendant:

You are hereby summoned and required to serve an Answer to the attached Complaint, either personally or through an attorney, within twenty (20) days after service of this summons upon you exclusive of the day of service. If you are being sued as an officer or agency of the United States Government or the District of Columbia Government you have 60 days after service of this summons to serve your Answer. A copy of the Answer must be mailed to the attorney for the party plaintiff who is suing you. The attorney's name and address appear **below.** If plaintiff has no attorney, a copy of the Answer must be mailed to the plaintiff at the address stated on this Summons.

You are also required to file the original Answer with the Court in Room JM 170 at 500 Indiana Avenue, N.W. between 9:00 a.m. and 4:00 p.m., Mondays through Fridays or between 9:00 a.m. and 12:00 Noon on Saturdays. You may file the original Answer with the Court either before you serve a copy of the Answer on the plaintiff or within five (5) days after you have served the plaintiff If you fail to file an Answer, judgment by default may be entered against you for the relief demanded in the complaint.

*Clerk of the Court*

| Craig A. Holman |
|---|

Name of Plaintiff's Attorney

| 555 12th Street, N.W. |
|---|

Address

| Washington, D.C. 20004 |
|---|

| 202-942-5722 |
|---|

Telephone

By _____

Deputy Clerk

Date | June 12, 2007 |

PUEDE OBTENERSE COPIAS DE ESTE FORMULARIO EN ESPANOL EN EL TRIBUNAL SUPERIOR DEL DISTRITO DE COLUMBIA 500 INDIANA AVENUE. N W SALA JM 170

YOU MAY OBTAIN A COPY OF THIS FORM IN SPANISH AT THE SUPERIOR COURT OF D.C. 500 INDIANA AVENUE. N.W. ROOM JM 170

Form CV(6)-456/Mar. 93

**NOTE:** SEE IMPORTANT INFORMATION ON BACK OF THIS FORM

IMPORTANT: IF YOU FAIL TO SERVE AND FILE AN ANSWER WITHIN THE TIME STATED ABOVE, OR IF, AFTER YOU ANSWER, YOU FAIL TO APPEAR AT ANY TIME THE COURT NOTIFIES YOU TO DO SO, A JUDGMENT BY DEFAULT MAY BE ENTERED AGAINST YOU FOR THE MONEY DAMAGES OR OTHER RELIEF DEMANDED IN THE COMPLAINT. IF THIS OCCURS, YOUR WAGES MAY BE ATTACHED OR WITHHELD OR PERSONAL PROPERTY OR REAL ESTATE YOU OWN MAY BE TAKEN AND SOLD TO PAY THE JUDGMENT. IF YOU INTEND TO OPPOSE THIS ACTION, DO NOT *FAIL TO ANSWER WITHIN THE REQUIRED TIME*

If you wish to talk to a lawyer and feel that you cannot afford to pay a fee to a lawyer, promptly contact one of the offices of the Legal Aid Society (628-l 161) or the Neighborhood Legal Services (682-2700) for help or come to Room JM 170 at 500 Indiana Avenue, N.W, for more information concerning where you may ask for such help.

*Manno* (handwritten)

**RECEIVED**

JUN 1 4 2007

Corporate Legal

**CT** CORPORATION
A WoltersKluwer Company

**Service of Process
Transmittal**
06/12/2007
Log Number 512304787

TO:     Nancy Hahon
        Atlantic Mutual Insurance Company
        100 Wall Street, 28th Floor
        New York, NY, 10005-3743

RE:     **Process Served in District of Columbia**

FOR:    ATLANTIC MUTUAL INSURANCE COMPANY (Domestic State: NJ)

**ENCLOSED ARE COPIES OF LEGAL PROCESS RECEIVED BY THE STATUTORY AGENT OF THE ABOVE COMPANY AS FOLLOWS:**

| | |
|---|---|
| **TITLE OF ACTION:** | HRGM Corporation, et al Pltfs vs Atlantic Mutual Insurance Company, Dft |
| **DOCUMENT(S) SERVED:** | Summons, Complaint, Verification, Exhibits |
| **COURT/AGENCY:** | Superior Court - Civil Division, DC<br>Case # 0003206-07 |
| **NATURE OF ACTION:** | Complaint for Declaratory Judgment, Breach of Contract, Breach of Fiduciary Duty, and Accounting |
| **ON WHOM PROCESS WAS SERVED:** | C T Corporation System, Washington, DC |
| **DATE AND HOUR OF SERVICE:** | By Process Server on 06/12/2007 at 12:20 |
| **APPEARANCE OR ANSWER DUE:** | Within 20 days after service exclusive of the day of service |
| **ATTORNEY(S) / SENDER(S):** | Craig A. Holman<br>Arnold & Porter LLP<br>555 12th Street, N.W.<br>Washington, DC, 20004<br>202-942-5000 |
| **ACTION ITEMS:** | SOP Papers with Transmittal, via Fed Ex 2 Day, 790268175700<br>Email Notification, Vera Drew Vera_C_Drew@AtlanticMutual.com |
| **SIGNED:**<br>**PER:**<br>**ADDRESS:** | C T Corporation System<br>Mark Diffenbaugh<br>1015 15th Street, N.W.<br>Suite 1000<br>Washington, DC, 20005 |
| **TELEPHONE:** | 202-572-3133 |

JUN 1 5 2007

Page 1 of 1 / MH

Information displayed on this transmittal is for CT Corporation's record keeping purposes only and is provided to the recipient for quick reference. This information does not constitute a legal opinion as to the nature of action, the amount of damages, the answer date or any information contained in the documents themselves. Recipient is responsible for interpreting said documents and for taking appropriate action. Signatures on certified mail receipts confirm receipt of the package only, not of its contents.