## SUPERIOR COURT FOR THE DISTRICT OF COLUMBIA
## CIVIL DIVISION

HRGM CORPORATION )
2020 Shannon Place, S.E. )
Washington, D.C. 20020 )
)
and )
)
RAMESH BUTANI )
1205 South Huntress Court )
McLean, Virginia 22102 )
)
and )
)
HANSA BUTANI )
1205 South Huntress Court )
McLean, Virginia 22102 )
)
Plaintiffs, )
)
v. )
)
ATLANTIC MUTUAL INSURANCE )
COMPANY )
Administrative Center )
Three Giralda Farms )
Madison, New Jersey 07940-1004 )
)
SERVE:      D.C. Dept. of Insurance and )
Securities Regulation )
Lawrence Mirel, Insurance )
Commissioner )
Statutory Agent )
810 First Street, N.E., )
Suite 701 )
Washington, D.C. 20022 )
Attn: Ms. Michelle Mathis )
)
Defendant. )

RECEIVED
Civil Clerk's Office

MAY 0 8 2007

Superior Court of the
District of Columbia
Washington, D.C.

0003206-07

Civil Action No. _____

**JURY TRIAL DEMANDED**

## COMPLAINT FOR DECLARATORY JUDGMENT, BREACH OF CONTRACT, BREACH OF FIDUCIARY DUTY, AND ACCOUNTING

COMES NOW Plaintiffs HRGM Corporation ("HRGM") and Ramesh Butani and Hansa Butani (collectively, the "Butanis"), by and through their undersigned counsel and for their complaint against defendant Atlantic Mutual Insurance Company state as follows:

## PARTIES AND JURISDICTION

1.     Plaintiff HRGM, formerly HR General Maintenance Corporation, is a small, minority-owned corporation with its principal place of business in the Anacostia section of Washington, D.C., at 2020 Shannon Place, S.E., Washington, D.C. 20020. HRGM is organized under the laws of Virginia and registered to conduct business in the District of Columbia. HRGM provides construction contracting services to public and private entities.

2.     Plaintiff Ramesh Butani is an individual and the President of HRGM. Mr. Butani resides at 1205 South Huntress Court, McLean, Virginia 22102.

3.     Plaintiff Hansa Butani is an individual and the wife of Ramesh Butani. Mrs. Butani resides at 1205 South Huntress Court, McLean, Virginia 22102. (Sometimes Ramesh Butani and Hansa Butani are referred to herein as the "Butanis".)

4.     Defendant Atlantic Mutual Insurance Company ("Atlantic") is an insurance and surety company with its principal place of business located at Three Giralda Farms, Madison, New Jersey 07940. Atlantic has conducted business in the District of Columbia on numerous occasions in connection with the events outlined herein.

3.     This Court has jurisdiction over this action under D.C. Code Ann. 11-921.

## BACKGROUND FACTS APPLICABLE TO ALL COUNTS

### The Atlantic-HRGM Relationship

5.     HRGM has provided construction services since the 1970s.

6. Many of the projects for which HRGM provides construction services (particularly jobs for federal, state, and local governments) require the issuance of bid, performance, and payment bonds by a surety.

7. In or about 2001, Atlantic and HRGM entered a relationship by which Atlantic began issuing bid, performance, and payment bonds for HRGM on a number of projects. HRGM paid Atlantic a percentage of the contract amount for issuing these bonds.

8. Although HRGM had an established history of performing construction projects, Atlantic required that HRGM and the Butanis execute a General Agreement of Indemnity in connection with issuance of the bonds. (*See* Exhibit A at Attachment 1, General Agreement of Indemnity.)[1]

9. Over the course of the next year or so, Atlantic issued bonds for HRGM on approximately fifteen different projects located throughout the District of Columbia, Maryland, and Virginia.

10. Beginning in or about 2002, HRGM (which had over 20 years of business experience and was an Anacostia success story - even receiving Inc. Magazine recognition as a fastest growing inner city company) suffered difficulties on several of its projects, including improper terminations for default on two District of Columbia projects for which Atlantic had issued bonds. At the same time, HRGM also suffered a major fire (which HRGM did not cause) on a Prince Georges' County project (the Carmody Hills Elementary School).

