**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **ATLANTIC MUTUAL INSURANCE COMPANY,** | * | |
| **Counter-Plaintiff,** | * | |
| **v.** | * | |
| **HR GENERAL MAINTENANCE** | * | **Case No.: 1:07-cv-01176-JR** |
| **CORPORATION T/A HRGM CORPORATION,** | * | |
| **and** | * | |
| **RAMESH BUTANI, individually,** | * | |
| **and** | * | |
| **HANSA BUTANI, individually,** | * | |
| **Counter-Defendants.** | * | |
| | * | |

\*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*

## COUNTERCLAIM

Defendant/Counter-Plaintiff, Atlantic Mutual Insurance Company, through undersigned counsel, hereby files this Counterclaim against Plaintiffs/Counter-Defendants, HR General Maintenance Corporation t/a HRGM Corporation, Ramesh Butani and Hansa Butani, and in support thereof, alleges as follows:

## PARTIES

1.     Atlantic Mutual Insurance Company ("Atlantic") is an insurance company incorporated in the State of New Jersey and licensed to do business in the State of Maryland.

Atlantic engages in the business of issuing various types of surety bonds, including payment and performance bonds on construction projects.

2.     HR General Maintenance Corporation t/a HRGM Corporation ("HRGM") is a construction company incorporated in the District of Columbia with its principal place of business in the District of Columbia.

3.     Ramesh Butani is a signatory to both the General Agreement of Indemnity ("GAI") and the Joint Control Trust Account Agreement (the "Trust Agreement") between Atlantic, HRGM, Ramesh Butani and Hansa Butani.  Mr. Butani resides in McLean, Virginia.

4.     Hansa Butani is a signatory to both the GAI and the Trust Agreement between Atlantic, HRGM, Ramesh Butani and Hansa Butani.  Mrs. Butani resides in McLean, Virginia.

<u>JURISDICTION AND VENUE</u>

5.     This Court has jurisdiction over this matter pursuant to 28 U.S.C.A. §1332, as there is diversity of citizenship between the parties and the amount in controversy exceeds $75,000.00, exclusive of interest and costs.

<u>BACKGROUND</u>

A.     **THE INDEMNITY AGREEMENT**

6.     In or about 2001, HRGM approached Atlantic for the purpose of obtaining surety bonds on construction projects.

7.     As essential consideration for the execution of such bonds, Atlantic required that HRGM, by its President, Ramesh Butani, execute a General Agreement of Indemnity ("GAI"). In addition to Mr. Butani executing the GAI on behalf of HRGM, Mr. Butani, as an individual, and his wife, Hansa Butani, as an individual, also executed the GAI.

ND: 4818-6986-7009, v.  1

8.      HRGM, Mr. Butani and Mrs. Butani (collectively, the "Indemnitors") executed an Agreement of Indemnity on or about September 28, 2001.  (The Agreement of Indemnity is attached and incorporated herein as Exhibit 1 to this Counterclaim).  In part pertinent to the allegations in this Counterclaim, the Indemnitors agreed that:

> They will indemnify [Atlantic] and hold it harmless from and against all liability, losses, costs, damages, attorneys' fees, disbursements and expenses of every nature which the Surety may sustain or incur by reason of having executed or procured the execution of any such Bonds;

> *       *       *

See Exhibit 1 at Article 6.

9.      Atlantic, in reliance on the Indemnitors' representations that they would exonerate and indemnify Atlantic from all claims, losses, and expenses, executed performance and payment bonds for at least twenty-five (25) projects on which HRGM was hired to perform work.

**B.      THE BONDS**

10.      Upon execution of the GAI by HRGM and Mr. and Mrs. Butani, Atlantic issued the following bonds:

> a.      Bond No. 447390154-0000,  which named the United States as obligee and ensured the completion of certain work on the Pentagon.  Bond No. 447390154-0000 had a penal sum of $5,977,777.00;

> b.      Bond No. 447410496-0000, which named the District of Columbia Public Schools as obligee and ensured the completion of certain work on the Taft Elementary School project.  Bond No. 447410496-0000 had a penal sum of $1,916,049;

> c.      Bond No. 447410453-0000, which named Montgomery County (Maryland) Public Schools as obligee and ensured the completion of work

on the Oakland Terrace Elementary School project.   Bond No. 447410453-0000 had a penal sum of $1,378,130;

d.    Bond Nos. 447410458-0000, 447410466-0000, and 447410477-0000, which named Montgomery County (Maryland) Public Schools as obligee and ensured the completion of work on the Glen Haven Elementary School project.   Bond Nos. 447410458-0000, 447410466-0000, and 447410477-0000 had penal sums of $11,282,108.00, $130,000.00 and $4,000.00, respectively;

e.    Bond No. 447410452-0000, which named Montgomery County (Maryland) Public Schools as obligee and ensured the completion of work on the William Tyler Page Elementary School project.   Bond No. 447410452-0000 had a penal sum of $9,243,477.00;

f.    Bond No. 447390166-0000, which named Prince George's County (Maryland) Public Schools as obligee and ensured the renovation of the Berwyn Heights Elementary School project.  Bond No. 447390166-0000 had a penal sum of $4,975,777.00;

g.    Bond Nos. 447410464-0000 and 447410478-0000, which named District of Columbia Department of Public Works as obligee and ensured the renovation of the Reeves Center project.  Bond Nos. 447410464-0000 and 447410478-0000 had penal sums of $2,877,778.00 and $933,765.00, respectively;

h.    Bond No. 447390165-0000, which named Fairfax County, Virginia Department of Public Works as obligee and ensured the renovation of the Sully District Police Station project.  Bond No. 447390165-0000 had a penal sum of $5,013,521.00;

i.    Bond No. 447410465-0000, which named the District of Columbia Department of Public Works as obligee and ensured the renovation of the Northeast Vehicle Inspection Station.  Bond No. 447410465-0000 had a penal sum of $6,516,266.00;

j.    Bond No. 447410459-0000 which named the District of Columbia Department of Public Works as obligee and ensured the renovation of the Engine Company 20 project.  Bond No. 447410459-0000  had a penal sum of $2,917,777.00;

k.    Bond Nos. 447410469-0000, 447410472-0000 and 447410475-0000, which named the Washington Suburban Sanitary Commission as obligee

and ensured the completion of various WSSC projects. Bond Nos. 447410469-0000, 447410472-0000 and 447410475-0000 had penal sums of $63,250.00, $25,740.00 and $51,125.00, respectively;

l. Bond No. 447410455-0000, which named the District of Columbia Housing Authority as obligee and ensured the completion of the various job order contracts. Bond No. 447410455-0000 had a penal sum of $1,800,000.00;

m. Bond No. 447410470-0000, which ensured the completion of roofing at McKinley Tech High School. Bond No. 447410470-0000 had a penal sum of $1,875,000.00;

n. Bond No. 447410479-0000, which named Hensel Phelps Construction Company as obligee and ensured HRGM's work on the Pentagon renovation. Bond No. 447410479-0000 had a penal sum of $438,109.00;

o. Bond No. 447410462-0000, which named W.M. Schlosser Company, Inc. as obligee and ensured HRGM's work on the Blue Plains Waste Station project. Bond No. 447410462-0000 had a penal sum of $650,000.00;

p. Bond No. 447410454-0000, which named Bell/BCI Company as obligee and ensured HRGM's work on the Patuxent River Naval Air Station project. Bond No. 447410454-0000 had a penal sum of $409,000.00;

q. Bond No. 447390157-0000, which named the U.S. Department of Agriculture as obligee and ensured HRGM's work on the Agricultural Research Service project. Bond No. 447390157-0000 had a penal sum of $630,225.00;

r. Bond Nos. 447390155-0000 and 447390156-0000, which named the Gilbane/Smoot Joint Venture as obligee and ensured the completion of HRGM's work on Maryland Stadium Authority projects. Bond Nos. 447390155-0000 and 447390156-0000 had penal sums of $43,494.00 and $25,344.00, respectively;

s. Bond No. 447410451-0000, which named Montgomery County, Maryland as obligee and ensured the completion of certain driveway/roadway work. Bond No. 447410451-0000 had a penal sum of $81,000.00.

11.    In all, Atlantic issued to HRGM performance and payment bonds with penal sums totaling $53,878,712.00.

### C.    THE JOINT CONTROL TRUST ACCOUNT AGREEMENT

12.    During the course of many of the projects on which HRGM was performing work, Atlantic received notices of claims on both the performance and payment bonds issued to HRGM.

13.    In fact, Atlantic received performance and payment bond claims on at least thirteen (13) of the projects for which it had issued bonds on behalf of HRGM.

14.    Specifically, those thirteen projects were:

    a.    Bond No. 447410453-0000, which had a penal sum of $1,378,130.00;

    b.    Bond No. 447410458-0000, which had a penal sum of $ 11,282,108.00;

    c.    Bond No. 447410452-0000, which had a penal sum of $9,243,477.00;

    d.    Bond No. 447390166-0000, which had a penal sum of $4,975,777.00;

    e.    Bond No. 447410464-0000, which had a penal sum of $2,877,778.00;

    f.    Bond No. 447390165-0000, which had a penal sum of $5,013,521.00;

    g.    Bond No. 447410459-0000 which had a penal sum of $2,917,777.00;

    h.    Bond No. 447410465-0000, which had a penal sum of $6,516,266.00;

    i.    Bond No. 447410454-0000, which had a penal sum of $409,000.00;

    j.    Bond No. 447390154-0000,  which had a penal sum of $5,977,777.00;

    k.    Bond No. 447410462-0000, which had a penal sum of $650,000.00;

    l.    Bond No. 447410466-0000, which had a penal sum of $130,000.00;

    m.    Bond No. 447410479-0000, which had a penal sum of $438,109.00

15.     In the spirit of cooperation, and in an attempt for both Atlantic and HRGM to minimize their losses and expenses, Atlantic and HRGM agreed to cooperate to resolve the claims and enable HRGM to complete its work on the bonded projects, rather than having Atlantic assume control of and complete the projects without HRGM's involvement.

16.     To further clarify the rights and duties of Atlantic and HRGM, as well as the other Indemnitors, and in conjunction with but not in substitution for those set forth in the GAI, and to further facilitate the smooth completion of the projects, including ensuring that the funds necessary to complete the projects would be available to HRGM, the parties negotiated and entered into a Joint Control Trust Account Agreement (the "Trust Agreement") in October 2004. (A copy of the Joint Control Trust Account Agreement is attached hereto as Exhibit 2.)

17.     The Trust Agreement, among other things, "provided a mechanism for handling contract proceeds that HRGM received from the bonded projects, and," set forth a procedure for HRGM to obtain funds necessary to pay subcontractors, suppliers and other project expenditures, theoretically ensuring the projects' completions and reducing performance bond losses.

18.     HRGM's obligations to Atlantic under the Trust Agreement, as well as under the GAI, were secured by certain collateral pledged by HRGM, including real property held by HRGM and/or the Indemnitors to the GAI and the Trust Agreement. The Trust Agreement provided that Atlantic would release collateral if it became over-secured with respect to HRGM's and the Indemnitors' obligations to Atlantic. (See Ex. 2 at Art. II, Para. 4.) To date, Atlantic has not been over-secured.

19.     In addition to providing for collateralization of Atlantic, the Trust Agreement, in conjunction with the GAI, outlined the procedure by which HRGM was to repay to Atlantic any

ND: 4818-6986-7009, v. 1

losses, costs, and expenses that ultimately Atlantic incurred as a result of issuing bonds. (See Ex. 2 at Art. II, Para. 10.)

20.    The Trust Agreement also provided HRGM with a "grace period," during which time Atlantic would not make any demand for indemnification and HRGM would not be obligated to repay any monies to Atlantic.

21.    Pursuant to the terms of the Trust Agreement, the "grace period" expired on January 1, 2007 and HRGM was obligated to commence repayments to Atlantic on January 2, 2007.  (See Ex. 2 at Art. II, Para. 10.)