11. Although the owners had stopped payments to HRGM on several of the projects, HRGM's subcontractors continued to demand payment (in many instances despite contractual

---

[1] Exhibit A to the Complaint is a Joint Trust Control Agreement between Atlantic, HRGM, and the Butanis that is discussed at length later in this Complaint. The General Agreement of Indemnity between the parties is attached as to the Joint Trust Control Agreement and is included as part of Complaint Exhibit A. The copy of the Joint Control Trust Account Agreement attached hereto, however, does not contain the confidential financial statement of the Butanis that was part of that Agreement and redacts certain financial information.

"pay when paid" and "pay if paid" provisions) from both HRGM and Atlantic (under the project payment bonds). A number of subcontractors commenced legal actions against HRGM and Atlantic.

12.    Pursuant to the General Agreement of Indemnity, HRGM indemnified and held Atlantic harmless in connection with the legal matters through the fall of 2004.

### The Joint Control Trust Account Agreement

13.    In the fall of 2004, HRGM was dealing with simultaneous litigation, asserting claims against project owners and defending against payment demands and lawsuits brought by subcontractors against HRGM and Atlantic (in which HRGM was defending both HRGM and Atlantic). In light of this situation, HRGM met with Atlantic to discuss whether Atlantic would advance funds (secured by property owned by the Butanis) to allow HRGM to resolve a number of the subcontractor matters.

14.    As a result of their meeting, on October 25, 2004, Atlantic, HRGM, and the Butanis entered a Joint Control Trust Account Agreement. The Agreement created more than a surety relationship between the parties. In essence, Atlantic assumed control of many of the pending lawsuits against both it and HRGM. In addition, Atlantic assumed complete control over all funds paid to HRGM that were in any way connected with the bonded contracts. In short, HRGM and the Butanis entered into a relationship of trust with Atlantic, pursuant to which Atlantic acted on behalf of all of the parties with regard to certain legal actions and controlled funds to which both parties had potential rights.

15.    With respect to the subcontractor legal actions, Atlantic initially demanded the power to decide whether to litigate or settle those cases. HRGM (having provided Atlantic with substantial property to secure the debt) and the Butanis, however, had concern that Atlantic

might simply close cases (by paying more than a subcontractor was due) and required language allowing only the exercise of "reasonable discretion" by Atlantic.

16.     In addition, the Joint Control Trust Account Agreement required that HRGM pay to Atlantic any "unpaid contract balances, proceeds of change orders, or any funds which are paid by the Obligees on account of the Bonded Contracts." (Ex. A at ¶ II.8.)  The Agreement provided that such funds would be held in "trust," and would be used to repay amounts advanced by Atlantic, with any remainder paid to HRGM.  (*Id.* at ¶ II.7.)

17.     Any "checks or charges" against the Trust Account that were to be used for HRGM's benefit required "two signatures, one signature being that of an authorized representative of the Principal and the other by an authorized representative of the Surety [*i.e.*, Atlantic]." (*Id.* at ¶ II.6, II.7.)  Atlantic, however, was permitted to write checks to itself out of the Trust Accounts without an HRGM signature. (*Id.* at ¶ II.13.)

18.     With respect to any expenses incurred by Atlantic, its counsel, or its consultants that Atlantic contended were subject to reimbursement by HRGM or the Butanis, the Joint Control Trust Account Agreement required that Atlantic "promptly" provide invoices for already incurred amounts and send all future invoices to HRGM or the Butanis within 30 days of the Surety's receipt of such invoices:

> . . . . After the execution of this Agreement, Surety agrees to promptly provide to HRGM copies of all invoices from Surety's counsel and from consultants retained by Surety or its counsel, which Surety contends are advances, losses, costs or other charges that are subject to reimbursement by HRGM or the Indemnitors, subject to the terms and conditions of the Agreement of Indemnity. Thereafter, subject to the elimination of privileged communication, Surety will send all such future invoices within thirty (30) days of Surety's receipt of such invoices.

(*Id.* at ¶ II.8.)