22.    On January 23, 2007, in accordance with the terms of the Trust Agreement, Atlantic sent to HRGM and the Indemnitors and their counsel a Notice of Default, which provided the Indemnitors with ten (10) days to cure the default.  (A copy of the January 23, 2007 Notice of Default is attached hereto as Exhibit 3).

23.    Thereafter, counsel for HRGM and the Indemnitors requested that the cure period be extended so as to permit the parties additional time to discuss resolving the outstanding issues concerning the Indemnitors' repayment to Atlantic.  Counsel for HRGM and the Indemnitors agreed that no new Notice of Default would be necessary should the parties' discussions fail to resolve the outstanding issues.

## COUNT I
### (Breach of General Agreement of Indemnity)

24.    Paragraphs 1-23 above are incorporated herein by reference.

25.     As previously stated, HRGM is contractually obligated to indemnify Atlantic from and against all claims, losses, costs, and expenses, including attorney's fees, incurred as a result of having executed bonds on behalf of HRGM.

26.     To date, Atlantic has incurred losses and expenses totaling $8,782,629.60.  These losses and expenses total as follows:

(a)     Losses of $23,399.00 and expenses of $2,981.50 on Bond No.: 447390154-0000 (Pentagon);

(b)     Losses of $866,511.67 and expenses of $286,513.65 on Bond No.: 447390165-0000 (Sully District Police Station project);

(c)     Losses of $548,815.48 and expenses of $83,929.88 on Bond No.: 447390166-0000 (Berwyn Heights Elementary School project);

(d)     Losses of $855,882.01 and expenses of $344,500.20 on Bond No.: 447410452-0000 (William Tyler Page Elementary School project);

(e)     Losses of $223,133.63 and expenses of $265,118.58 on Bond No.: 447410453-0000 (Oakland Terrace Elementary School project);

(f)     Losses of $252,212.50 and expenses of $72,166.95 on Bond No.: 447410454-0000 (Patuxent River Naval Air Station project);

(g)     Expenses of $10,439.00 on Bond No.: 447410455-0000 (District of Columbia Housing Authority projects);

(h)     Losses of $23,087.37 and expenses of $297,466.07 on Bond No.: 447410459-0000 (Engine Company 20 project);

(i)     Losses of $18,234.14 on Bond No.: 447410462-0000 (Blue Plains Waste Station project);

(j)     Losses of $791,699.58 and expenses of $44,625.60 on Bond No.: 447410464-0000 (Reeves Center project);

(k)     Losses of $2,522,840.14 and expenses of $777,087.28 on Bond No.: 447410465-0000 (Northeast Vehicle Inspection Station project);

(l)     Losses of $120,575.90 and expenses of $171,629.92 on Bond No.: 447410466-0000 (Glen Haven Elementary  School project);

(m)    Losses of $1,047.20 on Bond No.: 447410479-0000 (Hensel Phelps Construction Company - Pentagon renovation); and

(n)     Losses of $178,732.35 on Bond No.: 447410496-0000 (Taft Elementary School project).

27.    The significant expenses incurred by Atlantic, including legal and engineering costs, result from HRGM's failure to perform its obligations in accordance with those contracts for which the bonds provided security.  Those expenses total $2,356,458.50.

28.    During the course of the Projects, and in an effort to work in close conjunction with HRGM, Atlantic agreed to provide HRGM with a $300,000 "credit" against the losses and expenses incurred by Atlantic, thereby reducing Atlantic's total losses and expenses to $8,482,629.60.

29.    In addition, Atlantic established reserves totaling $501,975.04 to fund payment bond claims that may be made in the future.  Those reserves currently remain in effect and are properly considered to be a loss to Atlantic, for which the Defendants remain liable.

30.    While Atlantic has recovered approximately $5,721,091.71 of its total losses and expenses, Atlantic has not been fully indemnified by HRGM and the other indemnitors.

31.    Despite repeated demands, HRGM has failed and refused to fully indemnify Atlantic for the additional losses and expenses incurred as a result of issuing the bonds.

32.    Atlantic's unreimbursed losses and expenses currently total $3,263,512.89.  Those losses and expenses, together with interest thereon, will continue to accrue.

33.     Under the terms of the Indemnity Agreement, HRGM and the Indemnitors must indemnify Atlantic from and against all claims, losses and expenses incurred to date and all expenses that will be incurred in the future as a result of HRGM's failure to perform its contractual obligations.    HRGM has failed to indemnify Atlantic from claims, losses and expenses.

34.     As a result of HRGM's breach of the Indemnity Agreement, Atlantic has suffered damages of $3,263,512.90, which is the sum of Atlantic's losses and reserves on the bonded projects on which it issued bonds to HRGM, plus expenses, including investigative, accounting and legal costs.  Atlantic anticipates that it may incur additional losses and expenses as a result of HRGM's failure to perform its contractual obligations.

**WHEREFORE**, Plaintiff, Atlantic Mutual Insurance Company, prays that this Court enter judgment in its favor and award it an amount in excess of $3,263,512.90, to be proven by motion or at trial, plus interest and the costs and expenses of this action, including attorneys' fees, against Plaintiff/Counter-Defendant, HRGM Corporation, and grant any other remedy or relief that justice may require.

## COUNT II
### (Breach of Joint Control Trust Account Agreement)

35.     Paragraphs 1-34 above are incorporated herein by reference.

36.     Pursuant to the terms of the Trust Agreement, HRGM, among other things, was to commence repayment to Atlantic of Atlantic's losses, costs and expenses on January 2, 2007.

37.     Despite repeated demand, HRGM has failed and refused to commence such repayments.

ND: 4818-6986-7009, v.  1

38.    The failure to comply with the repayment terms set forth in the Trust Agreement constitutes a breach of the Trust Agreement for which HRGM, and the Indemnitors are liable.

**WHEREFORE**, Plaintiff, Atlantic Mutual Insurance Company, prays that this Court enter judgment in its favor and award it an amount in excess of $3,263,512.90, to be proven by motion or at trial, plus interest and the costs and expenses of this action, including attorneys' fees, against Plaintiff/Counter-Defendant, HRGM Corporation, and grant any other remedy or relief that justice may require.

### COUNT III
### (Equitable Subrogation)

39.    Paragraphs 1-38 are incorporated herein by reference.

40.    Under general principles of surety law, as a result of the payments made by Atlantic, Atlantic is equitably subrogated to the interests of the obligees, subcontractors and suppliers to whom it issued payment on behalf of HRGM.

41.    As a result of HRGM's failure to perform its contractual obligations and Atlantic's payment of claims made on the bonds, Atlantic has incurred losses of $3,263,512.90. Atlantic anticipates that it will continue to incur losses as a result of HRGM's continued failure to perform its contractual obligations.

**WHEREFORE**,  Plaintiff, Atlantic Mutual Insurance Company, prays that this Court enter judgment in its favor and award it an amount in excess of $3,263,512.90, to be proven by motion or at trial, plus the costs and expenses of this action, including attorneys' fees, against Plaintiff/Counter-Defendant, HRGM Corporation, and grant any other remedy or relief that justice may require.

Respectfully submitted,

Niles, Barton & Wilmer LLP


__/s/  Craig D. Roswell_____
Craig D. Roswell
Bar Number:  433406
111 South Calvert Street, Suite 1400
Baltimore, MD 21202
410-783-6300
Facsimile 410-783-6363
cdroswell@niles-law.com
Attorney for Defendant/Counter-Plaintiff,
Atlantic Mutual Insurance Company


## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 25th day of July, 2007, a copy of the foregoing

Counterclaim was electronically filed via the U.S. District Court for the District of Columbia's

electronic case management system and served via electronic notification to:

Craig A. Holman
Arnold & Porter, LLP
555 12th Street, N.W.
Washington, D.C. 20004
*Attorney for Plaintiffs*


___/s/  Craig D. Roswell_____
Craig D. Roswell

Atlantic Mutual Companies    Atlantic ... l Insurance Company
Centennial Insurance Company

# General Agreement of Indemnity



KNOW ALL MEN BY THESE PRESENTS, that:   HR General Maintenance Corporation T/A HRGM Corporation

WHEREAS,  HR General Maintenance Corporation T/A HRGM Corporation

of Washington, DC 20020                                      (hereinafter called Contractor) may from time to time request
Atlantic Mutual Insurance Company and/or Centennial Insurance Company (hereinafter called Surety) to execute as surety or guarantor for the
Contractor, or procure the execution of, certain surety bonds, undertakings, guaranties, stipulations or other obligatory instruments (all such
instruments being hereinafter collectively called Bonds); and

WHEREAS, the undersigned Indemnitors by executing this instrument represent that they have a material and beneficial interest in the obtaining
of such Bonds by the Contractor (the Indemnitors and Contractor being hereinafter collectively called the Undersigned);

NOW, THEREFORE, in consideration of the execution of any one or more such Bonds, the Undersigned, for themselves, their respective
personal representatives, successors and assigns, jointly and severally, covenant and agree, with respect to all Bonds heretofore or hereafter
executed for the Contractor, that:

1.  If two or more persons are named in and execute this instrument as Contractor, each shall be bound as an Indemnitor by the terms of this
    instrument with respect to all Bonds executed or procured for the other person or persons so named, and as the Contractor with respect to
    all Bonds executed or procured for him. If any Bond or Bonds shall be executed or procured for any Joint Venture to which the Contractor is
    or may become a party, the liability and obligation of the Undersigned to the Surety shall be the same as if such Bond or Bonds had been
    executed for the Contractor acting alone, any agreement between or among the Joint Venturers notwithstanding.

2.  If the Surety shall decline to execute, or procure execution of, any Bond for which application hereafter may be made, no claim shall be
    made against the Surety in consequence of such declination; nor shall any claim be made if any Bond executed be not accepted by or on
    behalf of the Obligee. If the Surety shall execute or procure execution of a Bid or Proposal Bond, it may decline to execute or procure
    execution of any Bonds required in connection with any award made under the proposal for which such Bid or Proposal Bond is given and
    such declination shall not diminish or alter the liability of the Undersigned with respect to such Bid or Proposal Bond.

3.  This instrument is intended to apply to any and all Bonds executed, or execution of which has been procured, by the Surety for the
    Contractor whether or not there shall be any written application therefore executed by one or more of the Undersigned.

4.  If the Surety executes or has executed any such Bonds with co-sureties, or reinsures or has reinsured any portion thereof, or procures or
    has procured the execution of any such Bond, the terms of this instrument shall inure to the benefit of the Surety, the co-sureties, the
    reinsuring companies and the procured sureties, as their interests may appear.

5.  They will pay in advance the premiums for all such Bonds executed for the Contractor and any additional premiums accruing in respect
    thereof, in accordance with the Surety's Manual of rates applicable thereto.

6.  They will indemnify the Surety and hold it harmless from and against all liability, losses, costs, damages, attorneys' fees, disbursements
    and expenses of every nature which the Surety may sustain or incur by reason of having executed or procured the execution of any such
    Bonds; and they will pay over and make good to the Surety all money which the Surety or its representatives shall pay, or cause to be paid
    or become liable to pay, by reason of its execution of any such Bond as soon as it shall become liable therefore, whether the Surety shall
    have paid out such sum or any part thereof, or not. The Surety, in its sole discretion, from time to time may advance funds to or for the
    account of the Contractor for or in connection with the completion of the work under any contract in connection with which it has executed
    or may execute a Bond or Bonds (hereinafter sometimes referred to as Bonded Contract), and for the discharge of obligations incurred in
    connection therewith or relating thereto, and such advances shall be deemed "losses" under the terms of this instrument whether or not
    such advances have been so used by the Contractor.