19.    Under the Joint Control Trust Account Agreement, HRGM and the Butanis agreed to begin reimbursing Atlantic on January 2, 2007 (in payments spread over two years) for any amounts then due under the Agreement:

> If, by January 2, 2007 ("Reimbursement Deadline"), the Surety has not been fully reimbursed for all advances it has made under the Agreement of Indemnity or this Agreement and for another loss, cost, or expense which it has incurred and for which HRGM and Indemnitors are obligated to pay Surety in accordance with the Agreement of Indemnity (collectively the "Surety Advances"), then commencing on the Reimbursement Deadline, and on the first day of each month thereafter until the Surety Advances have been paid in full, HRGM shall commence making monthly payments to Surety in an amount sufficient to repay the outstanding balance of the Surety Advances as of the Reimbursement Deadline in twenty four (24) equal monthly payments of principal and interest assuming no additional payments are made pursuant to this Agreement after the Reimbursement Deadline. If any other payments are made to Surety pursuant to this Agreement after the Reimbursement Deadline, then on each such occasion ("Adjustment Date") the amount of the monthly payments thereafter required shall be adjusted downward, and shall be the amount of monthly payments necessary to pay off the outstanding balance of the Surety Advances as of the Adjustment Date by the twenty fourth (24th) month after the Reimbursement Deadline.

(*Id.* at ¶ II.10.)

16.    Atlantic also agreed to forebear from taking action under the General Agreement of Indemnity provided that HRGM and the Butanis, *inter alia*, provided Atlantic with security interests and liens in a number of HRGM and Butani assets. (*See Id.* at I.1 ("The Surety agrees that it will fund all reasonable settlements that Principal and Surety are able to negotiate with subcontractors, vendors and suppliers for claims arising in connection with the performance of the Bonded Contracts. . .").)

17.    Paragraph II.4 of the Joint Control Trust Account Agreement described the property tendered as collateral in connection with the Joint Control Trust Account Agreement:

The Principal's obligations to the Surety under the Agreement of Indemnity and under this Agreement shall be secured by (i) all of the collateral pledged by the Principal in the Agreement of Indemnity, including but not limited to Section 12 of the Agreement of Indemnity, to secure Principal's obligations under the Agreement of Indemnity, and by all of the monies of the Trust Account (hereinafter defined), which collateral is collectively hereinafter referred to as the "Original Collateral." To further secure their obligations under the Agreement of Indemnity and this Agreement, the Indemnitors hereby grant to Surety security interests and liens (as indicated in **Exhibit 3**) in the following (collectively the "Additional Collateral"): (i) Lot 1027, Square 5771 – 2021 Shannon Place S.E., Washington, D.C. 20020; (ii) Lot 1026, Square 5771 – 2021 Shannon Place, S.E., Washington, D.C. 20020; (iii) 700 New Hampshire Ave., N.W., Unit 615, Washington, D.C. 20037; (iv) Condominium, 3819 South George Mason Drive, Falls Church, Virginia; (v) Unit 23 Tyco Park, Fairfax County, Virginia; (vi) 4445 B Brookfield Corporate Drive, Chantilly, Virginia; (vii) Harborside Atlantis Vacation Timeshare in Paradise Island, Bahamas; and (viii) [redacted] Account of Annuity [redacted]. . . .

(*Id.* at ¶ II.4.) Several of the properties securing the Joint Control Trust Account Agreement are in the District of Columbia.

20.     Atlantic agreed not to immediately perfect its security interest in the Annuity Account, a retirement account that Mr. Butani assigned as collateral, because such actions would result in immediate losses and tax liabilities that would irreparably harm Mr. Butani. Instead, the parties agreed that Atlantic would not perfect or otherwise file the assignment absent an event of default under the Agreement.

21.     Paragraph II.4 of the Joint Control Trust Account Agreement also required Atlantic to begin releasing the property (on request) as soon as Atlantic became oversecured with respect to the liabilities of HRGM and the Butanis:

. . . If Surety subsequently becomes oversecured with respect to the liabilities of Principal and Indemnitors to Surety, Surety (at HRGM's request or requests) will release its security interests and liens in one or more pieces of the Additional Collateral such that