7.  If the Surety shall set up a reserve to cover any contingent claim or claims, loss, costs, attorneys' fees and/or other expenses in connection
    with any such Bond the Undersigned, within ten (10) days after receipt of written demand, as evidenced by registry or certified mail return
    receipt, will pay to the Surety current funds in an amount equal to such reserve, and any subsequent increase thereof, such funds to be
    held by the Surety as collateral, in addition to the indemnity afforded by this instrument, with the right to use the same or any part thereof, at
    any time, in payment or compromise of any judgment, claim, liability, loss, damage, attorneys' fees and disbursements or other expenses.
    Demand shall be sufficient if sent by registered or certified mail to the Undersigned at the address given herein or last known to the Surety

8.  The Surety may settle or compromise any claim, demand, suit or judgment upon any Bond or Bonds executed by it, and any such
    settlement or compromise shall be binding upon the Undersigned. If, however, the Undersigned shall timely request the Surety to litigate
    such claim or demand, or to defend such suit, or to appeal from such judgment, and shall deposit with the Surety at the time of such
    request cash, or other collateral satisfactory to the Surety in kind and amount, to be used to pay any judgment or judgments rendered or
    that may be rendered, with interest, costs, expenses and attorneys' fees, including those of the Surety, the Surety shall so litigate, defend or
    appeal; but nothing herein contained shall be deemed to impose a duty upon the Surety to give notice to the Undersigned of any such
    claim, demand, suit or judgment.

9.  The vouchers or other evidence of payments made by the Surety shall be prima facie evidence of the fact and amount of the liability of the
    Undersigned to the Surety.

10. The Contractor and Indemnitors covenant and agree that all payments received for or on account of a Bonded Contract shall be held as a
    trust fund in which the Surety has an interest, for the payment of obligations incurred in the performance of the contract and for labor,
    materials, and services furnished in the prosecution of the work provided in said contract or any authorized extension or modification
    thereof, and, further, it is expressly understood and declared that all monies due and to become due under any such contract or contracts
    are trust funds, whether in the possession of the Contractor or Indemnitors or otherwise, for payment of all such obligations in connection
    with any such contract or contracts for which the Surety would be liable under any of said Bonds, which said trust also inures to the benefit
    of the Surety for any liability or loss it may have or sustain under any such Bonds, and this agreement and declaration shall also constitute
    notice of such trust.

11. The Contractor will furnish to the Surety such information as it may request from time to time concerning any Bonded Contracts; and those
    with whom such contracts are made hereby are authorized to furnish to the Surety information concerning such contracts and the work

B-5005 0100.                                                                                                               Page 1 of 5

thereunder. The Surety from time to time until its liability with respect to all such contracts is terminated, and until it shall have been fully reimbursed for all loss and expense which it may have paid in connection therewith, may examine the books and records of the Contractor. All persons, including credit reporting agencies, having or obtaining information concerning the financial affairs and operations of the Undersigned hereby are authorized and directed to disclose such information to the Surety upon its request; and the Surety and every such person hereby are released and discharged of any and all claims, liability and responsibility which they or any of them might otherwise incur or be subject to for or by reason of any such disclosure, or for or by reason of the disclosure by the Surety to others of any information obtained by it from any source whatsoever.

12. In the event the Contractor shall breach, or default in or delay the performance of, any Bonded Contract, or fail promptly to discharge all obligations which might be claimable under any Bond executed in connection therewith or which might give rise to a lien or charge upon any unpaid contract balance or the property of an Obligee named in any such Bond, or in the event of any breach of the terms of this instrument, the Undersigned, and each of them, hereby assign and set over unto the Surety, as of the date hereof, their right, title and interest in and to: (a) All of the deferred payments and retained percentages, and all moneys and properties that may be, and that thereafter may become, payable to the Contractor on account of, and all claims and actions and causes of action relating to, such contract, or on account of or relating to extra work or materials supplied in connection therewith, as well as all other moneys or properties of the Contractor, hereby agreeing that such money and the proceeds of such payments, properties, claims, actions and causes of action shall be the sole property of the Surety to be by it credited upon any sum due or to become due it under the terms of this instrument; (b) all supplies, tools, plant, equipment, and materials (whether completely manufactured or not), wherever located, which have been or hereafter may be purchased, used, or acquired for use, entirely or partly, in the performance of such contract, hereby agreeing that the Surety and its authorized representatives are authorized to take possession of said supplies, tools, plant, equipment and materials and use and enjoy the title thereto and the possession thereof; and (c) all subcontracts relating to the work under such contract which have been or hereafter may be made, together with the materials embraced therein, and all surety bonds securing the performance of, or the discharge of obligations incurred in connection with, such subcontracts, hereby agreeing that the Surety may enforce the same in the name of the Contractor, or otherwise. In addition, in any such event aforesaid, the Surety, at its option and in its sole discretion, may take possession of all or any part of the work under any or all Bonded Contracts, and at the expense of the Undersigned complete, or cause the completion of, such work, or re-let, or consent to the re-letting or completion thereof; and in such event, may invite the Obligees, and the Obligees are authorized, to declare the Contractor in default under such contracts, any provisions thereof to the contrary notwithstanding. Neither the Surety nor the Obligees shall incur any liability to any of the Undersigned in the exercise of the rights granted by this Section 12, except for deliberate and willful malfeasance.

13. If it becomes necessary or advisable in the judgment of the Surety to control, administer, operate or manage any or all matters connected with the performance of any Bonded Contract for the purpose of attempting to minimize any ultimate loss to the Surety, or for the purpose of discharging its obligations of suretyship, the Undersigned hereby expressly covenant and agree that such action on the part of the Surety shall be entirely within its rights and remedies under the terms of this instrument and as Surety, and do hereby fully release and discharge the Surety, in this connection, from liability for all actions taken by it or for its omissions to act, except for deliberate and willful malfeasance.

14. In any action, suit or proceeding brought by the Surety to enforce any of the covenants of this instrument, the costs and expenses, including attorneys' fees, incurred by the Surety in connection therewith may be included in any judgment or decree rendered against the Undersigned. Failure of the Surety to pursue any remedy against any one or more of the Undersigned shall not effect a release of or waiver of any right against any other of the Undersigned. Separate suits against one or more of the Undersigned may be brought hereunder as causes of action accrue, and the bringing of suit, or recovery of judgment against one or more of the Undersigned upon any cause of action shall not prejudice or bar the bringing of suit and the recovery of judgment on the same cause of action against any other of the Undersigned, or against any or all of the Undersigned upon other causes of action, whether theretofore or thereafter arising.

15. The Surety may, without notice to or knowledge of the Indemnitors, assent to any change in such Bonds, and/or any contracts referred to therein, and/or in the general conditions, plans and/or specifications accompanying said contracts, including, but not limited to, any change in the time for the completion of said contracts and to payments or advances thereunder before the same may be due, and assent to or take any assignment or assignments, execute or consent to the execution of any continuations, extensions or renewals of the Bonds and execute any substitute or substitutes therefor, with the same or different conditions, provisions and Obligees and with the same or larger or smaller penalties, and the Indemnitors shall remain bound under the terms of this agreement even though any such assent by the Surety does or might substantially increase the liability of the Surety and the Indemnitors. The Undersigned waive notice of any act, fact or information coming to the notice or knowledge of the Surety concerning or affecting its rights of liability under any such Bond or Bonds, or the Undersigned's rights or liabilities hereunder.

16. If the execution of this instrument by any of the Undersigned shall be invalid for any reason, or if any of the Undersigned shall be released from his obligations hereunder, the terms and conditions hereof shall nevertheless be binding upon and continue in full force and effect as to the rest of the Undersigned; nor shall it be a defense to any claim by the Surety hereunder that it was to have procured additional indemnity or security, or that it has procured additional indemnity or security, or that it has released other indemnity or security in respect of any such Bond or Bonds.

17. If any provision or provisions of this instrument be void or unenforceable under the laws of any place governing its construction or enforcement, this instrument shall not be void or vitiated thereby but shall be construed and enforced with the same effect as though such provision or provisions were omitted. All rights and remedies of the Surety under this instrument shall be cumulative, and the exercise of or failure to exercise any particular right or remedy at any time shall not be considered to be an election of remedy or a waiver of any other right or remedy. The rights, powers, and remedies afforded the Surety by the terms of this instrument are in addition to, and not in lieu of, any and all other rights, powers, and remedies which the Surety may have or acquire against the Contractor or Indemnitors or others whether by the terms of any other instrument or agreement or by operation of law.

18. The Contractor and each of the Indemnitors hereby irrevocably constitutes and appoints Surety his true and lawful attorney for and in his name, place and stead to execute any and all instruments, and to do and perform any and all other acts and things requisite or proper, to vest in the Surety absolute title to any and all funds, property and/or rights in Section 12 hereof assigned, transferred and conveyed and to secure to the Surety the full and effective use and enjoyment of the rights granted the Surety under Sections 10 and 12 hereof; hereby giving and granting to said attorney full power and authority to do and perform all and every act and thing whatsoever, requisite and necessary to be done in and about the premises, as fully, to all intents and purposes, as the Contractor or Indemnitors might or could do if personally present, with full power of substitution and revocation, hereby ratifying and confirming all that said attorney or its substitute shall lawfully do or cause to be done by virtue hereof.

19. As used in this instrument, the singular includes the plural, and the plural the singular, and the masculine pronoun shall be read as feminine or neuter, as circumstances require; and the word "person" shall mean and include individuals, partnerships, corporations and associations.

20. Except as hereinafter in this paragraph provided, any of the Undersigned may, upon written notice by registered mail to the Administrative Offices of Atlantic Mutual Companies, 3 Giralda Farms, New Jersey 07940, to be effective not less than ten (10) days after receipt, limit his obligations under this instrument to Bonds executed by the Surety for the Contractor prior to the effective date of such notice, provided, however, that such notice shall not be effective with respect to any Bond or Bonds executed after such date (a) upon the award of a contract to the Contractor on a bid or proposal in respect of which the Surety has executed and delivered a bid or proposal bond prior to such date, or (b) which the Surety has become committed to execute prior to such date, or (c) in connection with any claim, lien, litigation, or other matter involving or relating to any Bond or Bonds executed prior to such date or thereafter executed as hereinbefore in (a) or (b) provided. Such limitation of the obligations of any of the Undersigned shall not operate to limit the obligations of, or release, the rest of the Undersigned whether or not they have notice or knowledge thereof.

General Agreement of Indemnity (continued)                                    Atlantic Mutual Companies

21.  The rights and remedies afforded the Surety by the terms of this instrument may not be waived or modified orally.

DATED this ___28th___ day of ___Sept___ 20 01 .

ATTEST:                                               HR General Maintenance Corporation T/A HRGM Corporation

By _Deepak T. Butani_                                 By _____  9/28/200_
Name _Deepak Butani_                                  Name Ramesh Butani
Title _Secretary_          , Secretary                Title President    Tax ID#54-1144392
                                                      Address 2021 Shannon Place, SE, Washington, DC 20020

By _____                              By _____
Name _____                            Name _____
Title _____  , Secretary              Title _____
                                                      Address _____

By _____                              By _____
Name _____                            Name _____
Title _____  , Secretary              Title _____
                                                      Address _____

WITNESS: _Caroline McNamara_                          By _____  9/28/200_
                                                      Name Ramesh Butani, Individually
                                                      Address 1205 South Huntress Court
                                                              McLean, VA 22102
                                                      SS No. 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

WITNESS: _Caroline McNamara_                          By _____
                                                      Name Hansa Butani, Individually
                                                      Address 1205 South Huntress Court
                                                              McLean, VA 22102
                                                      S.S. No. 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

                                                      By _____
                                                      Name _____
                                                      Address _____

                                                      S.S. No. _____

                                                      By _____
                                                      Name _____
                                                      Address _____

                                                      S.S. No. _____

                                                      By _____
                                                      Name _____
                                                      Address _____

                                                      S.S. No. _____

B-5005 0100

Atlantic Mutual Companies                                    General Agreement of Indemnity (continued)

State of *Maryland*                          } SS.:                    **Corporate Acknowledgment**
County of *Montgomery*

On the *28* day of *Sept.* ,2001 , before me personally came Ramesh Butani
to me known who, being by me duly sworn, did depose and say, that he resides in McLean, VA 22102
that he is the President                                          of HR General Maintenance Corporation T/A HRGM Corporation
the corporation described in, and which executed the above instrument; that he knows the seal of said corporation; that the seal affixed to said
instrument is such corporate seal; that it was so affixed by order of the Board of Directors of said corporation and that he signed his name hereto by
like order.