7

Surety at its discretion remains fully secured (but not oversecured). Surety will release the security interests and liens in the following order: (i) Unit 23, Tyco Park, Fairfax County, Virginia; (ii) 4445 B Brookfield Corporate Drive, Chantilly, Virginia; (iii) Lot 1027, Square 5771 – 2021 Shannon Place, S.E., Washington, D.C. 20020; (iv) Lot 1026, Square 5771 – 2021 Shannon Place, S.E., Washington, D.C. 20020; (v) 700 New Hampshire Ave., N.W., Unit 615, Washington, D.C. 20037; (vi) Condominium, 3819 South George Mason Drive, Falls Church, Virginia; (vii) [redacted] Account of Annuity [redacted]; and (viii) Harborside Atlantis Vacation Timeshare in Paradise Island, Bahamas. Nothing in the foregoing provision shall require Surety to release a property if such release would leave Surety undersecured with respect to the liabilities of Principal and Indemnitors to Surety under this Agreement and the Agreement of Indemnity.

(*Id.* at ¶ II.4.)

### The Post-Joint Control Trust Account Agreement Period

22.     After entering into the Joint Control Trust Account Agreement, Atlantic insisted that its lawyers (Niles, Barton & Wilmer, LLP) take over much of the active litigation related to the Atlantic bonds from the lawyers HRGM had been using (Holland & Knight LLP). The primary exceptions involved HRGM's litigation against the owners and certain exceptionally advanced subcontractor litigation. As a result of this transition, many of the tasks performed by Atlantic's counsel were duplicative of tasks already performed by HRGM's counsel and already paid for by HRGM.

23.     Over the coming year, Atlantic lawyers' engaged in a course of settling the subcontractor claims against HRGM and Atlantic. On a number of occasions, the settlements were made over HRGM's express written objection and/or in bad faith disregard of HRGM's interests and assertions.

24.     In certain circumstances, Atlantic faced subcontractor legal allegations that Atlantic had waived defenses by failing to timely respond to subcontractor bond claims.

25.   Also, at or about the time that Atlantic was settling the cases over HRGM objection, Atlantic (on information and belief) was seeking to shut down and close its bonding business.

26.   Simultaneously, HRGM and its counsel litigated the claims against the project owners, ultimately succeeding in getting the two District of Columbia default terminations converted to terminations for convenience and obtaining significant settlement payments. HRGM and its counsel also successfully settled several other owner claims. All Atlantic related owner claim settlements were made with the knowledge and consent of Atlantic. Pursuant to the Joint Control Trust Account Agreement, HRGM provided the litigation settlement amounts and all other proceeds on the Atlantic bonded contracts to Atlantic - an amount in excess of $6.8 million. (In two instances, Atlantic provided additional credit to HRGM to make owner settlement offers more attractive and when these credits are accounted for, HRGM's overall contribution to Atlantic is more than $7.1 million.)

27.   By early 2006, much of the litigation (subcontractor and owner) had been resolved and HRGM and the Butanis requested an opportunity to meet with Atlantic to seek an early resolution of the Joint Control Trust Account Agreement and the immediate release of some or all of the secured properties.

28.   In or about February 2006, the parties met in Baltimore. During the meeting, Atlantic asserted that HRGM and the Butanis owed it approximately $2.2 million under the Joint Control Trust Account Agreement. Because the figure was far above what HRGM's records showed, HRGM and the Butanis requested that Atlantic break down the amounts.

29.   The high level breakdown that Atlantic provided at the February 2006 meeting made it clear that Atlantic sought to charge HRGM and the Butanis for well over $1 million in

attorney fees (Niles, Barton and Wilmer) and consultant fees, despite the fact that Atlantic had not provided HRGM or the Butanis with invoices for these fees as required under the Joint Control Trust Account Agreement.   The breakdown also seemed to reveal other material discrepancies in the amount that Atlantic claimed was due from HRGM and the Butanis.

30.   HRGM and the Butanis objected to Atlantic's calculations both in the meeting and later in writing.  Specifically, HRGM and the Butanis objected to Atlantic's inclusion of amounts for which Atlantic had not provided timely notice, certain settlements that Atlantic made over HRGM's objection, and discrepancies in Atlantic's accounting records.   *(See, e.g.,* Exhibit B, Letter from Manno to Butani dated 2/16/06 (forwarding for the first time redacted Niles Barton and Meridian bills).)