Suzette M. Webb
Notary Public, State of Maryland
My Commission Expires April 14, 2003

*Suzette M. Webb* , Notary Public.
*Montgomery* County.

State of _____          } SS.:                    **Corporate Acknowledgment**
County of _____

On the _____ day of _____ ,20___ , before me personally came
to me known who, being by me duly sworn, did depose and say, that he resides in _____
that he is the _____                                        of _____
the corporation described in, and which executed the above instrument; that he knows the seal of said corporation; that the seal affixed to said
instrument is such corporate seal; that it was so affixed by order of the Board of Directors of said corporation and that he signed his name hereto by
like order.

Suzette M. Webb
Notary Public, State of Maryland
My Commission Expires April 14, 2003

_____ , Notary Public.
_____ County.

State of _____          } SS.:                    **Corporate Acknowledgment**
County of _____

On the _____ day of _____ ,20___ , before me personally came
to me known who, being by me duly sworn, did depose and say, that he resides in _____
that he is the _____                                        of _____
the corporation described in, and which executed the above instrument; that he knows the seal of said corporation; that the seal affixed to said
instrument is such corporate seal; that it was so affixed by order of the Board of Directors of said corporation and that he signed his name hereto by
like order.

_____ , Notary Public.
_____ County.

State of _____          } SS.:                    **Corporate Acknowledgment**
County of _____

On the _____ day of _____ ,20___ , before me personally came
to me known who, being by me duly sworn, did depose and say, that he resides in _____
that he is the _____                                        of _____
the corporation described in, and which executed the above instrument; that he knows the seal of said corporation; that the seal affixed to said
instrument is such corporate seal; that it was so affixed by order of the Board of Directors of said corporation and that he signed his name hereto by
like order.

_____ , Notary Public.
_____ County.

State of _____          } SS.:                    **Corporate Acknowledgment**
County of _____

On the _____ day of _____ ,20___ , before me personally came
to me known who, being by me duly sworn, did depose and say, that he resides in _____
that he is the _____                                        of _____
the corporation described in, and which executed the above instrument; that he knows the seal of said corporation; that the seal affixed to said
instrument is such corporate seal; that it was so affixed by order of the Board of Directors of said corporation and that he signed his name hereto by
like order.

_____ , Notary Public.
_____ County.

State of _____          } SS.:                    **Corporate Acknowledgment**
County of _____

On the _____ day of _____ ,20___ , before me personally came
to me known who, being by me duly sworn, did depose and say, that he resides in _____
that he is the _____                                        of _____
the corporation described in, and which executed the above instrument; that he knows the seal of said corporation; that the seal affixed to said
instrument is such corporate seal; that it was so affixed by order of the Board of Directors of said corporation and that he signed his name hereto by
like order.

_____ , Notary Public.
_____ County.

B-5005-1 0100

Atlantic Mutual Companies

General Agreement of Indemnity (continued)

## Individual Acknowledgment

State of *Maryland*
County of *Montgomery*                              } SS.:

On the 28 day of Sept. ,20 01, before me personally came Ramesh Butani
to me known, and known to me to be the individual described in and who executed the foregoing instrument, and  he duly acknowledged to me
that  he executed the same.

Suzette M. Webb
Notary Public, State of Maryland
My Commission Expires April 14, 2003

*Suzette M. Webb*, Notary Public.
*Montgomery* County.

## Individual Acknowledgment

State of *Maryland*
County of *Montgomery*                              } SS.:

On the 28 day of Sept. ,20 01, before me personally came Hansa Butani
to me known, and known to me to be the individual described in and who executed the foregoing instrument, and she duly acknowledged to me
that she executed the same.

Suzette M. Webb
Notary Public, State of Maryland
My Commission Expires April 14, 2003

*Suzette M. Webb*, Notary Public.
*Montgomery* County.

## Individual Acknowledgment

State of _____
County of _____                              } SS.:

On the _____ day of _____ ,20 ___, before me personally came
to me known, and known to me to be the individual described in and who executed the foregoing instrument, and  he duly acknowledged to me
that  he executed the same.

_____, Notary Public.
_____ County.

## Individual Acknowledgment

State of _____
County of _____                              } SS.:

On the _____ day of _____ ,20 ___, before me personally came
to me known, and known to me to be the individual described in and who executed the foregoing instrument, and  he duly acknowledged to me
that  he executed the same.

_____, Notary Public.
_____ County.

## Individual Acknowledgment

State of _____
County of _____                              } SS.:

On the _____ day of _____ ,20 ___, before me personally came
to me known, and known to me to be the individual described in and who executed the foregoing instrument, and  he duly acknowledged to me
that  he executed the same.

_____, Notary Public.
_____ County.

## Individual Acknowledgment

State of _____
County of _____                              } SS.:

On the _____ day of _____ ,20 ___, before me personally came
to me known, and known to me to be the individual described in and who executed the foregoing instrument, and  he duly acknowledged to me
that  he executed the same.

_____, Notary Public.
_____ County.

B-5005-2 0100

# JOINT CONTROL TRUST ACCOUNT AGREEMENT

This Joint Control Trust Account Agreement ("Agreement") is made and entered into this 25th day of October 2004 (the "Effective Date"), by and among, HRGM Corporation (hereinafter referred to as the "Principal" or "HRGM"), and Ramesh Butani and Hansa Butani (hereinafter referred to collectively as the "Indemnitors"), and Atlantic Mutual Insurance Company (hereinafter referred to as the "Surety").

## RECITALS

WHEREAS, on or about September 28, 2001, the Principal and the Indemnitors executed an Agreement of Indemnity with the Surety (the "Agreement of Indemnity"), a copy of which is attached hereto as **Exhibit 1;**

WHEREAS, the Principal has entered into various construction contracts (the "Bonded Contracts") for which the Surety has executed certain Performance Bonds and Labor and Material Payment Bonds (the "Bonds") with various entities (the "Obligees") for the construction of various projects (the "Projects") as more fully set forth in a List of the Bonded Contracts, Projects and Bonds attached hereto as **Exhibit 2;**

WHEREAS, as required by the Bonded Contracts, and induced by and in reliance upon the execution of the Agreement of Indemnity by the Principal and the Indemnitors, the Surety executed certain Performance Bonds and Labor and Material Payment Bonds (the "Bonds") as more fully set forth in **Exhibit 2;**

WHEREAS, the Principal and the Indemnitors hereby acknowledge their execution of the Agreement of Indemnity and reaffirm their joint and several obligations and liabilities to the Surety thereunder;

WHEREAS, the Bonded Contracts are in various stages of completion, and the Principal and the Indemnitors hereby acknowledge and admit that: (a) the Principal is financially unable to perform or complete the performance of certain of the Bonded Contracts without the financial assistance of the Surety; (b) certain subcontractors and suppliers of labor and/or materials with respect to certain of the Bonded Contracts and Projects have filed suit claiming non-payment; (c) the Principal has requested the financial assistance of the Surety as a result of (a) and (b) above; and (d) but for the willingness of the Surety to enter into this Agreement, the Principal may be unable to complete the performance of certain of the Bonded Contracts and may be unable to pay certain of its subcontractors and suppliers of labor and/or materials with respect to the Bonded Contracts and Projects; and

WHEREAS, HRGM and Indemnitors have requested that Surety forbear from enforcing its rights under the Agreement of Indemnity, and Surety has agreed to forbear from enforcing its rights under the Agreement of Indemnity and under this Agreement provided that certain additional collateral is provided by the Indemnitors and subject to the conditions set forth in this Agreement.

AGREEMENT

NOW, THEREFORE, for and in consideration of these premises and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, it is hereby mutually understood and agreed by and among the Principal, the Indemnitors and the Surety as follows:

## I.    Agreement to Fund Reasonable Settlements

1.    The Surety agrees that it will fund all reasonable settlements that Principal and Surety are able to negotiate with subcontractors, vendors and suppliers for claims arising in connection with the performance of the Bonded Contracts.  In connection with any settlement that the Surety is asked to fund under this Agreement, the Surety shall have the right in its reasonable discretion to determine whether to settle or litigate the particular claims.  All monies paid by the Surety in satisfaction of such settlements shall constitute advances under the Agreement of Indemnity and this Agreement.

## II.    Indemnification And Forebearance

1.    The Principal and the Indemnitors hereby acknowledge their execution of the Agreement of Indemnity and reaffirm their joint and several obligations and liabilities to the Surety thereunder.

2.    Nothing contained in this Agreement and done pursuant hereto shall in any way impair, alter or modify any and/or all of the rights and remedies of the Surety against the Principal and/or the Indemnitors under or in connection with the Agreement of Indemnity, except that Surety has agreed, under certain conditions, as further provided below, to forbear for a specified period of time from enforcing its rights and remedies under the Agreement of Indemnity.

3.    In the event that the Surety makes any payments under the Bonds, or in accordance with the terms of this Agreement or the Agreement of Indemnity, for which Surety has not received payment or repayment from the Principal, the Indemnitors, or a third party (e.g., a project owner), interest shall accrue on the outstanding balance of the amounts paid by the Surety at an annual rate of interest equal to the Prime Rate published by the Wall Street Journal on the Effective Date plus 2 percent; provided that the rate of interest shall be adjusted based on the Prime Rate published by the Wall Street Journal on the first anniversary of the Effective Date and on each anniversary thereafter until the amounts are paid in full.

4.    The Principal's obligations to the Surety under the Agreement of Indemnity and under this Agreement shall be secured by (i) all of the collateral pledged by the Principal in the Agreement of Indemnity, including but not limited to Section 12 of the Agreement of Indemnity, to secure Principal's obligations under the Agreement of Indemnity, and by all of the monies of the Trust Account (hereinafter defined), which collateral is collectively hereinafter referred to as the "Original Collateral."  To further secure their obligations under the Agreement of Indemnity and this Agreement, the Indemnitors hereby grant to Surety security interests and liens (as indicated in **Exhibit 3**) in the following (collectively the "Additional Collateral"): (i) Lot 1027, Square 5771  -

2021 Shannon Place, S.E., Washington, D.C. 20020; (ii) Lot 1026, Square 5771 - 2021 Shannon Place, S.E., Washington, D.C. 20020; (iii) 700 New Hampshire Ave., N.W., Unit 615, Washington, D.C. 20037; (iv) Condominium, 3819 South George Mason Drive, Falls Church, Virginia; (v) Unit 23.Tyco Park, Fairfax County, Virginia; (vi) 4445 B Brookfield Corporate Drive, Chantilly, Virginia; (vii) Harborside Altantis Vacation Timeshare in Paradise Island, Bahamas; and (viii) Fidelity Account of Annuity (Account No. GP10001116).   (Surety acknowledges that certain of the foregoing properties have previously been pledged to financing institutions or Selective Insurance Company of America ("Selective") and Surety agrees not to take any action inconsistent with the prior interests of the financing institutions or Selective in such properties.)  If Surety subsequently becomes oversecured with respect to the liabilities of Principal and Indemnitors to Surety, Surety (at HRGM's request or requests) will release its security interests and liens in one or more pieces of the Additional Collateral such that Surety at its discretion remains fully secured (but not oversecured).   Surety will release the security interests and liens in the following order:  (i) Unit 23, Tyco Park, Fairfax County, Virginia; (ii) 4445 B Brookfield Corporate Drive, Chantilly, Virginia; (iii) Lot 1027, Square 5771 - 2021 Shannon Place, S.E., Washington, D.C. 20020; (iv) Lot 1026, Square 5771 - 2021 Shannon Place, S.E., Washington, D.C. 20020; (v) 700 New Hampshire Ave., N.W., Unit 615, Washington, D.C. 20037; (vi) Condominium, 3819 South George Mason Drive, Falls Church, Virginia; (vii) Fidelity Account of Annuity (Account No. GP10001116); and (viii) Harborside Atlantis Vacation Timeshare in Paradise Island, Bahamas.  Nothing in the foregoing provision shall require Surety to release a property if such release would leave Surety undersecured with respect to the liabilities of Principal and Indemnitors to Surety under this Agreement and the Agreement of Indemnity.