31.   Atlantic's failure to timely present invoices from its attorneys and consultants deprived HRGM of the ability to account for such costs and expenses in its affirmative claim settlements and to review and question the time and amounts charged.  Moreover, significant amounts included in the untimely provided bills have nothing to do with subcontractor lawsuits or owner claims but instead relate to Atlantic seeking to improve its position with respect to HRGM, the Butanis, and their assets.  Certain of the bills also are heavily redacted making it difficult to determine whether such amounts would be properly reimbursable even if timely provided (which they were not).

32.   When the February 2006 meeting concluded, the parties had not reached agreement regarding the amount properly claimed by Atlantic under the Joint Control Trust Account Agreement.

33.   Following the February meeting, Atlantic and HRGM met again to reconcile their accounts with respect to the Joint Control Trust Account Agreement.  Although the meeting shed

further light on the efforts the parties needed to undertake to accurately reconcile the accounts, no such reconciliation occurred.

34.   During this period, HRGM and the Butanis continued to request that Atlantic begin releasing property secured by the Joint Control Trust Account Agreement. Even though the time had passed for any further suits on the Atlantic bonds (subcontractor or otherwise), and even though Atlantic had received over $7.1 million from HRGM since the parties entered into the Joint Control Trust Account Agreement, Atlantic did not meaningfully respond to the requests to release the secured property, much less release any of that property. (*See, e.g.,* Exhibit C, Letter from Gillis to Holman dated 12/21/06 ("With regard to HRGM's requests for a release of additional collateral, on more than one occasion, Ms. Manno has advised HRGM that it would review the collateral issue once all of the claims have been resolved."))

35.   On November 17, 2006, Atlantic (by Nancy Manno) sent Rachna Butani (the Butani's daughter and an HRGM director) an "updated worksheet" that recognized "some confusion concerning the recovery" and the inability of the parties to get "the numbers to match." (Exhibit D, E-mail from Manno to Butani dated 11/17/06.) The worksheet reflected numerous unexplained increases and again sought the nearly $1.2 million in fees and costs associated with Atlantic's attorneys and consultants for which Atlantic had not timely provided HRGM invoices. (*Id.*) The worksheet reflected a revised, materially increased purported amount due from HRGM and the Butanis of $2,736,445.82. (*Id.*)

36.   The worksheet Atlantic provided is (as Atlantic seemingly admits) a work in progress. Among other shortcomings, the worksheet is not complete. It is missing substantial payments that HRGM made to Atlantic and its agent Meridian under the Joint Control Trust Account Agreement and it does not provide any detail below the project level as to the claimed

advances. In addition, the worksheet improperly seeks nearly $1.2 million in costs associated with Niles Barton and Meridian for which Atlantic failed to provide timely or proper notice under the Joint Control Trust Account Agreement.

37.    Through the end of 2006, HRGM and the Butanis (repeatedly and in writing) sought to meet with Atlantic in order to (i) obtain an accurate accounting, (ii) reconcile the parties' disparate numbers, (iii) obtain the release of the secured property, and (iv) if possible, close the parties' relationship. (See, e.g., Exhibit E, E-mail from Butani to Manno dated 12/8/06 ("I still haven't heard back from you concerning our HRGM/Atlantic meeting date/time. I left you a voicemail message on Tuesday night as well as the email this past weekend. It is very critical that we schedule a meeting next week immediately. . . . "); Exhibit F, E-mail from Butani to Manno dated 12/3/06 ("I received the loss numbers per your spreadsheet as I noted to you in our last discussion, my numbers are different than yours. We will need to sit down and go over the transactions .. . . ."); Exhibit G, E-mail from Rachna Butani to Manno dated 11/14/06 (" . . . I have not received an up to date accounting summary of what Atlantic believes is owed from HRGM per the Joint Control Agreement."); Exhibit H, E-mail from Butani to Manno dated 9/26/06 ("I wanted to drop you a line because I hadn't heard back from you since I left two voicemail messages. . . .I was hoping to speak with you concerning the closeout between HRGM and Atlantic.").) Atlantic, however, refused these requests, stating that it was too busy to meet with HRGM.

38.    In late December, while still was refusing the requests for a meeting, Atlantic asserted, for the first time, that HRGM and the Butanis should begin making monthly payments under the Joint Control Trust Account Agreement based upon an Atlantic assumed debt of at least $2 million.