5.      As part of this Agreement, and with the consent and approval of the Indemnitors, the Principal agrees, at the subsequent request of the Surety should Surety deem such request necessary, to execute voluntary letters of default and termination (the "Letters of Default") addressed to the Obligees for one or more of the Bonded Contracts and Projects shown on the List of the Bonded Contracts, Projects and Bonds attached as **Exhibit 2**, a sample copy of which is attached hereto as **Exhibit 4.**  In accordance with the terms of the Agreement of Indemnity and this Agreement, the Surety may use the Letters of Default on each Bonded Contract and Project, individually as to each separate Bonded Contract or as to all of the Bonded Contracts, in the sole option and discretion of the Surety, whether or not there is a default under any of the Bonded Contracts, the Agreement of Indemnity or this Agreement.  A failure to execute one or more of such letters on Surety's request shall constitute a material breach of this Agreement under paragraph II.11.c. Such letters shall not constitute an admission or recognition by HRGM that HRGM is in default on any of the Bonded Contracts but instead are provided to allow Atlantic an additional measure of control with respect to the Bonded Contracts.

6.      Principal will take whatever steps Surety may reasonably request to allow Surety to resolve Surety's outstanding obligations under its performance bonds and collect all outstanding receivables on the projects for which Surety has issued performance bonds.

7.      Principal and the Indemnitors agree that all monies received from any owner on any project for which Surety issued performance and payment bonds, including any net proceeds

received by Principal or Indemnitors for claims Principal currently believes that it has against owners on projects for which Surety issued performance and payment bonds, will be paid to Surety and within ten (10) business days of Principal's or Indemnitors' receipt of such monies or claims payments and applied by Surety to reimburse itself for all losses, costs, advances, or expenses Surety has incurred under the Agreement of Indemnity or this Agreement, until Surety has been fully reimbursed for all such losses, costs, advances, or expenses. Thereafter, all such monies and recoveries shall be retained by Principal. (For purposes of this Agreement, net proceeds from claims shall mean the gross proceeds from claims on a specific Bonded Contract less any amounts deducted or withheld for a counter-claim, cross-claim or other defensive claim on the specific Bonded Contract for which Surety is or could be held liable, any applicable taxes, attorneys' fees and expenses owed to HRGM's counsel in matters related to the specific Bonded Contract or for which Surety has agreed to pay HRGM's counsel, supplier or subcontractor balances associated with the claims on the Bonded Contract, fees and expenses owed to consultants/expert witnesses, and any other claim costs following Surety's review and consent, with such consent not to be unreasonably withheld.)

8.    Principal and the Indemnitors agree that any unpaid contract balances, proceeds of change orders, or any funds which are paid by the Obligees on account of Bonded Contracts will be paid to Surety and Surety shall (in the following agreed to order of application): (i) use such amounts to discharge the obligations of Principal and Surety, if any, under the involved Bonds and Projects; (ii) apply those payments to pay down the amounts of any advances to Principal under this Agreement or the Agreement of Indemnity and to reimburse Surety for any other loss, cost, or expense which Surety incurs and for which Principal and Indemnitors are obligated to pay Surety in accordance with the Agreement of Indemnity and this Agreement. Once all advances, losses, costs and expenses have been repaid, Principal shall thereafter be entitled to retain all such funds and have returned to it any excesses paid to Surety. After the execution of this Agreement, Surety agrees to promptly provide to HRGM copies of all invoices from Surety's counsel and from consultants retained by Surety or its counsel, which Surety contends are advances, losses, costs or other charges that are subject to reimbursement by HRGM or the Indemnitors, subject to the terms and conditions of the Agreement of Indemnity. Thereafter, subject to the elimination of privileged communication, Surety will send all such future invoices within thirty (30) days of Surety's receipt of such invoices.

9.    Attached hereto and incorporated herein as **Exhibit 3, Attachment A** is the Indemnitors' current financial statement. The Indemnitors hereby agree and acknowledge that Surety executed this Agreement and agreed to advance funds to Principal, in part, based upon the representations contained in the attached financial statement.

10.    If, by January 2, 2007 ("Reimbursement Deadline"), the Surety has not been fully reimbursed for all advances it has made under the Agreement of Indemnity or this Agreement and for any other loss, cost, or expense which it has incurred and for which HRGM and Indemnitors are obligated to pay Surety in accordance with the Agreement of Indemnity (collectively the "Surety Advances"), then commencing on the Reimbursement Deadline, and on the first day of each month thereafter until the Surety Advances have been paid in full, HRGM shall commence making monthly payments to Surety in an amount sufficient to repay the outstanding balance of the Surety Advances as of the Reimbursement Deadline in twenty four

(24) equal monthly payments of principal and interest assuming no additional payments are made pursuant to this Agreement after the Reimbursement Deadline. If any other payments are made to Surety pursuant to this Agreement after the Reimbursement Deadline, then on each such occasion ("Adjustment Date") the amount of the monthly payments thereafter required shall be adjusted downward, and shall be the amount of monthly payments necessary to pay off the outstanding balance of the Surety Advances as of the Adjustment Date by the twenty fourth (24th) month after the Reimbursement Deadline.

      11.    The Surety agrees to forbear from exercising any of its rights and remedies against HRGM and the Indemnitors (whether collectively or separately) under either the Agreement of Indemnity or this Agreement or otherwise until the day which is twenty four (24) months after the Reimbursement Deadline; subject however, to the following acts of default:

      a.    HRGM or the Indemnitors' failure to timely make any payments required under this Agreement, if such default is not cured within ten (10) business days after HRGM and the Indemnitors receive notice from Surety of such default;

      b.    Any default under the Agreement of Indemnity which is not cured within ten (10) business days after HRGM and the Indemnitors receive notice from Surety of such default, other than HRGM and the Indemnitors': (i) failure to indemnify Surety; (ii) failure to reimburse Surety for any advances, losses, costs, or expenses which HRGM and the Indemnitors are liable to reimburse Surety under the terms of the Agreement of Indemnity; (iii) failure to cure any defaults under any construction contracts bonded by Surety; (iv) failure to pay subcontractors and suppliers which may be owed funds on any contract bonded by Surety; and (v) failure to comply with any other provision of the Agreement of Indemnity which relates to HRGM's failure to meet its monetary obligations under the Agreement of Indemnity;

      c.    Any other material default by Principal under this Agreement that is not cured within ten (10) business days after HRGM and the Indemnitors receive notice from Surety of such default;

      d.    Any material default of an agreement with any other lender or entity that has extended credit to either HRGM or the Indemnitors, excluding Selective, except as provided in (e), below, and subcontractors and suppliers of HRGM, which default has not been cured within any applicable cure periods and that is not cured by HRGM within ten (10) business days after HRGM and the Indemnitors receive notice from Surety of such default; and

      e.    Any material default under the Agreement between HRGM and Selective dated July 30, 2004 that is not cured within any applicable cure periods and that is not cured by HRGM within ten (10) business days after HRGM and the Indemnitors receive notice from Surety of such default.

In the event of any act of default as recited above, not cured within ten (10) business days from notice of Surety, then Surety's obligation to forebear as set forth herein shall terminate.

## III.    Establishment of Joint Control Trust Checking Account

1.      The Principal and the Surety shall open and establish a joint control trust checking account (the "Trust Account") in Commerce Bank the New Jersey Branch (the "Bank") in the name of "HRGM Special Operating Account." The Principal authorizes the Bank to establish the Trust Account. The Principal shall not open any other trust account(s) related to the Bonded Contracts, the Projects, or the Contract Funds without the express knowledge and consent of the Surety, which consent will not be unreasonably withheld. Upon written request of the Surety, Principal shall provide Surety with a listing of its trust accounts then in place.

2.      For the purposes of this Agreement, "Contract Funds" shall mean any and all monies payable to or received by the Principal under or in connection with the Bonded Contracts, including but not limited to monies earned and to be earned, payment of retained percentages and final payments due or to become due to the Principal of every kind or nature under the Bonded Contracts, including payments for all extras, net proceeds of claims, bonuses and/or of any other kind or nature which may be received by the Principal from the Bonded Contracts.

3.      The Principal, with the agreement of the Surety and the Indemnitors, shall execute Letters of Direction addressed to the Obligees, a sample copy of which is attached hereto as **Exhibit 5**, directing that all Contract Funds from the Bonded Contracts be made payable jointly to the Principal and the Surety, and mailed to the Surety at:

> Atlantic Mutual Insurance Company
> Administrative Center
> Three Giralda Farms
> Madison, NJ  07940 1004
> Attention: Michael J. Hurley, Esquire
> > Assistant Vice President – Surety Claims.

4.      The Principal, the Indemnitors and the Surety agree to deposit or cause to be deposited in the Trust Account all Contract Funds from the Bonded Contracts collected by the Principal or the Surety, and all monies which the Surety may, in its sole discretion and/or in accordance with the terms and conditions of this Agreement or the Agreement of Indemnity, advance or loan to the Principal. The Principal and the Indemnitors acknowledge and agree that all funds on deposit in the Trust Account are the sole property of Atlantic for use as set forth in this Agreement; provided, however, that any amounts above the amounts due to Atlantic under this Agreement or the Agreement of Indemnity shall be returned to HRGM. Unless and until all amounts due to Surety under the Agreement of Indemnity and this Agreement and satisfied, the Contract Funds shall not be deposited in any other account of the Principal without the express consent of the Surety.

5.      Pursuant to the Power of Attorney attached hereto and incorporated herein by reference as **Exhibit 6**, the Surety, through its authorized representatives, is authorized and empowered to endorse in the name of the Principal any and all checks received by the Surety or its representatives constituting Contract Funds from the Bonded Contracts, and to deposit said checks solely and only into the Trust Account. The Principal hereby agrees that the Surety may name one or more substitutes for the attorneys named in the Power of Attorney, with notice to the Principal.

Furthermore, the Principal hereby ratifies and confirms all acts that any attorney or his substitute or substitutes may lawfully do or cause to be done by virtue of the Power of Attorney contained in **Exhibit 6**.

6.      Unless and until such time as all amounts due to the Surety under this Agreement and the Agreement of Indemnity are satisfied, the Contract Funds are hereby irrevocably segregated, earmarked and set aside solely and only for the purposes set forth in this Agreement. The Contract Funds and all other monies deposited in the Trust Account shall be considered and constituted as trust funds for the purposes set forth in this Agreement. The Principal shall hold all Contract Funds in the Trust Account in trust for the Surety separate and apart from all other funds and property of the Principal. The Principal hereby covenants and agrees that it will not knowingly permit any funds in the Trust Account, whether represented by checks, vouchers, orders or otherwise, to be used for any purpose other than as more particularly set forth in this Agreement, unless and until all amounts due to the Surety under this Agreement and the Agreement of Indemnity are satisfied or unless otherwise expressly agreed to by Surety.

7.      Except as provided in Section III, paragraph 13 of this agreement, all checks and charges against the Trust Account shall be required to have two signatures, one signature being that of an authorized representative of the Principal and the other by an authorized representative of the Surety. The Principal and the Surety mutually agree that they will work in conjunction with the Bank to establish such other means and methods of transferring funds from the Trust Account so long as such means or methods require the consent of both the Principal and the Surety for any withdrawal or transfer of funds from the Trust Account. The Principal is restricted from making any wire transfers, use of counter-checks, or other non-check transfers from the Trust Account without the express written approval of the Surety.

8.      The persons now designated to sign checks or approve transfers on the Trust Account on behalf of the Surety are any one of the following: 1) Michael J. Hurley; 2) Nancy Manno, 3) William Welsh, 4) Judy Gimson, and 5) David D. Gilliss. It is understood and agreed that the Surety may, in its sole discretion, substitute or add another representative or representatives for the persons originally named, without the prior consent of, but upon notice to the Principal and the Bank.