39.     HRGM and the Butanis, through counsel, objected to Atlantic's demanded approach because it required HRGM or the Butanis to begin paying on an amount that was far in excess of what they believed to be due and did so without even providing a detailed accounting of the claimed amount.  HRGM and the Butanis suggested instead that the parties: (i) meet immediately to reconcile the account and address any disagreements; (ii) allow their counsel to meet to do the same (if Atlantic was not available); and (iii) allow HRGM or the Butanis to start paying on a lesser amount (approximately $700,000) until the parties could meet.

40.     Although Atlantic was the holder and trustee of over $6.8 million dollars that HRGM provided and further was secured by substantial property, it responded to the requests of HRGM and the Butanis with an increased demand and threats of default.  Specifically, on December 21, 2006, Atlantic demanded that HRGM "commence payment on Atlantic's current accounting of $2,749,654.30 in losses and expenses."  (*See* Exhibit D, Letter from Gilliss to Holman dated 12/21/06 at 2.)

41.     Despite Atlantic's hostile posture, and in a good faith effort to comply with its obligations under the Joint Control Trust Account Agreement, HRGM timely sent a first payment check to Atlantic in January 2007 for $29,162.44. The amount of the check was based upon HRGM's good faith estimate of the amount that it properly owed under the Agreement with monthly repayments spread over the Agreement's repayment period.

42.     In addition, after much effort, Atlantic finally agreed to meet with HRGM and Ramesh Butani in New Jersey on January 17, 2007.  This meeting, however, once again ended without Atlantic providing an accounting to support its calculations of the amount owed under the Joint Control Trust Account Agreement or an agreement by the parties with regard to that

amount. Indeed, Atlantic continued to assert that HRGM and the Butanis owe $2,749,654.30 and demanded that they immediately begin making payments.

43. On January 18, 2007, Atlantic sent a notice of default to HRGM and the Butanis and returned the $29,162.44 good faith payment. In violation of the cure provisions in the Joint Control Trust Account Agreement, Atlantic demanded that HRGM or the Butanis make a payment of $127,197.33 by January 28, 2007. Atlantic threatened to initiate action to protect its interests if the payment was not made.

44. In response to a letter from HRGM's counsel (noting the improper and heavy-handed nature of the January 18, 2006 default notice), Atlantic reissued its default notice on January 23, 2007. This notice demanded that HRGM or the Butanis make a payment of $127,197.33 by February 7, 2007.

45. In light of the ongoing dispute between the parties, HRGM and the Butanis through counsel, requested that Atlantic withdraw its January 23, 2007 default notice pending further negotiations between the parties and without prejudice to Atlantic's right to reissue the notice should such negotiations fail. HRGM and the Butanis explained that if Atlantic did not withdraw the notice, HRGM and the Butanis would be forced to seek a judicial resolution of the dispute. HRGM and the Butanis again required that Atlantic provide them with "copies of all bank statements and checks for the Trust Account pursuant to provision III.11."

46. Subsequent to January 2007, the Parties entered a standstill agreement to allow for further discussions. The standstill agreement extended through May 7, 2007. The Parties were unable to reach resolution of the matter.

47. HRGM and the Butanis have satisfied all conditions precedent to bringing this action.

## CAUSES OF ACTION

### Count I Declaratory Judgment

48.     HRGM and the Butanis restate the allegations of paragraphs 1 through 47 of the Complaint.

49.     HRGM, the Butanis, and Atlantic are parties to a Joint Control Trust Account Agreement.

50.     An actual, existing, justiciable controversy exists between HRGM and the Butanis and Atlantic regarding the Joint Control Trust Account Agreement and the parties' rights and liabilities arising thereunder.

51.     HRGM and the Butanis have performed their obligations under the Joint Control Trust Account Agreement.

52.     Atlantic, however, has refused to perform its obligations under the Joint Control Trust Account Agreement and otherwise breached the Joint Control Trust Account Agreement by:

- Demanding that HRGM and the Butanis pay amounts not due under the Joint Control Trust Account Agreement;

- Settling several subcontractor claims at levels above the amounts authorized by HRGM notwithstanding that Atlantic had security interests sufficient to cover any amounts due under the Joint Control Trust Account Agreement and the amounts at issue in the involved litigation;

- Failing to handle the "Trust" account monies as provided for in the Joint Control Trust Account Agreement;