9.      The persons now designated to sign checks or approve transfers on the Trust Account on behalf of the Principal are: 1) Ramesh Butani; and 2) Rachna Butani. It is understood and agreed that the Principal may substitute or add another representative or representatives for the persons originally named, but only with the approval in writing of the Surety and the Indemnitors, and upon notice to the Bank.

10.      The Principal hereby agrees that any Contract Funds it may receive contrary to the Letters of Direction sent to the Obligees (see sample attached as **Exhibit 5**) or because of the Principal's failure to promptly issue such Letters of Direction or for any other reason shall be held as trust funds by the Principal and shall be immediately presented to a representative of the Surety for deposit in the Trust Account.

11.    The Surety shall maintain possession of the checkbook for the Trust Account.  The Surety shall receive directly from the Bank all bank statements and the originals of all deposit slips, canceled checks, debit memos, service charges, etc. from the Trust Account.  The Principal hereby authorizes the Bank to furnish to the Surety such information as the Surety may desire concerning deposits to and withdrawals from the Trust Account.  The Principal also authorizes the Obligees to furnish to the Surety complete information concerning payments made to the Principal of Contract Funds from the Bonded Contracts and to furnish any other information concerning the Bonded Contracts which the Surety may require.  Upon request from the Principal, the Surety shall furnish to the Principal copies of all bank statements and checks which have been returned.

12.    None of the Contract Funds deposited in the Trust Account shall be subject to any right of set-off by the Bank as a result of any transactions involving the Bank, the Principal and/or the Indemnitors, nor be assigned or diverted from the uses or purposes set forth in this Agreement. The Surety may require of the Bank a written acknowledgment of this paragraph as a condition to the establishment or continuance of the Trust Account at the Bank.

13.    Subject to the Surety's obligation to forbear from exercising its rights and remedies under Section II above, the Principal hereby authorizes and empowers any two of the signators of the Surety on the Trust Account to sign one or more checks from the Trust Account, and, at the sole option and discretion of the Surety, to withdraw all or a portion of the trust funds from the Trust Account, which Trust funds shall be applied toward satisfaction of Principal's obligations to Surety under the Agreement of Indemnity, the Bonds, or the Bonded Contracts. It is expressly understood by and between the Principal and the Surety that the Bank shall have no duty to make inquiry as to the purpose of any transfer or check from the Trust Account, whether made or done pursuant to this paragraph or any other provision of this Agreement.

14.    At its sole option and discretion, the Surety may notify the Bank in writing, by wire or orally (wire or oral notice shall be confirmed in writing as soon as practicable) to stop payment on and not to honor any checks drawn against the Trust Account after the receipt of such notice unless said check or checks are made payable to the Surety and signed by any two of the signators of the Surety on the Trust Account as provided in Section III, paragraph 8 above. The Principal hereby acknowledges to the Bank that the Principal may not issue a stop-payment request on any check drawn on the Trust Account without the express written approval of the Surety presented to the Bank.

15.    All fees assessed by the Bank with respect to the Trust Account shall be the joint and several obligation of the Principal and the Surety.

## IV.    Use of the Contract Funds from the Trust Account

1.    The Contract Funds contained in the Trust Account shall be used solely (unless otherwise agreed to by the Surety) for the payment of all labor and material costs, including amounts due to laborers, subcontractors and suppliers and for rental of equipment from others which is actually used in the prosecution of the work under the Bonded Contracts, incurred by the Principal, and the Principal's subcontractors and suppliers, which are necessary to complete the work under the Bonded Contracts and for which the Surety may become liable under the Bonds.

Any excess amounts in the Trust Account shall be used to repay Surety advances, losses, costs, or expenses as set forth in Section II of this Agreement and otherwise returned to the Principal. The Principal agrees that it will not use or rent any of its equipment or machinery in any manner which will interfere with or delay the prompt completion of the Bonded Contracts. It is specifically understood and agreed by the Principal, the Indemnitors and the Surety that the Contract Funds contained in the Trust Account shall not be used to pay the obligations of the Principal on contracts not bonded by the Surety.

2.    The Surety is not obligated to pay or cause to be paid any of the overhead and general and administrative expenses of the Principal. The Surety, at its option and sole discretion, may consent to the use of funds from the Trust Account to pay all or a portion of the Principal's overhead and general and administrative expenses. The Principal acknowledges, agrees and consents that the Surety reserves the right to reject the payment of any bill(s) requested by the Principal pursuant to the procedures described below if the Surety deems, in its sole discretion, that the requested payment or payments are for the overhead and general and administrative expenses of the Principal.

3.    On a monthly basis, the Principal shall provide to the Surety a budget of its anticipated revenues from the Bonded Contracts and estimated expenses for labor, materials, subcontractor payments and any other payments, including the overhead and general and administrative expenses described in Section IV, paragraph 2 above, that the Principal anticipates will be requested from the Trust Account.

4.    Absent other mutually agreeable arrangements which must be reduced to a written document between and among the Principal, the Indemnitors and the Surety, the procedure for the payment of the Principal's bills on the Bonded Contracts, including its direct payroll, shall be as follows:

(a)    On a weekly basis or as otherwise required, the Principal shall provide to the representative of the Surety the following information:

(i)    A summary sheet listing all of the invoices to be paid, broken down by Bonded Contract, showing the person to be paid, the amount to be paid, the date to be paid, and the total payments to all payees. The Principal shall designate on the summary sheet those invoices it believes should receive priority for payment in the event that the Contract Funds in the Trust Account are insufficient to pay all of the invoices submitted for payment. The Principal shall sign off its approval of the summary sheet and the payments described therein;

(ii)    A copy of each invoice to be paid, showing the Bonded Contract for which the invoice was incurred, along with a copy of all necessary supporting documentation for the invoice;

(iii)    A check request to the Surety to be drawn from the Trust Account, said check request clearly indicating the specific invoices to be paid and the Bonded Contracts for which the invoices are being paid;

(iv)    If requested by the Surety, a partial waiver and release in a form acceptable to the Surety in the amount of the check, which must be signed by the payee and returned to the Surety.

(b) The Principal represents and warrants that all invoices shown on the summary sheet and all check requests from the Trust Account presented to the Surety's representative are for the purposes authorized by this Agreement, and that the amount of any such invoice and/or check request is currently due and owing to the payee named therein.

(c) The representative of the Surety shall review all of the invoices and back-up information provided above and sign off his or her approval on the summary sheet for all of the invoices that the Surety agrees are to be paid from the Trust Account. The representative of the Surety shall not be obligated to pay or approve the payment of invoices according to the priorities designated by the Principal on the summary sheet. The representative of the Surety shall receive from the Principal for the Surety's records an originally signed copy of the summary sheet along with a copy of the invoice and the backup information, said records to be kept and maintained by the representative of the Surety.

(d) In the event that there are Contract Funds sufficient in the Trust Account to cover those payments which have been approved, the representative of the Surety shall sign the checks drawn on the Trust Account on behalf of the Surety, and mail the checks, along with copies of the partial waiver and release forms if required, to the Principal.

(e) Once the Principal has received the checks, the checks shall be signed by an authorized signator of checks for the Principal drawn on the Trust Account, and mailed, along with the partial waiver and release forms if required, to the named payees of the check drawn to pay the invoice.

(f) It is expressly understood by the Principal and the Indemnitors that should the Surety or its representative disapprove any payments requested by the Principal or any check requests by the Principal or refuse to sign any check drawn on the Trust Account, such decision is final as to the Principal and the Indemnitors, and the Principal and the Indemnitors shall have no right or cause of action of any kind or nature against the Surety, its agents, employees, attorneys or representatives as a result of such disapproval.

(g) In the event that the Contract Funds in the Trust Account are insufficient to cover those payments which have been requested by the Principal and approved by the representative of the Surety, the Surety reserves the right, in its sole option and discretion, to advance monies, loan monies or otherwise fund the Principal or the Trust Account. Any such advances to, loans to or funding of the Principal or the Trust Account by the Surety shall be at the written request of the Principal, and signed by a representative of the Principal. In the event that the Surety advances to, loans to or otherwise funds the Principal or the Trust Account at the request of the Principal:

(i)    Any such advances to, loans to or funding of the Principal or the Trust Account by the Surety shall be conclusively presumed to be a loss to the Surety, notwithstanding the use or misuse of such advances or loans by the Principal, for which the Principal and the

Indemnitors shall be obligated to indemnify the Surety in accordance with the terms of the Agreement of Indemnity and this Agreement;

(ii)    All monies advanced to, loaned to or otherwise used to fund the Principal or the Trust Account by the Surety shall constitute and be deemed trust funds in accordance with the terms of this Agreement; and

(iii)    Any such advances to, loans to or funding of the Principal or the Trust Account by the Surety shall also be deemed to be a payment by the Surety under its Bonds for which interest shall run in accordance with the provisions of this Agreement.

(iv)    In the event that the Surety refuses to advance monies, loan monies or otherwise fund the Principal or the Trust Account, the Surety may, in its sole discretion, send only such checks drawn on the Trust Account to the payees as the Surety deems necessary and expedient under the circumstances.

(h)    On a bi-weekly basis, the Principal shall provide to the representative of the Surety for approval the payroll for the Bonded Contracts bonded by the Surety for the Principal (the "Payroll"), broken down by Bonded Contract, including the net pay for each employee, taxes to be withheld, and all other deductions. In the event that there are sufficient Contract Funds in the Trust Account, upon the approval by the Surety of the Payroll of the Principal, the Principal and the Surety shall take all steps necessary to fund the presently existing payroll account of the Principal from the Trust Account. It shall be the responsibility of the Principal, through its payroll company, to present the net Payroll checks to its employees directly rather than through the representative of the Surety.

(i)    Payment of all withholding and payroll taxes and other amounts deducted from employee wages under the Bonded Contracts from the date of this Agreement forward shall be made on a priority basis directly from the existing payroll account of the Principal or by the Principal's payroll company to the appropriate payee(s) for all withholding and payroll taxes and other normal payroll burden expenses. It shall be the responsibility of the Principal, within the time limits of all appropriate statutes and regulations, to prepare and pay all such taxes and other deductions from the Payroll, from the existing payroll account of the Principal to the appropriate payee(s) or with an appropriate deposit slip to the correct account to receive the appropriate check(s). Surety agrees to and HRGM hereby consents to Surety's right to obtain from HRGM's payroll company information, documentation or certification that the net pay for each employee, taxes to be withheld, and all other deductions have been paid.

5.    The Surety and the representative(s) of the Surety shall incur no liability to the Principal or to any other person in connection with the due discharge of their duties under this Agreement.

V.    **Miscellaneous Provisions**

1.      This Agreement shall be construed and governed by the laws of the State of Maryland and shall bind the heirs, personal representatives, assignees and successors in interests of the parties hereto.

2.      The Principal, the Indemnitors and the Surety hereby represent, covenant and warrant that they have full right, power and authority, uninhibited by contract or otherwise, to execute and perform this Agreement, that the Principal and the Surety have been duly authorized by all proper and necessary corporate action, and that all consents and approvals of stockholders or of any public authority or regulatory body required as a condition to the validity or enforceability of this Agreement against the Principal and the Surety have been obtained. Furthermore, the Principal, the Indemnitors and the Surety hereby represent, covenant and warrant that the execution of this Agreement and the full performance of this Agreement will not result in the breach of or default under any agreement to which they may be a party.