- Failing to acknowledge and act with reasonable promptness on requests to meet, reconcile, and account for the handling of the Joint Control Trust Account Agreement money;

- Settling subcontractor claims at amounts above those reasonably determined as potentially due apparently with bad faith disregard for the interests of HRGM and the Butanis or as a result of legal issues caused by or business issues relating solely to Atlantic (e.g., Atlantic's intended shut down of its bonding business);

- Refusing to consider release of the property tendered by HRGM and the Butanis under the Joint Control Trust Account Agreement;

- Failing to provide HRGM and the Butanis with "copies of all bank statements and checks" as requested and required under the Joint Control Trust Account Agreement; and

- Failing to provide HRGM and the Butanis with sufficient information to understand the amounts claimed by Atlantic under the Joint Control Trust Account Agreement.

53.     Atlantic demanded (notwithstanding the foregoing conduct) that HRGM and the Butanis commence "repayment" to Atlantic on January 2, 2007 at a rate sufficient to pay Atlantic the sum of $2,749,654.30 plus interest over the next two years even though such amounts are not due under the Joint Control Trust Account Agreement and Atlantic has not provided an adequate explanation of the amount claimed.

WHEREFORE, HRGM and the Butanis request declaratory judgment in their favor: (i) that Atlantic must give HRGM and the Butanis a full and proper accounting of all transactions taking place in connection with the Atlantic controlled Joint Control Trust Account Agreement

before demanding repayment from HRGM and the Butanis and must provide a two year period for repayment of any outstanding amounts; (ii) that Atlantic has breached its obligations of good faith and fair dealing under the Joint Control Trust Account Agreement by failing to provide a proper accounting to HRGM and the Butanis regarding Atlantic's handling of the trust amounts and multi-million dollar demands; (iii) that Atlantic may not demand reimbursement of expenses (including, but not limited to, the expenses associated with Niles Barton and Meridian) that Atlantic did not properly or timely tender as required under paragraph II.8 of the Joint Control Trust Account Agreement; (iv) that Atlantic may not demand reimbursement of expenses not reasonably incurred by reason of having executed the involved bonds (including, but not limited to, amounts paid because Atlantic failed to timely respond to bond claims, amounts related to redacted entries, amounts related to work performed to improve Atlantic's position versus HRGM, amounts representing unreasonable charges, amounts paid to expedite Atlantic's departure from the bonding business, etc.); (v) that Atlantic, which is fully secured under the Joint Control Trust Account Agreement, may not settle subcontractor disputes over HRGM's reasonable objections and then demand repayment of such amounts from HRGM and the Butanis; and (vi) that HRGM and the Butanis are entitled to have some or all of the collateral released under the Joint Control Trust Account Agreement.

## Count II Breach of Contract and Fiduciary Duty

54.     HRGM and the Butanis restate the allegations of paragraphs 1 through 47 of the Complaint.

55.     HRGM, the Butanis, and Atlantic are parties to a Joint Control Trust Account Agreement.

56.     The Joint Control Trust Account Agreement creates a trust relationship between Atlantic and HRGM and the Butanis.

57.     Under the Joint Control Trust Account Agreement, Atlantic is called upon to act on behalf of HRGM and the Butanis.

58.     HRGM and the Butanis have performed their obligations under the Joint Control Trust Account Agreement.

59.     Atlantic, however, has failed to perform its obligations under the Joint Control Trust Account Agreement and otherwise breached the Joint Control Trust Account Agreement by:

> • Willfully and maliciously demanding that HRGM and the Butanis pay amounts not due under the Joint Control Trust Account Agreement;

> • Willfully and maliciously seeking reimbursement from HRGM and the Butanis of expenses that Atlantic incurred without regard for their reasonableness or propriety.