3.      THE PRINCIPAL AND THE INDEMNITORS HEREBY ACKNOWLEDGE AND AGREE THAT, EXCEPT AS PROVIDED HEREIN, THE SURETY HAS NO OBLIGATION TO FUND THE TRUST ACCOUNT, PROVIDE FINANCIAL ASSISTANCE TO THE PRINCIPAL IN ANY MANNER OR METHOD, OR MAKE ANY PAYMENTS OTHER THAN THOSE PAYMENTS FOR WHICH THE SURETY HAS SPECIFICALLY AGREED TO MAKE PURSUANT TO THE TERMS OF THIS AGREEMENT. THE PRINCIPAL AND THE INDEMNITORS SPECIFICALLY ACKNOWLEDGE AND AGREE THAT THEIR EXECUTION OF THIS AGREEMENT HAS NOT BEEN INDUCED BY OR MADE IN RELIANCE UPON ANY ORAL OR WRITTEN REPRESENTATIONS BY THE SURETY OR ITS AGENTS, EMPLOYEES, ATTORNEYS OR CONSULTANTS THAT THE SURETY WILL FUND THE TRUST ACCOUNT OR PROVIDE ANY FINANCIAL ASSISTANCE TO THE PRINCIPAL EXCEPT AS PROVIDED HEREIN. IN THE EVENT THAT THE SURETY AGREES TO FUND THE TRUST ACCOUNT, PROVIDE FINANCIAL ASSISTANCE TO THE PRINCIPAL IN ANY MANNER OR METHOD, OR MAKE ANY PAYMENTS OTHER THAN THOSE PAYMENTS FOR WHICH THE SURETY HAS SPECIFICALLY AGREED TO MAKE PURSUANT TO THE TERMS OF THIS AGREEMENT, SAID ACTION SHALL BE IN THE SOLE JUDGMENT, OPTION AND DISCRETION OF THE SURETY AND IN THE BEST INTERESTS OF THE SURETY AND NOT THE PRINCIPAL OR THE INDEMNITORS. FURTHERMORE, THE SURETY'S AGREEMENT TO TAKE ANY SUCH ACTION DOES NOT BIND AND COMMIT THE SURETY TO ANY OTHER FUNDING OF THE TRUST ACCOUNT, PROVIDING OF FINANCIAL ASSISTANCE, OR MAKING OF ANY PAYMENTS OTHER THAN THOSE PAYMENTS FOR WHICH THE SURETY HAS SPECIFICALLY AGREED TO MAKE PURSUANT TO THE TERMS OF THIS AGREEMENT.

4.      THE EXECUTION OF THIS AGREEMENT BY THE SURETY IN NO MANNER BINDS THE SURETY TO EXECUTE ANY FUTURE BOND OR BONDS ON BEHALF OF THE PRINCIPAL.   THE PRINCIPAL AND THE INDEMNITORS SPECIFICALLY ACKNOWLEDGE AND AGREE THAT THEIR EXECUTION OF THIS AGREEMENT HAS NOT BEEN INDUCED BY OR MADE IN RELIANCE UPON ANY ORAL OR WRITTEN REPRESENTATIONS BY THE SURETY OR ITS AGENTS, EMPLOYEES, ATTORNEYS OR CONSULTANTS THAT THE SURETY WILL EXECUTE ANY FUTURE BOND OR BONDS ON BEHALF OF THE PRINCIPAL. IN THE EVENT THAT THE SURETY

JOINT CONTROL TRUST ACCOUNT AGREEMENT  - Page 12

EXECUTES ANY FUTURE BOND OR BONDS ON BEHALF OF THE PRINCIPAL, ANY SUCH BOND SHALL BE DEEMED INCLUDED IN THE LIST OF BONDED CONTRACTS, PROJECTS AND BONDS ATTACHED HERETO AS **EXHIBIT 2** AND SHALL BE SUBJECT TO THE TERMS AND PROVISIONS OF THIS AGREEMENT. THE EXECUTION OF BONDS BY THE SURETY FOR THE PRINCIPAL WHILE THIS AGREEMENT IS IN EFFECT SHALL BE IN THE SOLE JUDGMENT, OPTION AND DISCRETION OF THE SURETY, PURSUANT TO ITS UNDERWRITING POLICIES AND PROCEDURES, AND SHALL BE IN THE BEST INTERESTS OF THE SURETY AND NOT THE PRINCIPAL. THE AGREEMENT BY THE SURETY TO EXECUTE ANY ONE BOND IN ACCORDANCE WITH THIS PARAGRAPH DOES NOT BIND AND COMMIT THE SURETY TO EXECUTE ANY OTHER BOND OR BONDS AT THE REQUEST OF THE PRINCIPAL.

5.      The Principal shall maintain accurate books, records and accounts showing clearly, among other things, the itemized receipts and disbursements allocable to the Bonded Contracts. The books, records and accounts shall be available for examination by the Surety and its representatives at the Principal's principal office at all times during regular business hours. The Surety is entitled to receive copies of all bank account records of any and all accounts of the Principal, including but not limited to the Trust Account, of any kind or nature, including canceled checks, bank statements, deposit slips, debit memos, etc.

6.      The Principal hereby authorizes the Surety and its representative(s), including attorneys, accountants, consultants or employees, to visit at any time the job site of the Bonded Contracts, to obtain at any time access to all job records and personnel of the Principal to determine the status of the progress on the Bonded Contracts, and to obtain at any time any and all other information and documentation with respect to the Bonded Contracts deemed necessary in the sole discretion of the Surety and/or its representative(s).

7.      The Principal agrees to use all reasonable efforts to complete the Bonded Contracts on a timely basis.

8.      It is further agreed that this Agreement is solely for the benefit of the parties hereto and shall not create any rights in any person not a party hereto, or in any way increase the rights of third persons, or increase the obligations of any party hereto to any third person, or increase the liability or obligations of the Surety under its Bonds.

9.      The terms and provisions of the Agreement of Indemnity shall remain in full force and effect, subject to the agreement to forbear set forth in Section II. Nothing contained in this Agreement shall in any way prejudice or waive the legal and equitable rights of subrogation of the Surety. Subject to the agreement to forebear set forth in Section II, the rights of the Surety under this Agreement are in addition to, and not in lieu of, any of the rights which the Surety may have against the Principal or any other parties, including the Indemnitors, at law, in equity or by the terms of any other agreement, including the Agreement of Indemnity. All rights of the Surety pursuant to the Agreement of Indemnity and this Agreement shall inure to the benefit of the Surety, its co-sureties, if any, and its and their reinsurers.

10.      HRGM and the Indemnitors, for themselves, their heirs, successors, executors and

assigns do hereby waive and forever relinquish, and they do hereby release the Surety, its parent, affiliates and subsidiary companies, their officers, directors and employees, their agents and any professionals employed by it in connection with any of the matters set forth herein, or with respect to the Indemnity Agreements or any of the Bonds, from, any and all claims and causes of action which they now have, whether known or unknown, including, but not limited to, claims of fraud, fraud in the inducement, extortion, tortious or contractual interference, domination, lender liability or the like or any breach of any alleged obligation of Surety, its parent, affiliates and subsidiary companies to issue bonds on behalf of or to otherwise act toward or for the benefit of HRGM or Indemnitors.

11.     The Principal agrees to provide its full and complete cooperation to the Surety in any and all future litigation involving the Bonded Contracts and the Bonds.

12.     It is agreed and understood by the Principal, the Indemnitors and the Surety that there have been no oral or other agreements of any kind whatsoever as a condition precedent or to induce the execution and delivery of this Agreement by any party hereto. It is further agreed that no change, addition or amendment shall be made herein or to any of the terms, covenants or conditions hereto except by writing, signed by the parties to this Agreement.

13.     In the event that one or more provisions of this Agreement shall be declared to be invalid, illegal or unenforceable in any respect, unless such invalidity, illegality or unenforceability shall be tantamount to a failure of consideration, the validity, legality and enforceability of the remaining provisions contained in this Agreement shall not in any way be affected or impaired thereby.

14.     Except as otherwise specifically provided herein, or as specifically and subsequently agreed to by the parties in writing, all notices, requests or other communications required or permitted to be given hereunder shall be deemed duly given if mailed by Federal Express overnight delivery service or another nationally recognized same day or overnight delivery service, and addressed as follows:

<u>To the Principal and the Indemnitors:</u>

HRGM Corporation
2020 Shannon Place, SE
Washington, D.C. 20020
Attention: Ramesh Butani

Ramesh Butani
1205 South Huntress Court
McLean, VA 22102

Hansa Butani
1205 South Huntress Court
McLean, VA 22102

<u>With a Copy to:</u>

Holland & Knight LLP
2099 Pennsylvania Avenue, N.W., Suite 100
Washington, D.C. 20006
Attention: Craig Holman, Esquire

<u>To the Surety:</u>

Atlantic Mutual Insurance Company
Administrative Center
Three Giralda Farms
Madison, NJ  07940 1004
Attention: Michael J. Hurley, Esquire

<u>With a copy to:</u>

Niles, Barton & Wilmer, LLP
111 S. Calvert Street, Suite 1400
Baltimore, Maryland 21202
Attention: David D. Gilliss, Esquire

Any such notice shall be deemed to have been received by the recipient on the next business day following the day it was mailed.

15.    It is further understood and agreed by the Principal and the Indemnitors that this Agreement shall be construed without any regard to any presumption or other rule requiring construction against the party causing this Agreement, or any Exhibits attached to this Agreement, to be drafted.

16.    This Agreement may be executed in one or more counterparts, each of which shall be deemed to be an original.

IN WITNESS WHEREOF, the parties have executed this Agreement on the date indicated above, and each of the undersigned personally represent and warrant that they have the full right, power and authority to execute this Agreement on behalf of the respective parties.

(Signature page to follow on next page)

ATTEST/WITNESS

_____

_____

_____


_____

PRINCIPAL

_____
By:  Ramesh Butani, President

INDEMNITORS

_____
Ramesh Butani

_____  10/25/04
Hansa Butani

SURETY

_____
By: Michael J. Hurley, Esquire
    Assistant Vice President – Surety Claims


# 2344672_v2

## Exhibit 2

### LIST OF THE BONDED CONTRACTS, PROJECTS AND BONDS

Attached hereto and incorporated herein by reference as **Exhibit 2, Attachment A** is a list of all or substantially all of the Bonded Contracts, Projects and Bonds entered into by the Principal for which the Surety executed Performance Bonds, Labor and/or Material Payment Bonds, also listed, on behalf of the Principal.

The fact that any bonded contract(s), project(s) and/or bond(s) have been left off of or inadvertently omitted from the list attached as Attachment A does not absolve the signers of the Agreement from any liability for any losses paid by the Surety as described in the Agreement for any such bonded contract(s), project(s) and/or bond(s), and the signers of the Agreement agree to be bound to the Surety for each such bonded contract(s), project(s) and/or bond(s) as if it or they had been included in the list attached as Attachment A. It is the intent of Exhibit 2 and Attachment A to include all of the bonded contract(s), project(s) and/or bond(s) that involve Surety.

Furthermore, in the event that the Principal should, now or in the future, enter into any contract(s) and/or project(s) for which the Surety should execute any bond(s) for any reason whatsoever, it is the intention of the parties to the Agreement that such future contract(s), project(s) and/or bond(s) shall be deemed to be included in Attachment A to Exhibit 2, whether listed or not, as if said contract(s), project(s) and/or bond(s) had, in fact, been listed in Attachment A to Exhibit 2, and said future contract(s), project(s) and/or bond(s) shall be included within the terms of the Agreement between the parties.

**Exhibit 2, Attachment A**

USACE Retaining Walls      (Bond No.:   447-390154)

Berwyn Heights Elementary (Bond No.: 447-390166)

Blue Plains Water      (Bond No.: 447-410462)

DC Housing Authority (Atlantic)*    (Bond No.: 447-410455)

Engine 20 Firehouse (Bond No. 447-410459)

Glen Haven Elementary (Bond No. 447-410458)

McKinley Roof ( Bond No. 447-410470)

NEVIS (Bond No.: 447-410465)

Oakland  Terrace Elementary (Bond No. 447-410453)

Patuxent Fuel Farm

Reeves Center Restroom  (Bond No.447-410478)

Reeves Center Windows (Bond No.447-410464)

Sully Police Station (Bond No. 447-390165)

Wm. Tyler Page Elementary (Bond No. 447-410452)

Taft Window Replacement


\*  Atlantic is aware that Selective supplied a bond for a related DC Housing Authority
project and nothing herein shall be construed as assigning to Atlantic any Contract Funds
which may be due to Selective on the DC Housing Authority Bonded Contract.