> • Willfully, maliciously, and unreasonably settling several subcontractor claims at levels above the amounts authorized by HRGM notwithstanding that Atlantic had security interests sufficient to cover amounts due under the Joint Control

Trust Account Agreement and any potential litigation losses and otherwise with bad faith disregard for the interests of HRGM and the Butanis;

- Willfully and maliciously settling certain subcontractor claims at amounts above those reasonably determined as potentially due by HRGM (and charging such amounts back to HRGM and the Butanis) with bad faith disregard for the interests of HRGM and the Butanis or as a result of legal issues caused by or business issues relating solely to Atlantic (e.g., Atlantic's intended shut down of its bonding business);

- Willfully and maliciously failing to handle the Trust account monies as provided for in the Joint Control Trust Account Agreement;

- Willfully and maliciously failing to acknowledge and act with reasonable promptness on requests to meet with HRGM and the Butanis to reconcile and account for the handling of the Joint Control Trust Account Agreement money in violation of Atlantic's obligation of good faith and fair dealing;

- Willfully and maliciously failing to release (or even consider release of) HRGM and Butani property as required by the Joint Control Trust Account Agreement notwithstanding multi-million dollar repayments by HRGM;

- Willfully and maliciously failing to and provide HRGM and the Butanis with "copies of all bank statements and checks" as requested and required under the Joint Control Trust Account Agreement; and

- Willfully and maliciously failing to provide HRGM and the Butanis with sufficient information to understand the amounts claimed by Atlantic under the Joint Control Trust Account Agreement.

60.   By and through the above listed conduct, Atlantic breached the Joint Control Trust Account Agreement and underlying Indemnity Agreement.

61.   In addition, by and through the above listed conduct, Atlantic breached the fiduciary duties it owes to HRGM and the Butanis as a result of the Joint Control Trust Account Agreement.

62.   As a direct and proximate result of Atlantic's breaches of the Agreement, HRGM and the Butanis have been injured and continue to suffer further injury and damages.

WHEREFORE, HRGM and the Butanis request compensatory damages in the amount of $3 million dollars or such other amount as HRGM and the Butanis prove at trial and punitive damages, together with interest, costs, and attorneys' fees, and such other relief as is just and equitable.

### Count III Accounting

63.   HRGM and the Butanis restate the allegations of paragraphs 1 through 47 of the Complaint.

64.   HRGM, the Butanis, and Atlantic are parties to a Joint Control Trust Account Agreement.

65.   HRGM and the Butanis have performed their obligations under the Joint Control Trust Account Agreement, including HRGM tendering over $6.8 million (excluding credits) to Atlantic for use and handling only as set forth under the Agreement.

66.   Pursuant to the Joint Control Trust Account Agreement, Atlantic has taken the $6.8 million dollars for use in trust and demanded that HRGM and the Butanis owe Atlantic an additional $2,749,654.30 under the Agreement.

67. HRGM and the Butanis are entitled to a full, complete, and accurate statement of the handling of the amounts tendered by HRGM under the Joint Control Trust Account Agreement and the amounts claimed by Atlantic under the Agreement.

68. HRGM and the Butanis have sought such an accounting over a period of numerous months.

69. Atlantic, however, has not provided a full or complete account of the handling of the amounts tendered by HRGM through the Joint Control Trust Account Agreement or claimed by Atlantic under the Agreement.

WHEREFORE, HRGM and the Butanis request that Atlantic be ordered by this Court to fully and completely account for the handling and use of all sums provided by HRGM under the Joint Control Trust Account Agreement or charged by Atlantic (and back to HRGM and the Butanis) under the Joint Control Trust Account Agreement and that HRGM and the Butanis have judgment against Atlantic in any sum found due them together with interest, costs, and attorneys' fees, and such other relief as is just and equitable.

## PRAYER FOR RELIEF

WHEREFORE, HRGM and the Butanis respectfully request that the Court:

a. grant HRGM and the Butanis the relief requested in the Complaint; and

b. grant HRGM and the Butanis such other and further relief as the Court deems just and proper.

## JURY TRIAL DEMAND

HRGM and the Butanis hereby demand a trial by jury on all counts so triable.

**VERIFICATION**

I, Ramesh Butani, President of HRGM Corporation, state that the facts contained in this Complaint are true and correct to the best of my information and belief.

Dated:  May 8, 2007

Ramesh Butani

Dated:  May 8, 2007

Respectfully Submitted,

Craig A. Holman (D.C. Bar No. 447852)
Cameron W. Fogle (D.C. Bar No. 473380)
ARNOLD & PORTER LLP
555 Twelfth Street, N.W.
Washington, D.C.  20004
Tel:  (202) 942-5000
Fax:  (202) 942-5722