**Exhibit 3**

**LIST OF COLLATERAL**

As Collateral for this Agreement and the Agreement of Indemnity executed by the Principal and the Indemnitors, the Principal and the Indemnitors grant, convey and assign to the Surety a lien on the real property more fully described below and a security interest in all of the personal property more fully described below.

1.    All of the collateral pledged by the Principal in the Agreement of Indemnity, including but not limited to Section 12 of the Agreement of Indemnity, to secure Principal's obligations under the Agreement of Indemnity, and by all of the monies of the Trust Account set forth in the Agreement;

2.    Lot 1027, Square 5771 - 2021 Shannon Place, S.E., Washington, D.C. 20020;

3.    Lot 1026, Square 5771 - 2021 Shannon Place, S.E., Washington, D.C. 20020;

4.    700 New Hampshire Ave., N.W., Unit 615, Washington, D.C. 20037;

5.    Condominium, 3819 South George Mason Drive, Falls Church, Virginia;

6.    Tyco Park Warehouse, Unit 23 Tyco Park, Fairfax County, Virginia;

7.    4445 B Brookfield Corporate Drive, Chantilly, Virginia;

8.    Fidelity Account of Annuity (Account No.GP10001116 valued at $359,152.61); and

9.    Harborside Atlantis Vacation Timeshare in Paradise Island, Bahamas.

The Surety shall have all of the rights and remedies of a secured party under the Uniform Commercial Code in effect in the state in which the personal property is located.

The Collateral shall be properly insured by the Principal and the Indemnitors until the Surety's security interest and lien rights are terminated. Such policies shall be payable to the Surety and the Principal and/or the Indemnitors or others as their interests may appear. The Principal and the Indemnitors shall furnish the Surety with certificates or other evidence satisfactory to the Surety in compliance with the foregoing insurance provisions.

The Principal and the Indemnitors shall execute alone or with the Surety any financing statement required by the Uniform Commercial Code and necessary to perfect the security interest in any of the Collateral described herein.

The Surety may, at any reasonable time, enter upon the premises of the Principal and/or the Indemnitors to inspect the Collateral and the books and records of the Principal and the Indemnitors pertaining to the Collateral or its proceeds, and the Principal and the Indemnitors shall assist the Surety in making such an inspection.

The rights of the Surety against the Collateral shall be governed by the terms of the Agreement to which this Exhibit 3 is attached. The Surety may delay or refrain from exercising any past, present or future right or remedy hereunder without waiving any such right or remedy, and no waiver by the Surety of any default shall operate as a waiver of any other default or the same default on a future occasion.

All of the rights of the Surety hereunder shall inure to the benefit of its successors and assigns.

ATTEST/WITNESS

PRINCIPAL

By: Ramesh Butani, President

ATTEST/WITNESS

INDEMNITORS

Ramesh Butani

Hansa Butani

ATTEST/WITNESS

SURETY

By: Michael J. Hurley, Esquire,
    Assistant Vice President–    Surety Claims

LIST OF COLLATERAL - Page   2

**Exhibit 4**
**[Example]**

## VOLUNTARY LETTER OF DEFAULT AND TERMINATION

[Principal's Letterhead]

[Date]

To:    Obligee

_____

_____

_____

RE: Principal:        HRGM Corporation
Obligee:
Bonded Contract & Project:    _____
Bond No.:                     _____
Surety:                  Atlantic Mutual Insurance Company

To Whom It May Concern:

    This is to advise you that the Principal, HRGM Corporation, the contractor on the above-referenced construction Project, is financially unable to perform or complete the performance of the work or comply with its contractual obligations on the above Project, and is in default under the above Bonded Contract for the Project. Therefore, the Principal hereby irrevocably and voluntarily abandons and terminates the above construction Bonded Contract effective upon your receipt of this letter. The Surety for the Principal, Atlantic Mutual Insurance Company, will be in contact with you within a short period of time to discuss this matter.

Very truly yours,

_____

HRGM Corporation

By: Ramesh Butani, President

c.c. Surety

**Exhibit 5**
**[Example]**

**LETTER OF DIRECTION**

[Principal's Letterhead]

[Date]

To:     Obligee

_____

_____

_____

RE: Principal:        HRGM Corporation
Obligee:
Bonded Contract & Project:     _____
Bond No.:                                  _____
Surety:                        Atlantic Mutual Insurance Company

To Whom It May Concern:

      This is to advise you that the Principal, HRGM Corporation, hereby irrevocably requests that any and all payments due or to become due of any kind or nature on account of the above described Bonded Contract and Project be made payable jointly to the Principal and Atlantic Mutual Insurance Company, which is the Surety on the Performance Bond and the Labor and Material Payment Bond for the above Project. All such joint check payments should be forwarded directly to:

Atlantic Mutual Insurance Company
Administrative Center
Three Giralda Farms
      Madison, NJ  07940 1004
Attention: Michael J. Hurley, Esquire

Please be advised that the Surety agrees to this arrangement. Furthermore, there will be no modification or change in these instructions without the written authorization and express consent of the Surety.

Very truly yours,

_____

HRGM Corporation
By: Ramesh Butani, President


c.c. Surety

## Exhibit 6

## Power of Attorney

KNOW ALL MEN BY THESE PRESENTS THAT, HRGM Corporation (hereinafter referred to as the "Principal") does constitute and appoint Atlantic Mutual Insurance Company (the "Surety"), and its representatives, their successors and assigns, its true and lawful attorney-in-fact, for it and in its name to receive, endorse and collect any and all checks and drafts or other forms of remittance payable to the Principal, and issued in payment of money earned or to be earned, or to become due and payable under the Bonded Contracts described in the list attached hereto as **Exhibit 2**, including all retained percentages, estimates, final payments, any other monies now due or which may become due in payment for work performed and materials furnished under the Bonded Contracts described in **Exhibit 2**, and all other Contract Funds as defined in a Joint Control Trust Account Agreement between the Principal, the Surety and others dated October 25, 2004 (the "Agreement"), which may require endorsement for deposit and collection. This Power of Attorney shall give the Surety the right to endorse any such checks or drafts on behalf of the Principal solely and only for the purpose of depositing said checks or drafts in the Trust Account more fully described in the Agreement.

The Principal does hereby authorize and empower its said attorney-in-fact, or any of them, to give full discharge and acquittance for the same and hereby ratifies and confirms all that lawfully may be done by virtue of this Power of Attorney. This Power of Attorney is coupled with an interest and is irrevocable. The Principal hereby revokes any and all previous Powers of Attorney executed in reference to the disposition of the proceeds of the Bonded Contracts described in **Exhibit 2** of the Agreement.

IN WITNESS WHEREOF, the Principal has caused this instrument to be executed and sealed by its duly authorized officers this ___25th___ day of October, 2004.

| ATTEST/WITNESS | PRINCIPAL |
|---|---|
| *[signature]* | *[signature]* |
| | By: Ramesh Butani, President |

STATE OF _MARYLAND_ , COUNTY OF _City_ _Baltimore_ , to wit:

I HEREBY CERTIFY that on this _25th_ day of ~~June~~ _October_, 2004, before me, the subscriber, a Notary Public of the State of _Maryland_ , personally appeared _RAMESH BUTANI_ the President of HRGM Corporation, who is personally known to me; who, being duly sworn, did depose and say that he is the President of HRGM Corporation, the corporation described in and which executed this Power of Attorney; and that he has been duly authorized by all proper and necessary corporate actions to execute this Power of Attorney.

AS WITNESS, my hand and Notarial Seal.

_Janice D Hughlett_
Notary Public

NOTARY
PUBLIC
JANICE D. HUGHLETT
BALTIMORE CITY, MD

MY COMMISSION EXPIRES:
APRIL 1, 2005

# NILES, BARTON & WILMER, LLP

**ATTORNEYS AT LAW**

TELEPHONE 410-783-6300

FACSIMILE 410-783-6363

SUITE 1400

JII S. CALVERT STREET

BALTIMORE, MARYLAND 21202-6185

WEBSITE www.niles-law.com

WRITER'S DIRECT CONTACT

Phone: (410) 783-6384
Fax: (410) 783-6363
E-Mail: ddgilliss@niles-law.com

January 23, 2007

**VIA FEDERAL EXPRESS**
Craig Holman, Esquire
Holland & Knight LLP
2099 Pennsylvania Ave., NW
Suite 100
Washington, D.C. 20006

**VIA FEDERAL EXPRESS**
Mr. Ramesh Butani
1205 South Huntress Court
McLean, Virginia 22102

**VIA FEDERAL EXPRESS**
Mr. Ramesh Butani
President
HRGM Corporation
2020 Shannon Place, SE
Washington, D.C. 20020

**VIA FEDERAL EXPRESS**
Mrs. Hansa Butani
1205 South Huntress Court
McLean, Virginia 22102

Re:    HRGM Corporation's Indemnity Obligations

Dear Mr. Holman:

I am in receipt of your letter of January 22, 2007.  My client, Atlantic Mutual Insurance Company ("Atlantic"), has asked me to respond.

With regard to the issues you raised regarding timing and Atlantic Mutual's January 18, 2007 Notice of Default, Atlantic understands HRGM's position.  Consequently, this letter shall serve as a ten (10) day notice to HRGM and Ramesh Butani and Hansa Butani, the Indemnitors, to cure the default on repayment discussed in Atlantic's letter of January 18, 2007.  Should HRGM and/or the indemnitors fail to cure the repayment default by February 7, 2007, Atlantic reserves the right to initiate all appropriate actions to protect its interests.  In addition, this letter also confirms that, as Michael J. Hurley is no longer employed by Atlantic, the point of contact for future correspondence regarding this matter is Nancy Manno.

Your letter seeks assurances from Atlantic that it will not take any action against the Exhibit 3 collateral or the Fidelity Annuity account until such time that a determination as to the total repayment amount is made.  If, as you represent, HRGM and the indemnitors truly "want nothing more than to resolve this dispute," then HRGM and the indemnitors must

Craig Holman, Esquire
January 23, 2007
Page 2


negotiate with Atlantic in good faith and work with Atlantic to come to terms with the significant losses and expenses that Atlantic has incurred. Atlantic has repeatedly advised HRGM and the indemnitors of its total repayment number and has offered, in the nature of settlement and without prejudice, to compromise that repayment number. Yet, HRGM continues to assert that it is only obligated to repay to Atlantic $699,893.64, without any good faith counter-offer to Atlantic's repayment number.[1]  For instance, and this is just one example, Atlantic incurred engineering consulting fees. HRGM refuses to reimburse Atlantic for any portion of those fees. That is simply unacceptable and it is contrary to the indemnitors' contractual obligations. However, in an attempt to further demonstrate Atlantic's own good faith, Atlantic agrees to forbear from executing on the collateral for thirty (30) days, provided that HRGM, in good faith, demonstrates its willingness to work with Atlantic to fashion a resolution to Atlantic's indemnity demand. Simply meeting with Atlantic while refusing to negotiate in good faith will not suffice. This agreement to forbear in no way restricts Atlantic's ability to take other appropriate action to protect its contractual and equitable rights.

Please let me know whether HRGM and the indemnitors plan to make a reasoned settlement offer that evidences HRGM's good faith intentions to negotiate a full resolution of this matter. Atlantic must hear from you in writing by Monday, January 29, 2007 as to whether HRGM and the indemnitors will make a good faith offer of settlement. If that is your client's intention, then Atlantic will forbear for thirty (30) days from executing on the collateral and will permit a continuation of the discussions between the parties. Until such time that this matter is fully resolved, Atlantic continues to reserve all rights and remedies available to it, both in equity and at law.

Sincerely,

David D. Gilliss


DDG/bws

---

[1] You continue to assert, as HRGM has asserted in the past, that Atlantic "has refused to permit an accounting to support" its repayment figure. However, on numerous occasions (most recently in my letter of December 29, 2006), Atlantic has offered to make its books and records available for HRGM's review. HRGM has never availed itself of Atlantic's offer. Further, despite Atlantic's request that HRGM provide current appraisals of the Exhibit 3 collateral so that Atlantic may determine its value, HRGM has yet to provide such appraisals.